Nicholas A. Kampars, OSB No. 063870
nick.kampars@wildwoodlaw.com
WILDWOOD LAW GROUP LLC
3519 NE 15th Avenue, Suite 362
Portland, OR 97212
Phone: (503) 564-3049

Jacob A. Walker (*pro hac vice* motion forthcoming)
jake@blockleviton.com
BLOCK & LEVITON LLP
260 Franklin Street, Suite 1860
Boston, MA 02110
Phone: (617) 398-5600

*Attorneys for Plaintiff Scott Sigman*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| SCOTT SIGMAN, | Case No.: |
| Plaintiff, | |
| v. | CLASS ACTION ALLEGATION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS (15 U.S.C. §§ 78j(b) and 78t(a)) |
| NUSCALE POWER CORPORATION, JOHN L. HOPKINS, CHRIS COLBERT, ROBERT R. HAMADY, and CLAYTON SCOTT, | DEMAND FOR JURY TRIAL |
| Defendant(s). | |

Plaintiff Scott Sigman ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to himself and upon information and belief as to all other matters, based on the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission ("SEC"), news reports, press releases issued by Defendants, and other publicly available documents:

## INTRODUCTION

1.      Plaintiff brings claims against all Defendants for violating Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated by the SEC, 17 C.F.R. § 240.10b-5, on behalf of the class of persons and entities ("Class") that purchased or otherwise acquired the securities of NuScale Power Corporation ("NuScale" or "Company") between March 15, 2023 and November 8, 2023 ("Class Period").

2.      NuScale is a nuclear power company that develops small modular reactor ("SMR") technology. It claims that its SMRs will "deliver safe, scalable, cost-effective and reliable carbon-free power." NuScale has not yet commercialized any SMRs.

3.      On the morning of October 19, 2023, Iceberg Research issued a research report ("Iceberg Report") that contradicted NuScale's claims that it could fulfill two large contracts: (1) a contract with the Utah Associated Municipal Power Systems ("UAMPS") for its Carbon Free Power Project ("CFPP"), and (2) a contract with Standard Power, a company providing data center services for businesses focusing on blockchain mining and high performance computing applications.

4.      On October 19, 2023, the Company's share price fell $0.61 per share, or 12.0%, to close at $4.46 per share, on unusually high trading volume.

5.      On October 20, 2023, the Company's share price continued to fall another $0.67 per share, or 14.9%, to close at $3.80 per share, on unusually high trading volume.

6.      On November 8, 2023, after the market closed, NuScale and UAMPS announced that they had mutually agreed to terminate the CFPP contract because they had failed to engage enough subscribers.

7.      On this news, the Company's share price fell $1.02 per share, or 32.9%, to close at $2.08 per share on November 9, 2023, on unusually high trading volume.

8.      Throughout the Class Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Defendants misled investors by failing to disclose that (1) because of the effect of inflationary pressures on the cost of construction and power, the Company and UAMPS would be unable to sign up enough subscribers to fulfill the CFPP; (2) Standard Power did not have the financial ability to support its agreement with NuScale; and (3) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Defendants' wrongful acts also arose in and emanated from, in part, this District, including the dissemination of materially misleading statements into this District and the purchase of the Company's securities by members of the Class who reside in this District. Additionally, the Company's principal offices are located in this District and Division.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### I.    Plaintiff

13.     Plaintiff Scott Sigman, as set forth in the accompanying certification, incorporated by reference herein, purchased NuScale securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### II.    Defendants

14.     Defendant NuScale is incorporated under the laws of Delaware with principal offices located in Portland, Oregon. NuScale's common stock and warrants trade on the New York Stock Exchange under the symbol "SMR."

15.     Defendant John L. Hopkins was the Company's Chief Executive Officer at all relevant times.

16.     Defendant Chris Colbert was the Company's Chief Financial Officer until August 7, 2023.

17.     Defendant Robert R. Hamady has served as the Company's Chief Financial Officer since August 7, 2023.

18.     Defendant Clayton Scott served as the Company's Executive Vice President of Business Development until August 7, 2023, when he was promoted to Chief Commercial Officer.

19.     Defendants Hopkins, Colbert, Hamady, and Scott (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC; press releases; and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## BACKGROUND

20.     NuScale was founded in 2007 with the mission to "improve the quality of life for humankind by advancing nuclear power." It aims to change nuclear power by developing SMRs, which have lower power capacities and, by extension, lower costs than conventional nuclear reactors. NuScale developed the NuScale Power Module ("NPM"), its core SMR technology that

can generate 77 million watts of electric power ("MWe"). Its power plant design, the VOYGR, can accommodate up to 12 NPMs for a total maximum gross output of 924 MWe.

**I.    Background of NuScale's Agreement with UAMPS**

21.    UAMPS was NuScale's first customer. On April 9, 2015, NuScale and UAMPS jointly submitted a grant application to the United States Department of Energy ("DOE") for the CFPP. DOE authorized UAMPS to develop the CFPP at the DOE's Idaho National Laboratory site to provide power to UAMPS's members (mainly municipalities in the western United States). Until NuScale and UAMPS terminated their agreement, they contemplated that UAMPS would deploy a VOYGR power plant with six NPMs, for a total of 462 MWe. NuScale told investors that construction would begin in 2025 and that the plant would be operational in 2029. NuScale's contract with UAMPS, under which it would provide support of license applications, startup and testing, initial training, and initial fuel services, was valued at over $9 billion.

22.    Between 2016 and 2020, NuScale projected pricing the power at $55/MWh. In January 2023, however, the price rose to $89/MWh. NuScale attributed the increase to inflationary pressures and rising interest rates.

23.    On February 28, 2023, NuScale and UAMPS amended their agreement. The amendment provided that if UAMPS and NuScale failed to meet their subscription target by February 1, 2024, the agreement would terminate and existing subscribers would be refunded their costs. The subscription target provided that NuScale must engage UAMPS members who would account for 370 MWe, or 80% of the project's capacity. At the time, subscription levels were at 120 MWe, or 26% of total capacity.

II.     **Background of NuScale's Agreement with Standard Power**

24.     With the viability of NuScale's flagship agreement with UAMPS uncertain, the Company pivoted to its even larger agreement with Standard Power. On October 6, 2023, NuScale announce that the digital infrastructure company had agreed to develop two VOYGR power plants in Ohio and Pennsylvania to power nearby data centers. With a projected capacity of 1,848 MWe, the deal's projected value for NuScale was $37 billion. As part of the agreement, NuScale's commercial partner Entra1 would help fund and would develop, manage, own, and operate the SMRs. NuScale announced that Standard Power planned to open the plants by 2029.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS

25.     The Class Period begins on March 15, 2023. On that date, NuScale filed its Form 10-K for the fiscal year ended December 31, 2022, which provided:

> As finalized on March 7, 2023, we entered into Amendment 3 of the DCRA and the Long Lead Material Reimbursement Agreement with CFPP LLC (the "LLM Agreement"), both effective as of February 28, 2023. The LLM Agreement relates to the long-lead materials that are incorporated into the NPMs (the "LLM"). The amended DCRA changed the Company's potential refund obligations to UAMPS described above, if at specified times in the development of the CFPP, the estimated cost of electricity (based on increasingly accurate project cost estimates at various stages of development) exceeds an agreed target cost of $89.00/megawatt-hour (subject to adjustment as specified in the DCRA). ***In addition, the Company may be obligated to refund to UAMPS a percentage of its net development costs if CFPP does not secure a total of 370 MWe of committed subscription obligation (the committed level of subscription as of February 28, 2023 was 120 MWe)***.

26.     The Company also held an earnings call with investors on March 15, 2023. During the call, an investor asked "what level of confidence" the Company had that it could reach the 80% subscription level to avoid termination of the UAMPS contract and reimbursement of members' costs. Colbert replied:

> So I think you got it very well, Marc, so good on reading the report and following through that. But what you stated is actively correct, that would go from 25% to 80%. We'd be liable for potentially reimbursement if they chose to terminate for

failure to reach that point. ***In terms of our confidence of gain at that point, we are working with UAMPS in the carbon-free power project to bring in that additional subscription. And we'll be monitoring that throughout the year as we move forward with them.***

***The news is that as you saw with them coming forward with 26 or 27 members voting to move forward with the project earlier this year at the $89 per megawatt hour price, that's very much indicative of a market that's changing and tightening in that area. And depending upon those factors going forward, we think that will continue in the Western region***, particularly as coal plants continue to retire at a faster pace than expected, as we see people looking to get benefit from the Inflation Reduction Act we're making investments now as opposed to later on.

27.    On May 9, 2023, the Company filed a Form 10-Q with the SEC for the quarterly period ended March 31, 2023. On the same day, NuScale held an earnings call with investors, at which Hopkins stated:

As we have discussed, NuScale and UAMPS are targeting 80% subscription for the CFPP by year-end 2023. ***We are working closely with UAMPS on securing additional subscriptions and believe this can be generated through a combination of existing CFPP participants, increasing their subscription levels, UAMPS members who are not currently CFPP participants signing on to the project, and additional Western public power entities, investor-owned utilities and industrials. UAMPS' members and other public power entities in the Western U.S. are facing the rapid retirement of coal plants and the expense and the challenge of accessing natural gas. These issues highlight their need to add capacity and dispatchable load growth to complement renewable resources.*** The facts on the ground will be reflected in the integrated resource plans.

28.    During the same call, an investor asked, "John, you had hit a little bit on it in your prepared remarks, but can we get a little more color on how the conversations are progressing with some of those entities to hit that committed subscription level in the CFPP?" Hopkins replied:

***It's going quite well***. What we're looking at is members that can up their subscription from what they currently have. We're in discussions also with certain industrials that don't necessarily want to own a nuclear asset but they certainly want a 24/7 clean energy that will be awarded from our CFPP project. ***So we continue to work with the customer. And so far, the progress is looking pretty good.***

29.    On August 9, 2023, the Company filed a form 10-Q for the quarterly period ended June 30, 2023. On the same day, NuScale held an earnings call with investors, at which Hopkins stated:

> UAMPS is targeting 80% subscription for the project by year-end 2023. They're working to achieve this target in 3 ways. First, existing CFPP participants can increase their subscription levels; second, UAMPS members who are not CFPP participants can sign on to the project; and third, Carbon Free Power Project can bring in additional Western public power utilities, investor-owned utilities, data center operators and industrial customers.
>
> *The expense and challenge of accessing natural gas in the region, the rapid retirement of coal plants and the acute need to add dispatchable power generation to complement renewable resources are primary consideration for CFPP participants. Other UAMPS members and utilities operate in the Western U.S., creating opportunities across all 3 of these groups.*

30.    During the same call, an investor asked, in regard to conversations with potential subscribers to hit the 80% target, "Can you talk to us if there's any more color around how those are going? And then what sort of time line should we be looking for to be getting updates on that?" Hopkins replied:

> *Marc, we continue to make progress on CFPP.* We -- as I commented, they just submitted a limited work authorization to the NRC review just a little early. This will authorize the early start constructions. As it relates to subscriptions, we are working with UAMPS because they are targeting 80% subscription for CFPP by 2023.
>
> And as I mentioned before, we believe there's 3 ways you can get it. Now the existing CFPP participants could increase their subscription levels; we believe they're undersubscribed currently. We can sign UAMPS members that are not participating. And as I mentioned before, there's a lot of discussions we're having right now with Western public utilities that are facing rapid coal retirement or they're looking at the expense of accessing natural gas. So we're working with them. *And as it stands right now -- things could change, but we see that they will continue to be our first customer, where they will get to subscription, we believe the funding will come through, and we're working diligently to make that happen.*
>
> From a timing perspective, we're watching it very closely. We have weekly conversations with our customer at UAMPS. So we're informing each other. We're

trying to speak to each other. This is a near-term deployable project. And our time lines haven't changed. We're still looking at the 2029 COD, 2030 DOD time frame, which I believe is the only project in this country that's going to make that time line.

31.    On October 6, 2023, NuScale filed a press release with the SEC titled "Standard Power Chooses NuScale's Approved SMR Technology and ENTRA1 Energy to Energize Data Centers." The Company filed the press release on a Form 8-K, which Hamady signed. The press release stated:

> Standard Power, a provider of infrastructure as a service to advanced data processing companies, announced plans to develop two small modular reactor (SMR)-powered facilities that will together produce nearly 2GW of clean, carbon free energy and has chosen to work with technology provider NuScale Power Corporation (NuScale) (NYSE: SMR), the only technology provider and producer of SMRs that has obtained U.S. regulatory approval, and ENTRA1 Energy (ENTRA1) an independent global energy development and production company to support Standard Power's two projects.
>
> The facilities will be located in Ohio and Pennsylvania. Standard Power aims to use the carbon-free energy to power nearby data centers. As the technology provider, NuScale will provide its approved NuScale SMR Technology for these projects, the only SMR technology that has received design approval from the United States Nuclear Regulatory Commission – a world-class regulator for nuclear safety . . . .
>
> Based on Standard Power's plans for the two facilities, NuScale will end up providing 24 units of 77 MWe modules producing 1,848 MWe of clean energy from both the Ohio and Pennsylvania sites. The two projects will represent a significant economic boost for their respective communities. Standard Power estimates that each proposed SMR-powered data center project will employ a significant number of skilled workers during the construction period with a focus on union labor. Standard Power will leverage its local community partnerships to advance education programs as well as job creations focusing on local labor.

32.    Also on October 6, 2023, NuScale held a conference call for its Analyst/Investor Day. During the call, Scott stated:

> And today, great news, Standard Power. We've announced this morning that we are going to do 2 plants, 12 modules, 924 megawatts each, one in Ohio, one in Pennsylvania. And this was because of our abilities to put the plant in the locations because of the EPZ, because of the flexibility of the technology, because of our certification with the NRC and because of ENTRA1 being able to work with

Standard Power under the models we described earlier, brought us this solution. ***And the fact that Standard Power, they need the power like last year. These guys are building data centers. They need it now. And they have the demand and matter of fact, they're looking long term at a lot of opportunities. They see the growth, as I said earlier, AI and data centers, it's a tremendous growth pattern for our future.***

So it's a great opportunity. We're excited. ***Now the good thing is, is that this is an immediate situation. We're going to start work right away. Actually, Standard Power has already been working substantially on their existing sites that they're working with. So they're invested. So we'll start immediate work with Standard, and this is an exciting opportunity for the company***. And it's great to be in this building to talk about it, like I said, so we're excited to see this move forward.

33.    The statements identified in ¶¶ 25-32 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants misled investors by failing to disclose that (1) due to the impact of inflationary pressures on the cost of construction and power, the Company and UAMPS would be unable to sign up enough subscribers to fulfill the CFPP; (2) Standard Power did not have the financial ability to support its agreement with NuScale; and (3) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

34.    On October 19, 2023, Iceberg Research published a report titled "NuScale Power ($SMR): A Fake Customer and a Major Contract in Peril Cast Doubt on NuScale's Viability." The Iceberg Report concluded that the contracts with both UAMPS and Standard Power were unlikely to result in any revenue for the Company, albeit for different reasons. As to the UAMPS agreement, the Iceberg Report concluded:

What many have missed is that NuScale has been given till around January 2024 to raise project commitments to 80% or 370 MWe, from the existing 26% or 120 MWe, or risk termination. Crucially, when the participants agreed to this timeline, they were assured refunds for project costs if it were terminated, which creates an

incentive for them to drop out. We are three months to the deadline and subscriptions have not moved an inch.

35.     The Iceberg Report disclosed that not a single additional customer had subscribed

to the CFPP since March 2023:

> NuScale has around three months to the deadline but is nowhere near the 80%. In August 2023, the company told news outlet Power that *"no changes have occurred since March"*. At a September meeting of the Washington City power board, when asked about subscription progress, director Rick Hansen said . . . that *"Not anybody that's able to or willing to sign at this point."* He added. *"We have lots of cheerleaders but not a lot of people that want to jump in the game at this point."* Interested parties want additional mechanisms to de-risk it, according to him. This suggests no one has signed on since March.

36.     As to the Standard Power contract, the Iceberg Report concluded:

> This contract has zero chance of being executed as Standard Power clearly does not have the means to support contracts of this size. Its current CEO Maxim Serezhin has an outstanding $54k tax warrant in New York. Its former managing director Adam Swickle was found guilty of securities fraud in the past. Entra1 — NuScale's commercial partner — is expected to help with the funding. The company was created in 2021 and it is very unlikely to be able to finance even a portion of this contract.

37.     The Iceberg Report debunked the possibility that Standard Power would want or

need 1,848 MWe of power, reporting that:

> In September 2022, the reported data mining capacity of the company was a mere 50 MWe, far below the contracted SMRs total capacity of 1,848 MWe. Adding to the confusion, Standard Power's basic website reveals that *"Planned development at this site (Ohio) include a 40 megawatt blockchain mining operation and a data center with critical capacity of up to 12 megawatts."*

38.     The Iceberg Report also cast doubt on the credibility of Standard Power's

leadership. It disclosed that "CEO Maxim Serezhin has an outstanding $54k tax warrant in New

York, indicating a failure to fulfill his tax obligations" and "Former [managing director] Adam

Swickle has a track record that screams 'investor beware'. He cut his teeth at notorious Wall Street

firms like Stratton Oakmont and Meyers Pollock & Robbins — both infamous for pump-and-dump

schemes and ultimately shuttered due to regulatory crackdowns." Swickle was subject to SEC

scrutiny in 2003 for "setting up a fake foreign exchange trading house and making off with investors' cash," resulting in over $700,000 in monetary penalties.

39.     On this news, the Company's share price fell $0.61 per share, or 12.0%, to close at $4.46 per share on October 19, 2023, on unusually high trading volume. The Company's share price continued to fall another $0.67 per share, or 14.9%, to close at $3.80 per share on October 20, 2023, on unusually high trading volume.

40.     On November 8, 2023, after the market closed, NuScale published a press release on Form 8-K filed with the SEC titled "Utah Associated Municipal Power Systems (UAMPS) and NuScale Power Agree to Terminate the Carbon Free Power Project (CFPP)." The press release cited as the reason for the termination that "Despite significant efforts by both parties to advance the CFPP, it appears unlikely that the project will have enough subscription to continue toward deployment."

41.     On this news, the Company's share price fell $1.02 per share, or 32.9%, to close at $2.08 per share on November 9, 2023, on unusually high trading volume.

## LOSS CAUSATION

42.     Defendants' wrongful conduct directly and proximately caused the losses suffered by Plaintiff and the Class as described in ¶¶ 39 and 41.

43.     During the Class Period, Plaintiff and the Class purchased NuScale securities at artificially inflated prices. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## ADDITIONAL INDICIA OF SCIENTER

44.     Defendants knew that each of the public documents and statements identified above and issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding NuScale's financials, their control over, and/or receipt and/or modification of the Company's materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning NuScale's operations, participated in the fraudulent scheme alleged herein.

## CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities that purchased or otherwise acquired NuScale securities between March 15, 2023 and October 19, 2023, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

46.     The Class is so numerous that joinder of all members is impracticable. Throughout the Class Period, millions of NuScale's shares traded on the NASDAQ. Consequently, the number of Class members is believed to be in the thousands and Class members are likely scattered across the United States.

47.     The precise number of Class members is unknown to Plaintiff at this time but could be determined following discovery as Record owners and other members of the Class may be identified based on documents possessed by NuScale or its transfer agent. Those persons and entities may be notified of the pendency of this action as is typically done in securities class actions.

48.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws. Plaintiff does not have any interests adverse to the Class.

49.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

50.     Common questions of law and fact predominate over questions affecting any individual Class member.  The common questions include:

a.   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of NuScale;

b.   whether Defendants thereby violated the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; and

c.   whether and to what extent Class members have been damaged by Defendants and the proper measure of damages.

51.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for several reasons. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of

conduct for Defendants. Also, adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests. Moreover, damages suffered by individual Class members may be small, making it overly expensive and burdensome for individual Class members to pursue redress on their own and the number of Class members makes joinder impracticable.

52.    There will be no difficulty in the management of this litigation as a class action.

53.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## FRAUD ON THE MARKET

54.    The market for NuScale's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, NuScale's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of NuScale's securities and market information relating to NuScale, and have been damaged thereby.

55.    During the Class Period, the artificial inflation of NuScale's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about NuScale's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of NuScale and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially

inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result. At all relevant times, the market for NuScale securities was an efficient market for the following reasons, among others:

    a.   NuScale shares met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

    b.   As a regulated issuer, NuScale filed periodic public reports with the SEC and/or the New York Stock Exchange;

    c.   NuScale regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

    d.   NuScale was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

56.    As a result of the foregoing, the market for NuScale's securities promptly digested current information regarding NuScale from all publicly available sources and reflected such information in NuScale's share price. Under these circumstances, all purchasers of NuScale's securities during the Class Period suffered similar injury through their purchase of NuScale's securities at artificially inflated prices and a presumption of reliance applies.

57.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

58.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading,

and/or the forward-looking statement was authorized or approved by an executive officer of NuScale who knew that the statement was false when made.

## COUNT ONE

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5

### (Against All Defendants)

59.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.     By reason of the conduct herein alleged, each Defendant named herein violated Section 10(b) of the Exchange Act and Rule 10b-5.

61.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase NuScale's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

62.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NuScale's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

63.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about NuScale's financial well-being and prospects, as specified herein.

64.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NuScale's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about NuScale and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

65.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the

Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

66.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing NuScale's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

67.    As a result of the dissemination of materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of NuScale's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired NuScale's securities during the Class Period at artificially high prices and were damaged thereby.

68.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that NuScale was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their NuScale securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

69.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

70.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

71.    Plaintiff and the Class have sustained damages because they purchased NuScale stock at an inflated price, which declined in value as a result of the corrective disclosures detailed herein.

## COUNT TWO

### Violation of Section 20(a) of the Exchange Act

### (Against the Individual Defendants)

72.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

73.    Individual Defendants acted as controlling persons of NuScale within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's

operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision- making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

75.     As set forth above, NuScale and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants as follows:

      a.     Ordering that this action may be maintained as a class action and certifying Plaintiff as Class representatives and their counsel as Class counsel;

b.  Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damage sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

c.  Awarding pre-judgment and post-judgment interest on any such monetary relief;

d.  Awarding Plaintiff and their counsel reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

e.  Such further relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury.


November 15, 2023

WILDWOOD LAW GROUP LLC

/s/*Nicholas A. Kampars*
Nicholas A. Kampars, OSB No. 063870
3519 NE 15th Avenue, Suite 362
Portland, OR 97212
Phone: (503) 564-3049

BLOCK & LEVITON LLP

Jacob A. Walker, jake@blockleviton.com
(*pro hac vice* motion forthcoming)
260 Franklin Street, Suite 1860
Boston, MA 02110
Phone: (617) 398-5600

*Counsel for Plaintiff Scott Sigman*