IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **SCOTT SIGMAN**, individually and on behalf of all others similarly situated, | Case Nos. 3:23-cv-01689-IM & 3:23-cv-01956-IM |
| Plaintiffs, | **CONSOLIDATED OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| **NUSCALE POWER CORPORATION, JOHN L. HOPKINS, CHRIS COLBERT, ROBERT R. HAMADY**, and **CLAYTON SCOTT,** | |
| Defendants. | |
| *consolidated with* | |
| **JÉRÔME RYCKEWAERT**, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| **NUSCALE INVESTOR GROUP, NUSCALE POWER CORPORATION, JOHN L. HOPKINS, ROBERT R. HAMADY**, and **CLAYTON SCOTT,** | |
| Defendants. | |

Phillip Kim, Laurence M. Rosen, and Daniel Tyre-Karp, The Rosen Law Firm, P.A., 275 Madison Avenue, 40th Floor, New York, NY 10016. Jeffrey S. Ratliff, Ransom, Gilbertson, Martin & Ratliff, LLP, 5441 S Macadam Avenue, Suite 301, Portland, OR 97239. Attorneys for Plaintiffs.

B. John Casey, Alex Van Rysselberghe, Katharine S. Shepherd, and Jacob C. Goldberg, Stoel Rives LLP, 760 SW Ninth Avenue, Suite 3000, Portland, OR 97205. Attorneys for Defendants.

**IMMERGUT, District Judge.**

Lead Plaintiffs[1] bring this consolidated putative class action behalf of all persons and entities that purchased NuScale securities between March 15, 2023, and August 2, 2024 (the "Class Period"). Plaintiffs allege that during the Class Period, Defendant NuScale Power Corporation, a nuclear reactor developer, and several of its corporate executives, John Hopkins, Chris Colbert, Robert Hamady, and Clayton Scott (collectively "Defendants"), made false or misleading statements about the state of NuScale's two projects, in a form submitted to the SEC, and about an SEC inquiry. Plaintiffs allege that, in doing so, Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b–5. Second Amended Complaint, ECF 52.

Defendants move to dismiss Plaintiffs' Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs fail to state a claim for securities fraud under the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Motion to Dismiss Second Amended Class Action Complaint ("Mot."), *Sigman*, ECF 55 at 1–4.

---

[1] On January 31, 2024, this Court consolidated for all further proceedings the already-consolidated cases, Nos. 3:23-cv-01689-IM ("*Sigman*") and 3:23-cv-01956-IM ("*Ryckewaert*"). Order, *Sigman*, ECF 30. *Sigman* was designated as the lead case. *Id.* After the Court's Order on consolidation, Plaintiffs filed the Second Amended Complaint at issue here, ECF 52.

This Court concludes that Plaintiffs fail to sufficiently allege falsity under the heightened pleading standards imposed by Rule 9(b) and the PSLRA. Most of the alleged misstatements about NuScale's two projects are inactionable puffery or forward-looking statements protected by the PSLRA's safe-harbor provision, and Plaintiffs fail to allege that Defendants misled investors by omitting certain facts. Plaintiffs also fail to plead falsity as to the SEC quarterly filings and the SEC inquiry. Accordingly, Defendants' Motion to Dismiss is granted.

## BACKGROUND

The allegations below are based on the Second Amended Complaint and documents incorporated therein by reference. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014). At the motion to dismiss stage, these allegations must be taken as true and construed in the light most favorable to Plaintiffs. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408 (9th Cir. 2020).

### A.  The Parties

Plaintiffs in this case are persons and entities that purchased NuScale securities during the Class Period and claim that, as a result, they were economically damaged. Second Amended Complaint ("SAC"), *Sigman*, ECF 52 ¶ 1.

Defendant NuScale Power Corporation ("NuScale") is a publicly traded Oregon-based nuclear power company that develops small modular reactors ("SMRs"). *Id.* ¶ 2. All of the individual Defendants were NuScale executives during the Class Period. John L. Hopkins was NuScale's Chief Executive Officer throughout the Class Period. *Id.* ¶ 18. Chris Colbert was NuScale's Chief Financial Officer until August 7, 2023. *Id.* ¶ 19. Since August 7, 2023, NuScale's Chief Financial Officer has been Robert R. Hamady. *Id.* ¶ 20. Clayton Scott was NuScale's Executive Vice President of Business Development until August 7, 2023, when he was promoted to Chief Commercial Officer. *Id.* ¶ 21.

**B. The Carbon Free Power Project**

NuScale's first customer was the Utah Associated Municipal Power Systems ("UAMPS"), an association of municipal utilities, public utility districts, and electric cooperatives in the western United States. *Id.* ¶ 35. In 2015, UAMPS retained NuScale to build SMRs and provide power to its members by 2029. *Id.* The project, called the Carbon Free Power Project ("CFPP"), would develop a nuclear power plant made up of with six modular reactors, capable of producing a total of 462 megawatt electric ("MWe"). *Id.*

Between 2016 and 2020, NuScale projected that the price of electricity produced by the CFPP would be around $55 per megawatt-hour ("MWh"). *Id.* ¶ 36. In 2021, NuScale raised its target price to $58/MWh. *Id.* In January 2023, NuScale raised the projected price to $89/MWh, and the project's estimated construction cost likewise rose from $5.3 billion to $9.3 billion. *Id.* ¶ 37. Some members opted out of CFPP when the price rose to $89/MWh, while others elected to remain subscribed. *Id.* ¶¶ 40, 72.

In February 2023, NuScale and UAMPS agreed that UAMPS could terminate its agreement with NuScale if NuScale did not meet a subscription target of 370 MWe—80% of the CFPP's total capacity—by February 1, 2024. *Id.* ¶ 38. At the time the parties made that agreement, the committed subscription level was 120 MWe, or 25% of total capacity. *Id.*

By September 30, 2023, subscriptions remained at 25% of CFPP capacity. *Id.* ¶¶ 38–39. On October 19, 2023, a short seller,[2] Iceberg Research, published a report ("Iceberg Report") about why NuScale's contract with UAMPS was unlikely to result in any revenue. *Id.* ¶ 87. On October 24, 2023, NuScale issued a press release denying all allegations in the Iceberg Report.

---

[2] Short sellers are traders who sell "shares that they have borrowed, hoping that their price will fall before they buy them back and return them to their owner, so that they make a profit." *Short Seller*, Cambridge Business English Dictionary (1st ed. 2011).

*Id.* ¶ 94. In a press release on November 8, 2023, NuScale and UAMPS announced they had

mutually agreed to terminate CFPP. *Id.* ¶ 95.

Plaintiffs allege that Defendants made materially false and/or misleading statements

about the CFPP subscription drive on several earnings calls with investors in March, May, and

August 2023. *Id.* ¶¶ 73, 76, 81. Plaintiffs allege that Defendants misled investors by omitting that

(1) members had opted out of CFPP because the price increased, (2) NuScale's internal

projections exceeded $89/MWh and NuScale concluded it could not reduce prices, and

(3) NuScale had failed to add new subscribers or increase subscription rates. *Id.* The FAC does

not state any specific dates when these alleged facts occurred.

**C.  The Standard Power Project**

NuScale's second planned project was with Standard Power, a company that provides

data center services for blockchain-mining and high-performance computing companies. *Id.* ¶ 3.

On October 6, 2023, NuScale issued a press release announcing plans to develop two power

plants for Standard Power in Ohio and Pennsylvania. *Id.* ¶¶ 49, 82. The two plants had a

projected capacity of 1,848 MWe, and the value of the deal for NuScale was $37 billion. *Id.* ¶ 49.

As part of the deal, NuScale's commercial partner ENTRA1 would help fund the project and

develop, manage, own, and operate the SMRs. *Id.* The project was planned to be completed by

2029. *Id.*

On the same day as the press release, NuScale held a conference call for investors. *Id.*

¶ 83. During the call, Defendant Hopkins referred to the press release as a "major

announcement" and described the project as a "massive move." *Id.* On the call, Defendant

Hopkins emphasized Standard Power's immediate need for the project to power its data centers.

*Id.* ¶ 84.

PAGE 5 – OPINION & ORDER GRANTING MOTION TO DISMISS

Plaintiffs allege that these statements during the investor call were materially false and/or misleading because Defendants omitted material adverse facts about Standard Power's financial ability to support the project, its need for a project of its size, and about ENTRA1's ability to finance the project. *Id.* ¶ 86. Plaintiffs also allege, based on the Iceberg Report, that Standard Power's leadership was not credible because the CEO had an outstanding tax warrant in New York and the former managing director was "subject to SEC scrutiny" in 2003 for "setting up a fake foreign exchange trading house and making off with investors' cash." *Id.* ¶ 91.

**D. SEC Form 10-Q Quarterly Filings**

SEC rules require that publicly traded companies file annual and quarterly reports that comply with Generally Accepted Accounting Principles ("GAAP"). *Id.* ¶ 58. Under GAAP guidelines, filings must disclose a material loss contingency[3] if the loss is at least reasonably possible. *Id.* ¶ 61. Filings must record an accrual for a material loss contingency if it is both probable and reasonably estimable. *Id.*

NuScale's Form 10-Q for the second quarter of 2023 filed on August 9, 2023, stated that its maximum liability for the CFPP agreement was $15,293. *Id.* ¶ 65. The Form stated that liability was only "reasonably possible" and therefore recorded no accrual for material loss contingencies. *Id.* NuScale's subsequent Form 10-Q for the third quarter of 2023 filed on November 9, 2023, reported that liability was "probable." *Id.* ¶ 67.

Plaintiffs allege that Defendants violated GAAP in their Form 10-Q for the second quarter of 2023. *Id.* ¶¶ 64, 70. Plaintiffs allege the form was misleading because Defendants

---

[3] The Financial Accounting Standards Board, which issues the GAAP, defines a loss contingency as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." Accounting Standards Codification 450-20-20.

knew NuScale would likely fail to meet the 80% subscription target for CFPP and were therefore required to record an accrual. *Id.* ¶¶ 66, 69–70.

**E.  SEC Form 10-K and the SEC Inquiry**

In December 2023, NuScale received a "voluntary request" from the SEC "for information relating to its employment, severance, and confidentiality agreements," which NuScale "understood to be part of a broader inquiry involving multiple companies related to the SEC's whistleblower provisions." 2024 Form 8-K, ECF 57, Ex. 20 at 2. NuScale responded to the SEC's voluntary request in January 2024. *Id.*

On March 15, 2024, NuScale filed Form 10-K with the SEC for the year of 2023. SAC, ECF 52 ¶ 99. That Form contained a risk warning that stated, in relevant part: "[s]hort selling reports may potentially lead to increased volatility in an issuer's stock price and to regulatory and governmental inquiries" and that "any potential inquiry or formal investigation from a governmental organization or other regulatory body, including an inquiry from the SEC, arising from the presence of such allegations could result in a material diversion of our management's time and may have a material adverse effect on our business and results of operations." *Id.*

In May 2024, the short seller Hunterbrook Media ("Hunterbrook") issued a Freedom of Information Act ("FOIA") request to the SEC concerning "any investigation(s) or inquiries that directly pertain to the conduct, disclosures, and/or transactions of the registrant NuScale Power from January 1, 2023." *Id.* ¶ 101. The SEC denied the FOIA request on June 27, 2024. *Id.* Hunterbrook appealed the SEC's denial of the FOIA request. *Id.* ¶ 102. On July 29, 2024, Hunterbrook published the SEC's response to Hunterbrook's appeal ("Hunterbrook Report"). *Id.* Plaintiffs allege the SEC's response confirmed that the SEC had an "active and ongoing" inquiry into NuScale. *Id.* The Hunterbrook Report quoted a spokesperson for NuScale stating, "We are

unaware of any SEC investigation into NuScale or any reason for such an investigation." *Id.* ¶ 104.

On July 29, 2024, the day of the Hunterbrook Report, NuScale issued a press release stating, "The [SEC] has not communicated to NuScale that it is the target of a current or prospective investigation, and the Company is unaware of any reason for such an investigation." *Id.* ¶ 105. The next day, on July 30, 2024, NuScale contacted the SEC following the Hunterbrook Report. 2024 Form 8-K, ECF 57, Ex. 20 at 2. On July 31, 2024, the SEC "made follow up requests for additional information relating to the December 2023 request." *Id.*

On August 2, 2024, NuScale filed a Form 8-K stating that the SEC had requested information from the company in December 2023 and July 2024 "relating to [NuScale's] employment, severance, and confidentiality agreements" and that NuScale was in the process of responding to those requests. *Id.*; SAC, ECF 52 ¶ 107. NuScale's share price fell 5.7% that day. SAC, ECF 52 ¶ 108.

Plaintiffs allege that NuScale's 10-K Form for 2023 and NuScale's spokespeople's statements in the Hunterbrook Report and July 29, 2024 press release were misleading by implying to investors that an SEC inquiry was hypothetical when NuScale knew at the time that the SEC "had opened an investigation" into NuScale. *Id.* ¶¶ 100, 106.

## F. Procedural History

Plaintiff Sigman filed a class action complaint on November 15, 2023, on behalf of all persons and entities that purchased NuScale securities between March 15, 2023, and October 19, 2023. Complaint ("Compl."), *Sigman*, ECF 1 ¶ 45. Plaintiff Ryckewaert filed a class action complaint on December 26, 2023, on behalf of all persons and entities that purchased NuScale securities between March 15, 2023, and November 8, 2023. Compl., *Ryckewaert*, ECF 1 ¶ 45. Both complaints brought claims against Defendants for violating Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b–5. Compl., *Sigman*, ECF 1 ¶ 1; Compl., *Ryckewaert*, ECF 1 ¶ 1. The *Ryckewaert* and *Sigman* cases were consolidated for all purposes on January 31, 2024. Order, *Sigman*, ECF 30. Plaintiffs filed the Second Amended Class Action Complaint on September 20, 2024, which expanded the Class Period to March 15, 2023 to August 2, 2024. SAC, *Sigman*, ECF 52 ¶ 1.

Defendants filed the instant motion to dismiss on November 1, 2024. Mot., *Sigman*, ECF 55. Plaintiffs filed their opposition on December 17, 2024, Opposition to Defendants' Motion to Dismiss ("Opp'n"), ECF 58, and Defendants filed a reply in support of their motion on January 24, 2025, Reply, ECF 59.

## LEGAL STANDARDS

In general, to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to state a "claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). But Plaintiffs face "exacting" and "heightened" pleading standards for claims alleging securities fraud under the Exchange Act. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313, 321 (2007). To allege falsity, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4(b). Additionally, Federal Rule of Civil Procedure 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Under Rule 9(b), fraud allegations "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they

PAGE 9 – OPINION & ORDER GRANTING MOTION TO DISMISS

have done anything wrong." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 947 (9th Cir. 2023) (internal quotation marks and citation omitted), *cert. dismissed as improvidently granted sub nom. Facebook, Inc. v. Amalgamated Bank*, No. 23-980, 2024 WL 4861195 (U.S. Nov. 22, 2024).

These heightened pleading standards represent an "unusual deviation from the usually lenient requirements of federal rules pleadings." *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001), *abrogated on other grounds by Tellabs*, 551 U.S. at 315–18 (2007). They "prevent[] a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). These standards "apply 'to all elements of a securities fraud action.'" *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1181 (9th Cir. 2024) (quoting *Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 605 (9th Cir. 2014)).

## DISCUSSION

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). "Pursuant to this section, the Securities and Exchange Commission promulgated Rule 10b–5, which makes it unlawful, among other things, '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010) (quoting 17 C.F.R. § 240.10b–5(b)).[4] To prove a

---

[4] Section 10(b) and Rule 10b-5 are coextensive, and this Court therefore refers to them collectively as "§ 10(b)." *See SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002).

violation under § 10(b), a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1057 (9th Cir. 2014) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)). "[T]o prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first allege a violation of § 10(b) or Rule 10b[–]5." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

Defendants move to dismiss the SAC for failure to adequately plead falsity, scienter, and loss causation. Mot., *Sigman*, ECF 55 at 11–35. Defendants also request that this Court take judicial notice of and incorporate by reference several documents. Notice of Incorporation by Reference and Request for Judicial Notice ("Req."), ECF 56.

This Court first addresses Defendants' Request for Judicial Notice. This Court then turns to Defendants' Motion to Dismiss and concludes that Plaintiffs have failed to adequately plead falsity for their § 10(b) claims. Because Plaintiffs have not adequately pled falsity, this Court does not address the parties' arguments on scienter and loss causation. This Court then dismisses Plaintiffs' § 20 claims against the individual Defendants for failure to adequately plead a violation of § 10(b). Finally, this Court grants Plaintiffs leave to file a third amended complaint.

## A. Request for Judicial Notice and Incorporation by Reference

In support of their motion, Defendants request that this Court take judicial notice of or incorporate by reference several documents attached as Exhibits 1 through 20 to the Declaration of Alex Van Rysselberghe ("AVR Decl."), ECF 57. The Exhibits include several of NuScale's SEC filings (Exs. 1–2, 9, 12, 20), press releases issued by NuScale (Exs. 13, 17), transcripts from NuScale's earnings calls (Exs. 5, 7, 10, 14), slide deck presentations from earnings calls (Exs. 6,

PAGE 11 – OPINION & ORDER GRANTING MOTION TO DISMISS

8, 11, 15), the Iceberg and Hunterbrook Reports, (Exs. 16, 18–19), and various news articles (Exs. 3–4, 18). Req., ECF 56 at 2–4; AVR Decl., ECF 57. Plaintiffs do not oppose the Request.

Courts presented with a motion to dismiss a securities class action complaint "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322.

Many documents submitted with the Request are judicially noticeable SEC filings, financial news articles, and short seller reports that are not subject to reasonable dispute and are offered to show what information was publicly available to the market beginning March 2023.[5] The remaining documents are transcripts, press releases, and slide presentations that are incorporated by reference into the SAC.[6] This Court therefore grants the request and may consider these materials "to understand the 'total mix' of information available to investors over the class period," *Zamir v. Bridgepoint Educ., Inc.*, No. 15-CV-408, 2016 WL 3971400, at *4 (S.D. Cal. July 25, 2016) (citation omitted), without converting the motion to dismiss into a motion for summary judgment, *Boquist v. Courtney*, 32 F.4th 764, 772 (9th Cir. 2022). This

_____

[5] *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (taking judicial notice of SEC filings); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (holding courts may take judicial notice of publications to indicate what information was in the public realm at the time, but not for their truth); *In re Sorrento Therapeutics, Inc. Sec. Litig.*, No. 20-CV-00966, 2022 WL 22609807, at *4 (S.D. Cal. Apr. 11, 2022) ("Courts regularly take judicial notice of analyst reports . . . ."), *aff'd*, 97 F.4th 634 (9th Cir. 2024).

[6] *See In re Regulus Therapeutics Inc. Sec. Litig.*, 406 F. Supp. 3d 845, 854–55 (S.D. Cal. 2019) (incorporating by reference transcripts, press releases, and slide presentations). The short seller reports are also incorporated by reference into the SAC. *See In re Sorrento Therapeutics, Inc. Sec. Litig.*, 2022 WL 22609807, at *4 (incorporating by reference short seller reports relied on heavily in the plaintiff's complaint).

Court does not consider these documents for the truth of the matters asserted therein. *In re Regulus Therapeutics Inc. Sec. Litig.*, 406 F. Supp. 3d 845, 855 (S.D. Cal. 2019).

**B. Falsity**

Defendants move to dismiss Plaintiffs' SAC for failure to plead falsity. Mot., ECF 55 at 11–24. "To properly plead fraud with particularity under Rule 9(b), 'a pleading must identify the who, what, when, where, and how of the misconduct charged.'" *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018) (quoting *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)). "Most importantly, the complaint must explain 'what is false or misleading about the purportedly fraudulent statement, and why it is false.'" *In re Cloudera, Inc. Sec. Litig.*, 121 F.4th 1180, 1186 (9th Cir. 2024) (quoting *Davidson*, 889 F.3d at 964). The PSLRA additionally requires that a complaint "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91 (9th Cir. 2009).

"A statement is false or misleading if it directly contradicts what the defendant knew at the time or omits material information." *In re Cloudera*, 121 F.4th at 1186 (cleaned up). Put differently, a statement is false "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (citation and internal quotation marks omitted). "To be misleading, a statement must be capable of objective verification." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (citation and internal quotation marks omitted). Courts "apply the objective standard of a 'reasonable investor' to determine whether a statement is misleading." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021).

PAGE 13 – OPINION & ORDER GRANTING MOTION TO DISMISS

Plaintiffs' claims concern four categories of allegedly false statements: (1) NuScale executives' statements about the status and predicted success of CFPP in earnings calls with investors on March 15, May 9, and August 9, 2023; (2) NuScale executives' statements about the Standard Power project to investors during an October 6, 2023 conference call; (3) NuScale's statements in its Form 10-Q quarterly filings listing liability as only "reasonably probable" and "probable," and therefore not recording an accrual for material loss contingencies; and (4) NuScale's risk warning about a potential SEC investigation in its 2023 Form 10-K.

Defendants argue the alleged misstatements are inactionable because (1) they are forward-looking statements protected under the PSLRA's safe harbor provision; (2) they are inactionable puffery or opinion statements; (3) Defendants had no duty to disclose the omitted facts, and the statements were not false when made; and (4) Plaintiffs have not sufficiently pleaded falsity as to the SEC quarterly filings and SEC investigation. Mot., ECF 55 at 11–23. This Court agrees that the statements are not actionable and addresses each alleged misstatement in turn.

### 1.  Statements about CFPP and Standard Power

Plaintiffs allege that throughout the Class Period, Defendants misled investors by painting "an overly rosy picture" of NuScale's ability to meet the UAMPS subscriber requirements while omitting material information suggesting it would not reach its subscription target. Opp'n, ECF 58 at 10–11.

**March 15, 2023:** On an earnings call with investors, in response to a question about NuScale's "level of confidence" in meeting the 80% subscription target by February 2024, CEO Colbert stated: "[T]he news is that as you saw with [UAMPS] coming forward with 26 or 27 members voting to move forward with the project earlier this year at the $89 per megawatt hour

price, that's very much indicative of a market that's changing and tightening in that area." SAC, ECF 52 ¶ 72. Colbert remarked, "we think that will continue in the Western region . . . ." *Id.*

**May 9, 2023:** On an earnings call with investors, CFO Hopkins stated that NuScale was "working closely with UAMPS on securing additional subscriptions and believe this is going to be generated through a combination of existing CFPP participating members increasing their subscription levels, UAMPS members who are not currently CFPP participants signing on to the project, and additional Western public power entities, investor-owned utilities and industrials." *Id.* ¶ 74. In response to an analyst's request for "more color on how the conversations are progressing with some of the entities to hit that committed subscription level in the CFPP," Hopkins replied: "It's going quite well. What we're looking at is members that can up their subscription from what they currently have. We're in discussions also with certain industrials that don't necessarily want to own a nuclear asset but they certainly want a 24/7 clean energy that will be awarded from our CFPP project. So we continue to work with the customer. And so far, the progress is looking pretty good." *Id.* ¶ 75.

**August 9, 2023:** On an earnings call with investors, Hopkins stated that UAMPS was targeting additional subscribers in three ways: "First, existing CFPP participants can increase their subscription levels; second, UAMPS members who are not CFPP participants can sign on to the project; and third, [CFPP] can bring in additional Western public power utilities, investor-owned utilities, data center operators and industrial customers." *Id.* ¶ 78. When asked for "more color" on progress toward the 80% subscription goal, Hopkins replied: "[T]hings could change, but we see that [UAMPS] will continue to be our first customer, where they will get to subscription, we believe the funding will come through, and we're working diligently to make

PAGE 15 – OPINION & ORDER GRANTING MOTION TO DISMISS

that happen." *Id.* ¶ 80. Hopkins also stated during the call that "our working assumption is that CFPP will hit [the 80%] subscription goal." *Id.* ¶ 79.

Plaintiffs allege that these statements were misleading because they omitted adverse material facts, including that "(i) members opted out of the CFPP deal because the price increased to $89/MWh; (ii) [NuScale's] own price projections exceeded $89/MWh; (iii) [NuScale] could not reduce prices below $89/MWh; (iv) [NuScale] had failed to add any new subscribers or increase any existing subscribers subscription rates in 2023; and (v) due to the increased costs and longterm investment the CFPP required, [NuScale] and UAMPS would be unable to meet the 80% subscriber target." *Id.* ¶¶ 73, 76, 81.

Plaintiffs also allege that Defendants misled investors about the Standard Power deal by omitting several facts about Standard Power's financial resources, its need for a project of its size, and ENTRA1's ability to finance or develop a project of that size. *Id.* ¶¶ 82–86. The alleged misstatements occurred on an October 6, 2023 conference call NuScale held to discuss the Standard Power project it had just announced in a press release. On the call, Vice President of Business Development Clayton Scott said the press release was a "major announcement" and a "massive move." Scott stated, "[w]e've announced this morning that we are going to do 2 plants, 12 modules, 924 megawatts each, one in Ohio, one in Pennsylvania." *Id.* ¶ 84. He explained that Standard Power "need[ed] the power like last year" and "need it now" because of the data centers it was building. *Id.* He said, "it's a great opportunity [and] . . . an immediate situation" and characterized the deal as a "great win." *Id.* ¶¶ 84–85.

This Court concludes that Plaintiffs fail to plead falsity as to all of Defendants' statements to investors about CFPP and Standard Power because they are forward-looking

statements protected by the PSLRA's safe harbor provision, express classic corporate puffery, and are not misleading by omission.

### a. PSLRA Safe Harbor Provision

Defendants argue that these statements are forward-looking and therefore protected by the PSLRA's safe harbor provision. The PSLRA provides a "barrier at the pleading stage in the form of a safe harbor for 'forward-looking statements.'" *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). "A forward-looking statement is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *No. 84 Emp.- Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (simplified). The PSLRA's safe harbor provision, 15 U.S.C. § 78u-5(c)(1), exempts statements from liability if (1) "they were identified as forward-looking statements and accompanied by meaningful cautionary language," or (2) the plaintiff fails to allege with particularity that the "projections were made with *actual* knowledge that they were materially false or misleading." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (emphasis in original).

### i. Forward-looking

First, this Court concludes that most of the alleged misstatements are forward-looking statements that are shielded from liability by the PSLRA safe harbor provision, as they concern predictions about whether the CFPP or Standard Power projects would succeed and whether favorable market conditions would continue. As to the CFPP, Defendants point to the following forward-looking statements: (1) on the March 15 call, Colbert asserted that the market "will continue [to tighten] in the Western region, particularly as coal plants continue to retire," SAC, ECF 52 ¶ 72; (2) on the May 9 call, Hopkins was "express[ing] optimism" that NuScale and

PAGE 17 – OPINION & ORDER GRANTING MOTION TO DISMISS

UAMPS will secure additional subscriptions, *id.* ¶ 78; and (3) on the August 9 call, Hopkins predicted that UAMPS "will continue to be our first customer" because "we believe the funding will come through," *id.* ¶ 80. These are all forward-looking statements. *See, e.g., Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1195 (9th Cir. 2021) (holding that a statement that "we remain . . . on track to achieve a 5,000 unit week by the end of the year" is a nonactionable forward-looking statement). Plaintiffs' theory of the case being that "Defendants misled investors about the *likelihood* of meeting the 80% subscription threshold," SAC, ECF 52 ¶ 39 (emphasis added), confirms as much. Statements about the likelihood that something will happen are, by definition, forward-looking.

Scott's statements about the Standard Power project are also forward-looking. In describing the project, Scott stated that Standard Power was "looking long term at a lot of opportunities," said "[t]hey see the growth," and described it as a "tremendous growth pattern for our future." *Id.* ¶ 84. These are all forward-looking statements that express the potential of NuScale and Standard Power's future project.

Plaintiffs' counterarguments are unpersuasive. Plaintiffs argue that the PSLRA's safe harbor does not apply here because Plaintiffs are alleging that Defendants omitted present facts. Opp'n, ECF 58 at 20–21. But this exception to the safe harbor provision only applies when a plaintiff pleads that "[d]efendants were aware of and concealed adverse facts that gave investors a misleading impression." *Homyk v. ChemoCentryx, Inc.*, No. 21-cv-03343, 2023 WL 3579440, at *18 (N.D. Cal. Feb. 23, 2023). As this Court finds below, Plaintiffs have not sufficiently pleaded that any alleged omission by Defendants misled investors about either CFPP or Standard Power.

Plaintiffs also argue that the "statements are, at most, mixed statements that combine both forward-looking statements and non-forward-looking statements." Opp'n, ECF 58 at 21. Plaintiffs are correct that "where defendants make mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor of the PSLRA," *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1142, but Plaintiffs do not identify or explain which parts of the statements are "non-forward-looking." Regardless, to be an unprotected mixed statement, the non-forward-looking statement must be "about current or past facts." *Id.* As this Court explains below, the statements at issue are statements of opinion, not fact.

### ii. Cautionary language or not false when made

Second, this Court concludes that the forward-looking statements were either accompanied by cautionary language or made without actual knowledge of falsity. For example, on the August 9 call, Hopkins warned that "it is possible that conditions arise that the project could terminate and UAMPS could recover a portion of its net development cost and expense . . . ." Transcript of August 9, 2023 Earnings Call, ECF 57, Ex. 10 at 7. During earnings calls, Defendants also routinely referred investors to SEC filings[7] that provided specific cautions and risk factors associated with the cost and competitiveness of nuclear-generated electricity. *See* Form S-1, ECF 57, Ex. 1 at 14–15 (warning that "[t]he cost of electricity generated from nuclear sources may not be cost competitive with other electricity generation sources in some markets . . . which could materially and adversely affect our business" and "[t]he market for SMRs is not yet established and may not achieve the growth potential expected or may grow

---

[7] *See* Transcript of March 15, 2023 Earnings Call, ECF 57, Ex. 5 at 3 ("You can find a discussion of our risk factors . . . in our SEC filings on Form S-1 and Form 10-K."); *see also id.* Ex. 6 at 2; Ex. 7 at 3; Ex. 8 at 2; Ex. 10 at 3; Ex. 11 at 2; Ex. 14 at 1; Ex. 15 at 2 (similar).

PAGE 19 – OPINION & ORDER GRANTING MOTION TO DISMISS

more slowly than expected"); Ex. 2 at 6 (same). This Court concludes that these cautionary statements, combined with the fact that the alleged misstatements are forward-looking statements, include "enough cautionary language or risk disclosure" to make the alleged misstatements not misleading. *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995) (citation omitted).

Further, Plaintiffs have not pleaded that the alleged misstatements were made with knowledge of falsity. Securities fraud complaints must contain "allegations of specific 'contemporaneous statements or conditions'" that demonstrate the statements were false when made. *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001), *abrogated on other grounds by Tellas, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 315–18 (2007). Plaintiffs fail to allege with sufficient particularity *when* Defendants learned the facts that Plaintiffs allege were material omissions. The SAC does not state when NuScale internally projected prices to exceed $89/MWh, when NuScale concluded it could not reduce prices, or if any additional members opted out of the CFPP after some members initially unsubscribed in January 2023, before the subscription drive began in February 2023. *See* SAC, ECF 52 ¶¶ 39–46. The only "when" Plaintiffs allege regarding any of these facts is that the internal price projections began to exceed $89/MWh "in Spring 2023." *Id.* ¶ 44. "Spring 2023" is too vague an allegation, under the PSLRA's heightened pleading requirements, to demonstrate that Colbert's statements on March 15, 2023 or Hopkins' statements on May 9, 2023 were false when made. Absent specific allegations about when Defendants learned these facts, this Court cannot conclude that either Colbert or Hopkins even possessed knowledge of them when they made their statements, much less that the statements were misleading by omission.

### b. Puffery

Defendants also argue the alleged misstatements are inactionable opinion statements or puffery. Mot., ECF 55 at 12–16. "Puff[ery]" or "expressing an opinion rather than a knowingly false statement of fact . . . is not misleading." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017). "[T]he difference between a statement of fact and mere puffery rests in the specificity or generality of the claim." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008).

Defendants argue portions of the March 15, 2023, and May 9, 2023, calls about the CFPP are inactionable puffery or opinion statements. Mot., ECF 55 at 12–18. As for the March 15 call, Defendants argue Colbert's statements reflected a non-fraudulent "general opinion of a potentially favorable market." Reply, ECF 59 at 8–9. This Court agrees. Colbert was opining that some subscribers' willingness to pay the higher price may indicate the market in the Western region was changing in a way that could be helpful for the CFPP, and that he "think[s]" that shift will continue. Such "sincere statement[s] of pure opinion" are not actionable because they are "inherently subjective and uncertain assessments," and reasonable investors understand that words like "think" convey some lack of certainty. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186–87 (2015).

As for the May 9 call, Defendants argue that Hopkins' statements that conversations with potential subscribers were "going quite well" and stating that "so far, the progress is looking pretty good" are "classic examples of inactionable opinion [and] puffery." Reply, ECF 59 at 6. Defendants contend that a reasonable investor would not interpret a statement that preliminary conversations with prospective subscribers were "going well" early on in the subscription drive to mean that NuScale had actually added new subscribers. *Id.* This Court concludes that Hopkins' statements on the May 9 call are inactionable statements of vague corporate optimism

that would not mislead a reasonable investor. The context matters. *Omnicare*, 175 U.S. at 196 (stating that the analysis of whether a statement is misleading "must address the statement's context"). Contrary to Plaintiffs' argument, Hopkins' statements that "[i]t's going quite well" and "the progress is looking pretty good" were not referring to NuScale's progress towards meeting 80% subscription, *see* Opp'n, ECF 58 at 11, but rather were answering a question about how "conversations are progressing" with potential customers. A reasonable investor would understand the difference between statements that conversations with potential customers were progressing as opposed to statements affirming that NuScale was progressing toward meeting its 80% subscription target.

Moreover, statements that conversations with potential customers were "going quite well" and "the progress [with the customer] is looking pretty good" do not convey any specific facts about NuScale or the CFPP. *Cf. In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1143 (holding "general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly") (citation and internal quotation marks omitted)); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (reassuring investors that "everything [was] going fine" with FDA approval when the company knew FDA approval would never come was materially misleading). "When valuing corporations . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).

Indeed, several courts have found statements like "going quite well" and descriptions of general "progress" to be inactionable. *See Melot v. JAKKS Pac., Inc.*, No. LA CV13-05388, 2016 WL 6902093, at *19 (C.D. Cal. Nov. 18, 2016) (holding statements such as "growing" and "off

to a good start" to be inactionable feel-good monikers); *Finger v. Pearson PLC*, No. 17 Civ. 1422, 2019 WL 10632904, at *10 (S.D.N.Y. Sept. 16, 2019) (holding statements like "good growth" and "good progress" lacked the specificity necessary to be actionable); *City of Warren Police & Fire Ret. Sys. v. Zebra Techs. Corp.,* No. 19 C 5782, 2020 WL 6118571, at *6 (N.D. Ill. Oct. 16, 2020) (finding that a statement about "significant progress" was a "subjective description" lacking "useful information upon which a reasonable investor would base a decision to invest"); *Pittman v. Unum Grp.*, No. 18-CV-000128, 2020 WL 2846929, at *15 (E.D. Tenn. June 1, 2020) (finding statements like "gone pretty well" and "we've made good progress" inactionable); *Anderson v. Spirit AeroSystems Holdings, Inc.*, 105 F. Supp. 3d 1246, 1260–61 (D. Kan. 2015) (same).[8] Additionally, when Hopkins made these statements in May 2023, NuScale still had ten months left in the subscription drive to meet the 80% subscription rate. Plaintiffs do not identify any contemporaneous facts that would call into question Hopkins' optimism only two or three months into the subscription drive.

As for the August 9 call, Defendants argue that Hopkins' statements about the three ways NuScale could meet its subscription target, that he believed UAMPS would "continue to be [NuScale's] first customer," and that funding would come through are all inactionable puffery and opinion statements. Reply, ECF 59 at 6. This Court agrees that Hopkins' statements about

---

[8] Plaintiffs' cited cases are factually distinguishable. *See In re Fibrogen, Inc.*, No. 21-cv-02623, 2022 WL 2793032, at *8–11 (N.D. Cal. July 15, 2022) (holding statements were not puffery in context because they made objectively false specific factual representations about the safety and efficacy of a new drug); *In re BioMarin Pharm. Inc. Sec. Litig.*, No. 20-cv-06719, 2022 WL 164299, at *12 (N.D. Cal. Jan. 6, 2022) (holding false "factual assertions" about specific project timelines and inspections were not opinions or puffery); *In re Avon Sec. Litig.*, No. 19 Civ. 01420, 2019 WL 6115349, at *16 (S.D.N.Y. Nov. 18, 2019) (holding that statements touting a "strong [sales] team" were misleading in context because they were made repeatedly and contradicted by verifiable facts).

the progress of CFPP are inactionable puffery that would not mislead a reasonable investor.[9]

Hopkins, in response to a request for "more color" on how CFPP was going, stated vaguely that

Defendants "continue to make progress on CFPP." He then opined on three ways he "believe[d]"

the 80% subscription could be met and stated he "believe[d] the funding will come through."

These opinion statements are not actionable under federal securities law.

Finally, as to Standard Power, several of Scott's statements are inactionable vague

assertions of corporate optimism. He stated that Defendants were "excited" about the deal, which

he described as "a great opportunity" and "a great win." This is inactionable puffery that simply

represents his optimism about the deal. *See Farhar v. Ontrak, Inc.*, 714 F. Supp. 3d 1198, 1209–

10 (C.D. Cal. 2024) (finding similar "excited" statements were inactionable puffery); *Turocy v.*

*El Pollo Loco Holdings, Inc.*, No. SA CV 15-1343, 2016 WL 4056209, at *9 (C.D. Cal. July 25,

2016) (finding statements such as "great value," "we're excited," and "compelling value

proposition" were inactionable assertions of "corporate optimism").

---

[9] Again, Plaintiffs' cited cases are factually distinguishable. In *In re Chicago Bridge & Iron Co. N.V. Securities Litigation*, the court held that stating that a project was making "good progress" was misleading by omission because a three-month stop-work order had halted all progress. No. 17 Civ. 1580, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018). There are no facts alleged here that would similarly halt all progress toward the subscription target.

In, *Moshell v. Sasol Ltd.*, the same court held that statements that a project was "progressing on track" and "well-managed" were misleading because they were directly contradicted by known cost overruns and delays. 481 F. Supp. 3d 280, 289–90 (S.D.N.Y. 2020). The defendants' cautionary statements that their budgets and schedules "may be affected by delays or cost overruns" were misleading because the risk they warned of "had already transpired." *Id.* No similar facts exist here. Hopkins' cautionary language that "things could change" with regard to UAMPS being their first customer had not already been contradicted by existing fact; UAMPS was still NuScale's first customer in August 2023.

Finally, in *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, the statements were not "puffery" at all, but rather "concrete description[s]" and "assurances" about objective facts regarding the company's sales contracts. 63 F.4th 747, 770–71 (9th Cir. 2023).

PAGE 24 – OPINION & ORDER GRANTING MOTION TO DISMISS

### c.  Omitted Facts

Plaintiffs argue that even if the alleged misstatements are opinions, they are misleading by omission. Opp'n, ECF 58 at 16. Although statements of opinion may be misleading by omission, alleging this is "no small task." *Omnicare*, 175 U.S. at 194.[10] "An opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* at 189. "[F]or an opinion to be misleading by omission, (1) the 'statement must omit material facts about the defendant's inquiry into or knowledge concerning a statement of opinion,' and (2) 'those facts must conflict with what a reasonable investor would take from the statement itself.'" *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017) (quoting *City of Dearborn Heights*, 856 F.3d at 615) (cleaned up).

Plaintiffs do not allege that Defendants did not in fact hold the opinions professed or that their opinions were based on false premises. Rather, they claim Defendants' opinions were misleading because, by omitting certain facts, Defendants misled investors about the state of the CFPP and Standard Power projects. This Court concludes that Plaintiffs have not sufficiently pleaded that the opinion statements were misleading by omission.

As to the CFPP, Plaintiffs' allegations that Colbert's and Hopkins' statements were misleading by omission are insufficient for three reasons. First, Plaintiffs fail to plead with specificity when the allegedly material facts about CFPP became known to Defendants, such that the statements were false when made. It is unclear from the SAC whether NuScale's internal price projections were reached before or after March, May, or August 2023, whether NuScale determined it could not reduce prices below $89/MWh before or after those dates, and whether

---

[10] "Although *Omnicare* concerned Section 11 claims," the Ninth Circuit has held that its reasoning "is equally applicable to Section 10(b) and Rule 10b-5 claims." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017).

additional subscribers opted out of CFPP after the initial price increase in January 2023. *See* SAC, ECF 52 ¶ 81. Plaintiffs point to Hopkins' statements on the August 9 call that "we're watching [subscription efforts] very closely" and that Defendants "have weekly conversations with our customer at UAMPS." *Id.* ¶ 80. That Defendants were generally aware of the subscription rate does not excuse Plaintiffs from pleading with specificity when Defendants learned the particular omitted facts, such that Defendants' statements were false when made.

Second, even if the allegedly material omitted facts were known to Defendants on the dates of the earnings calls, Defendants did not have a duty to disclose facts as alleged by Plaintiffs because the statements would not have misled investors about the subscription drive. Section 10(b) "do[es] not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Disclosure is required "only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b–5(b)). As a general matter, Defendants were still in the first one to six months of the subscription drive when each of the alleged misstatements about the CFPP were made. A reasonable investor would not believe that statements expressing optimism about the CFPP and conversations with potential subscribers meant that Defendants were certain or even likely to reach 80% subscription. *See Omnicare*, 175 U.S. at 190–91 (holding that an omission is actionable only when the speaker omits "material facts that cannot be squared" with a "fair reading" of the statement "in its full context"). Indeed, one analyst's question on the August 9 call about how "much cash would be going out the door" if the CFPP "ends up not going forward" shows that some investors understood that NuScale may not meet the 80% subscription rate. Transcript of August 9, 2023 Earnings Call, ECF 57, Ex. 10 at 9.

Third, Colbert's and Hopkins' expressions of optimism about how conversations with potential subscribers were going and the likelihood of reaching 80% subscription were not misleading because NuScale was in fact communicating with prospects and exploring ways to reduce costs, even if those efforts ultimately proved unsuccessful. SAC, ECF 52 ¶ 45. Additionally, Colbert's and Hopkins' opinions and predictions about market conditions did not trigger a duty to disclose because reasonable investors do not rely on them to make investment decisions. *See Wenger v. Lumisys, Inc.,* 2 F. Supp. 2d 1231, 1245–46 (N.D. Cal. 1998) (finding statements and projections about the market inactionable because "reasonable investors do not consider 'soft' statements or loose predictions important in making decisions"); *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1235–36 (N.D. Cal. 1994) (holding "general statements about the future and 'puffing' about a company," such as "[i]t's a great time for a company like ours," inactionable); *In re Ross Sys. Sec. Litig.*, No. C-94-0017, 1994 WL 583114, at *8 (N.D. Cal. July 21, 1994) (same).

As to Standard Power, Plaintiffs' allegations that Scott's statements were misleading by omission are also deficient. First, Plaintiffs do not allege that Defendants knew any of the omitted information on October 6, 2023, such that the statements were false when made. *See* SAC, ECF 52 ¶ 86. Second, most of the allegedly omitted information identified by Plaintiffs is based on Iceberg's admitted "speculation" and "opinions," not statements of fact. *See* Iceberg Report, ECF 57, Ex. 16 at 10, 17–18 (repeatedly referring to the report as reflecting Iceberg's "opinions"). Plaintiffs cannot base a securities fraud claim on a short seller's admitted speculation. *City of Dearborn Heights*, 856 F.3d at 619 (holding that the plaintiff's own conclusion "cannot serve as an omission of fact that sufficiently pleads falsity"). Finally, Plaintiffs fail to allege why Defendants were obligated to disclose facts about Standard Power

executives' past personal financial misconduct when discussing a future project with Standard Power or why such information was material.

In sum, Plaintiffs have failed to plead falsity as to Defendants' alleged misstatements about CFPP and Standard Power on earnings calls with investors.

### 2. Quarterly SEC Filings

Plaintiffs also allege NuScale violated GAAP in its June 30, 2023, 10-Q by failing to report, as it later did in the September 30, 2023, 10-Q, that NuScale had accrued a loss contingency reserve for the CFPP. SAC, ECF 52 ¶ 64. Defendants argue Plaintiffs do not identify specific facts showing that the statement that the CFPP's failure was only "reasonably possible" as of June 30, 2023, was objectively false. Mot., ECF 55 at 22. Defendants maintain that companies have "considerable leeway" in describing loss contingencies. *Id.* This Court concludes that Plaintiffs have not adequately alleged a material misrepresentation based on NuScale's failure to report accrual in the second quarter 2023 Form 10-Q.

"GAAP is not a set of rules ensuring identical treatment of identical transactions; rather, it tolerates a range of reasonable treatments, leaving the choice among alternatives to management." *Luna v. Marvell Tech. Grp. Ltd*, No. 15-CV-05447, 2016 WL 5930655, at *5 (N.D. Cal. Oct. 12, 2016) (citation omitted). A plaintiff cannot rely on a defendant's eventual reporting of accrual to show that earlier financial statements were misleading. *Id.* at *9. "In order to allege the circumstances constituting fraud, plaintiff must set forth facts explaining why the difference between the earlier and the later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood . . . ." *Id.* at *5 (citation omitted).

Here, the SAC does not contain any specific allegations explaining why Defendants' decision not to report accrual in the June 30 filing was fraudulent, rather than a permissible judgment call. Plaintiffs allege the June 30 filing was fraudulent because Defendants "were well

PAGE 28 – OPINION & ORDER GRANTING MOTION TO DISMISS

aware that they would likely fail to meet the 80% subscription target," pointing to Defendants' knowledge that (1) subscribers had opted out due to the price increase, (2) NuScale could not reduce the price, and (3) NuScale had not recruited any new subscribers in 2023. SAC, ECF 52 ¶ 66. But as this Court has explained, the SAC does not allege if additional subscribers opted out during the Class Period or *when* NuScale determined it could not reduce the price. Plaintiffs do not allege any facts showing that the statement that the CFPP's failure was only "reasonably possible" as of June 30 was objectively false. Rather, the SAC "sets forth the conclusory allegation that Defendants should have recognized a loss earlier because" at some unspecified time, NuScale knew the price increase costed them subscribers. *Luna*, 2016 WL 5930655, at *5. Absent specific factual allegations of fraud, Plaintiffs fail to meet the particularity requirements of Rule 9(b). *Id.*; *see also In re Oak Tech. Sec. Litig.*, No. 96-20552, 1997 WL 448168, at *9 (N.D. Cal. Aug. 1, 1997) (finding a "conclusory allegation that [d]efendants should have recognized a loss earlier" insufficient); *Caprin v. Simon Transp. Servs.*, 112 F. Supp. 2d 1251, 1256 (D. Utah 2000), (finding "plaintiffs have alleged no facts demonstrating that [the defendant's] reserve estimates were outside the bounds of permissible judgment much less fraudulent"), *aff'd sub nom. Caprin v. Simon Transp. Servs., Inc.*, 99 F. App'x 150 (10th Cir. 2004).

### 3.  2023 Form 10-K and SEC Inquiry

Plaintiffs allege "Defendants misled investors by implying to investors that an SEC inquiry was hypothetical when the Company knew in December 2023 that SEC had opened an investigation into NuScale, that the SEC had requested information from NuScale concerning that investigation, that NuScale had responded to the SEC's request for information, and that the SEC had not closed the investigation." SAC, ECF 52 ¶ 106. This Court finds Plaintiffs have not

PAGE 29 – OPINION & ORDER GRANTING MOTION TO DISMISS

sufficiently pleaded why or how the 2023 Form 10-K was misleading or why the December 2023

SEC inquiry was material such that Defendants had a duty to disclose it.

First, Plaintiffs have not pleaded how or why the 2023 Form 10-K was misleading. The

alleged fraud is a statement in NuScale's 2023 Form 10-K warning about risks related to "any

potential inquiry or formal investigation . . . arising from the presence of [short seller]

allegations." SAC, ECF 52, ¶ 99. Plaintiffs do not allege that at any time, much less when this

statement was made, that the SEC investigated NuScale about allegations from a short seller. The

Hunterbrook Report was published in July 2024, several months *after* the SEC's initial voluntary

information request in December 2023. The SEC's request for additional information in July

2024 was for information "relating to the December 2023 request," 2024 Form 8-K, ECF 57, Ex.

20 at 2, not allegations in the Hunterbrook Report. Absent any allegations that the SEC

investigated NuScale about allegations from a short seller, Plaintiffs fail to satisfy Rule 9(b)'s

requirement that they allege "what is false or misleading about [the purportedly fraudulent]

statement, and why it is false." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d

1047, 1056 (9th Cir. 2011) (citation and quotation marks omitted).

Second, Plaintiffs have not alleged why NuScale's failure to disclose the December 2023

SEC voluntary request for information was materially misleading. Plaintiffs allege "Defendants

misled investors by implying to investors that an SEC inquiry was hypothetical when the

Company knew in December 2023 that SEC had opened an investigation into NuScale." SAC,

ECF 52 ¶ 100. But Plaintiffs do not allege why this inquiry, which NuScale stated in its

August 2, 2024 Form 8-K was a "voluntary request" for information related to "[NuScale's]

employment, severance, and confidentiality agreements," and part of a "broader inquiry

involving multiple companies related to the SEC's whistleblower provisions," 2024 Form 8-K,

ECF 57, Ex. 20 at 2, was material. "Plaintiffs must explain, in accordance with Rule 9(b)'s

heightened standard, why the SEC investigation was material in order to demonstrate that

[NuScale] made a false or misleading statement." *Mandalevy v. Bofi Holding, Inc.*,

No. 17CV667, 2018 WL 6436723, at *6 (S.D. Cal. Dec. 7, 2018), *aff'd in part and rev'd in part

on other grounds sub nom.*, *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198 (9th Cir. 2020). Courts

have recognized that not all investigations are material.[11]

Plaintiffs fail to allege that the December 2023 SEC inquiry had anything to do with

allegations arising from short seller reports, and therefore fail to allege that the 2023 Form 10-

K's risk warning characterizing such investigations as hypothetical was misleading. Plaintiffs

also do not allege why a reasonable investor would have viewed Defendants' nondisclosure of

the SEC's voluntary request for information about employment, severance, and confidentiality

agreements material. *Cf. No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W.

Holding Corp.,* 320 F.3d 920, 935 (9th Cir. 2003) (finding the defendant airline's

misrepresentations about an FAA investigation material because a reasonable investor would

have found such information significant given the company's ongoing maintenance problems).

NuScale's statements in its 2023 Form 10-K only referenced the potential risks of investigations

arising from short seller accusations, SAC, ECF 52 ¶ 99, which the SEC inquiry did not involve.

Plaintiffs do not allege how the SEC's request for information about employment would have

"significantly altered the total mix of information" from which reasonable investors make

decisions. *Mandalevy*, 2018 WL 6436723, at *7.

---

[11] *See, e.g.*, *Mandalevy*, No. 17CV667, 2018 WL 6436723, at *6–*7; *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 13–14 (S.D.N.Y. 2016) (concluding plaintiffs failed to establish a duty to disclose an SEC investigation because they did not plead materiality).

Plaintiffs argue that "NuScale understood the materiality, which is why it decided to lie twice about it . . . ." Opp'n, ECF 58 at 23. This argument misses the mark. What matters is whether Plaintiffs sufficiently pleaded that *investors* understood the materiality, not Defendants. Plaintiffs also argue "investors understood the materiality given that [NuScale's] stock dropped on both corrective disclosures," *id.*, but cite no case to support the proposition that a company's stock dropping after a corrective disclosure means a reasonable investor found an SEC investigation material. Indeed, "a drop in stock price, by itself, does not establish that the decline was caused by the revelation of an earlier misrepresentation." *SEC v. Leslie*, No. 07-CV-03444, 2012 WL 116562, at *7 (N.D. Cal. Jan. 13, 2012) (citation omitted).[12]

*    *    *

Plaintiffs have not met the heightened pleading requirements for pleading falsity as to their § 10(b) claims. The alleged misstatements to investors about CFPP and Standard Power were protected by the PSLRA's safe harbor provision, were corporate puffery, and were otherwise not misleading by omission. Plaintiffs fail to plead that reporting a loss contingency related to the CFPP as only "reasonably possible" in the second quarterly SEC filing was fraudulent. Finally, Plaintiffs fail to adequately allege that the December 2023 SEC inquiry was material, such that Defendants' risk warning in its 2023 Form 10-K was fraudulent.

## C.  Section 20(a) Claims

Plaintiffs bring claims under § 20(a) of the Exchange Act against the individual Defendants. Section 20(a) of the Exchange Act assigns joint and several liability for any person

---

[12] This Court recognizes that materiality is a fact-specific issue that should ordinarily be left to the trier of fact. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). In holding that Plaintiffs have not sufficiently alleged materiality, this Court does not opine on what contributed to the August 2, 2024, stock drop.

who "controls any person liable" under Section 10(b). 15 U.S.C. § 78t. Controlling persons liability under § 20(a) is derivative, such that there can be no liability under § 20(a) without a primary violation under § 10(b). *See City of Dearborn Heights*, 856 F.3d at 623; *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1113 (9th Cir. 2021). Because there was no primary violation here, Plaintiffs' § 20(a) claims are dismissed.

**D. Leave to Amend**

Plaintiffs request leave to file an amended complaint. Opp'n, ECF 58 at 35 n.2. "Leave to amend shall be freely given when justice so requires, and this policy is to be applied with extreme liberality." *Bacon v. Woodward*, 104 F.4th 744, 753 (9th Cir. 2024) (quoting *Desertrain v. City of L.A.*, 754 F.3d 1147, 1154 (9th Cir. 2014)). If Plaintiffs believe they can cure the deficiencies identified in this Opinion and Order, Plaintiffs are granted leave to file a Third Amended Complaint within thirty days. Failure to do so will result in dismissal with prejudice.

**CONCLUSION**

For the reasons above, Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, *Sigman*, ECF 55, is GRANTED with leave to amend. Plaintiffs' Third Amended Complaint is due within thirty (30) days of this order.

**IT IS SO ORDERED.**

DATED this 21st day of May, 2025.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

PAGE 33 – OPINION & ORDER GRANTING MOTION TO DISMISS