**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (pro hac vice)
Laurence M. Rosen, Esq. (pro hac vice)
Daniel Tyre-Karp (pro hac vice)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
　　　　lrosen@rosenlegal.com
　　　　dtyrekarp@rosenlegal.com

*Lead Counsel for Plaintiff and Class*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### PORTLAND DIVISION

| | |
|---|---|
| SCOTT SIGMAN, Individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　　　v.<br><br>NUSCALE POWER CORPORATION, JOHN L. HOPKINS, CHRIS COLBERT, ROBERT R. HAMADY, AND CLAYTON SCOTT,<br><br>　　　　　Defendants. | **Case No.: 3:23-cv-01689-IM**<br><br>**CLASS ACTION**<br><br>**OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT**<br><br>**REQUEST FOR ORAL ARGUMENT** |

Case 3:23-cv-01689-IM    Document 45    Filed 08/01/24    Page 2 of 47

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   FACTUAL BACKGROUND .....................................................................................2

    A.    The Parties ...................................................................................................2

    B.    The Carbon Free Power Project .................................................................3

    C.    The Standard Power Announcement ..........................................................4

    D.    The Truth Emerges .....................................................................................5

    1.    The Iceberg Report. ...................................................................................5

    2.    NuScale Confirms the Termination of the UAMPS Agreement ..............6

    3.    NuScale Lays Off Nearly One-Third of its Workforce ............................6

    E.    Defendants' Material Misstatements and Omissions .................................6

        1.    The UAMPS Subscription Drive ................................................6

        2.    Standard Power ...........................................................................9

III.  ARGUMENT ..........................................................................................................10

    A.    Plaintiffs Adequately Pleads Misrepresentations and Omissions of Material Facts ...........................................................................................10

        1.    Defendants Misled Investors About NuScale's Ability to Fulfill the UAMPS Contract ...........................................................11

        2.    Defendants' Statements About UAMPS Are Actionable Even If They Are Opinions ..................................................................17

        3.    Defendants Violated Applicable Accounting Standards............20

        4.    The PSLRA's Safe Harbor Does Not Save Defendants ...........21

        5.    The Standard Power Statements Misled Investors....................22

    B.    Plaintiffs Adequately Allege Scienter.....................................................25

        1.    Defendants Knew Or Recklessly Disregarded the Omitted Facts About The UAMPS Partnership .................................................26

        2.    Plaintiffs Adequately Allege A Core Operations Theory .........27

i
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

3.    Defendants Knew or Were Willfully Blind About the Standard

Power Contract.........................................................................................28

4.    GAAP Violation Supports Strong Inference of Scienter ...........................29

5.    Motive and Opportunity Support the Inference of Scienter.......................29

6.    The Inference of Scienter Is At Least As Compelling as

Defendants' Suggested Inference ..............................................................31

C.    The Complaint Adequately Pleads Loss Causation ...............................................32

D.    Plaintiff Adequately Alleges Control Person Liability .........................................34

IV.    CONCLUSION.......................................................................................................35

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF AUTHORITIES**

**Page(s)**

**Other Authorities**

*Am. West Holding Corp.*,

    320 F.3d ....................................................................................................................29

*Ashcroft v. Iqbal*,

    556 U.S. 662 (2009)..................................................................................................10

*Asher v. Baxter Int'l Inc.*,

    377 F.3d 727 (7th Cir.2004) .....................................................................................16

*Basic Inc. v. Levinson*,

    485 U.S. 224 (1988)..................................................................................................15

*Berson v. Applied Signal Tech., Inc.*,

    527 F.3d 982 (9th Cir. 2008) ..............................................................................11, 27

*Bielousov v. GoPro, Inc.*,

    2017 WL 3168522 (N.D. Cal. July 26, 2017)..........................................................30

*Brody v. Transitional Hosps. Corp.*,

    280 F.3d 997 (9th Cir. 2002) ...................................................................................19

*Burgess v. Premier Corp.*,

    727 F.2d 826 (9th Cir. 1984) ...................................................................................28

*Casella v. Webb*,

    883 F.2d 805 (9th Cir. 1989) ...................................................................................19

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,

    856 F.3d 605 (9th Cir. 2017) ..............................................................................17, 24

Cobalt Capital. *Cobalt MultiFamily investors I, LLC v. Lisa Arden*,

    2010 WL 3791040 (S.D.N.Y. Sept. 9, 2010)..........................................................23

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Dura Pharms., Inc. v. Broudo*,

    544 U.S. 336 (2005)........................................................................................10, 32

*Eclectic Properties E., LLC v. Marcus & Millichap Co.*,

    751 F.3d 990 (9th Cir. 2014) .........................................................................25

*Freudenberg v. E\*Trade Fin. Corp.*,

    712 F. Supp. 2d 171 (S.D.N.Y. 2010).............................................................31

*FTC v. Trudeau*,

    579 F.3d 754 (7th Cir. 2009) .........................................................................19

*Gammel v. Hewlett-Packard Co.*,

    2013 WL 1947525 (C.D. Cal. May 8, 2013) ..................................................31

*Ganino v. Citizens Utilities Co.*,

    228 F.3d 154 (2d Cir. 2000)...........................................................................16

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,

    63 F.4th 747 (9th Cir. 2023) ....................................................................19, 20

*Homyk v. ChemoCentryx, Inc.*,

    2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) ................................................21

*Howard v. Everex Sys., Inc.*,

    228 F.3d 1057 (9th Cir. 2000) .......................................................................28

*In re Alphabet, Inc. Sec. Litig.*,

    1 F.4th 687 (9th Cir. 2021) ............................................................................11

*In re Amgen Inc. Sec. Litig.*,

    2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)...............................................27

*In re Amgen Inc. Sec. Litig.*,

    544 F. Supp. 2d 1009 (C.D. Cal. 2008) .........................................................16

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In re Apple Computer Sec. Litig.*,

    886 F.2d 1109 (9th Cir. 1989) ...................................................................................16

*In re Atossa Genetics Inc Sec. Litig.*,

    868 F.3d 784 (9th Cir. 2017) ...................................................................15, 17, 18, 19

*In re Avon Sec. Litig.*,

    2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)...........................................................20

*In re BioMarin Pharm. Inc. Sec. Litig.*,

    2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ...............................................................20

*In re BofI Holding, Inc. Sec. Litig.*,

    2017 WL 2257980 (S.D. Cal. May 23, 2017)...........................................................34

*In re BP p.l.c. Sec. Litig.*,

    843 F. Supp. 2d 712 (S.D. Tex. 2012) .....................................................................22

*In re Bridgepoint Educ., Inc. Sec. Litig.*,

    2013 WL 5206216 (S.D. Cal. Sept. 13, 2013).........................................................19

*In re Charles Schwab Corp. Sec. Litig.*,

    257 F.R.D. 534 (N.D. Cal. 2009)..............................................................................32

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,

    2018 WL 2382600 (S.D.N.Y. May 24, 2018) .........................................................20

*In re Clearly Canadian Sec. Litig.*,

    875 F. Supp. 1410 (N.D. Cal. 1995) ........................................................................11

*In re Cutera Sec. Litig.*,

    610 F.3d 1103 (9th Cir. 2010) ..................................................................................21

*In re CV Therapeutics, Inc.*,

    2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) ..........................................................21

*In re Daou Sys., Inc.*,

411 F.3d 1006 (9th Cir. 2005) ...........................................................................................29

*In re DVI, Inc. Sec. Litig.*,

No. 2:03-CV-05336, 2010 WL 3522086 (E.D. Pa. Sept. 3, 2010) .......................................32

*In re Fibrogen, Inc.*,

2022 WL 2793032 (N.D. Cal. July 15, 2022).....................................................................20

*In re Genius Brands Int'l, Inc. Sec. Litig.*,

97 F.4th 1171 (9th Cir. 2024) ...........................................................................................33

*In re Gilead Scis. Sec. Litig.*,

536 F.3d 1049 (9th Cir. 2008) .............................................................................. 10, 25, 33

*In re Intuitive Surgical Sec. Litig.*,

65 F. Supp. 3d 821 (N.D. Cal. 2014) .................................................................................13

*In re Mullen Auto. Sec. Litig.*,

2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) ....................................................................24

*In re Newbridge Networks Sec. Litig.*,

962 F. Supp. 166 (D.D.C. 1997).........................................................................................11

*In re NIO, Inc. Sec. Litig.*,

2023 WL 5048615 (E.D.N.Y. Aug. 8, 2023)........................................................................34

*In re Novatel Wireless Sec. Litig.*,

830 F. Supp. 2d 996 (S.D. Cal. 2011)................................................................................33

*In re NVIDIA Corp. Sec. Litig.*,

768 F.3d 1046 (9th Cir. 2014) ...........................................................................................11

*In re Obalon Therapeutics, Inc.*,

2019 WL 4729461 ..............................................................................................................29

*In re Quality Sys., Inc. Sec. Litig.*,

    865 F.3d 1130 (9th Cir. 2017) ...............................................................................passim

*In re Silver Wheaton Corp. Sec. Litig.*,

    2016 WL 3226004 (C.D. Cal. June 6, 2016) .........................................................21

*In re Snap Inc. Sec. Litig.*,

    2018 WL 2972528 (C.D. Cal. June 7, 2018) .........................................................21

*In re Thoratec Corp. Sec. Litig.*,

    No. C-04-03168 RMW, 2006 WL 1305226 (N.D. Cal. May 11, 2006)................16

*In re VeriFone Holdings, Inc. Sec. Litig.*,

    704 F.3d 694 (9th Cir. 2012) ...............................................................................26

*Jaeger v. Zillow Grp., Inc.*,

    644 F. Supp. 3d 857 (W.D. Wash. 2022)..............................................................19

*Khoja v. Orexigen Therapeutics, Inc.*,

    899 F.3d 988 (9th Cir. 2018) ..........................................................................10, 11

*Loftus v. Primero Mining Corp.*,

    230 F. Supp. 3d 1209 (C.D. Cal. 2017) ................................................................21

*Lopez v. Smith*,

    203 F.3d 1122 (9th Cir. 2000) ..............................................................................35

*Mallen v. Alphatec Holdings, Inc.*,

    861 F. Supp. 2d 1111 (S.D. Cal. 2012)..................................................................21

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,

    540 F.3d 1049 (9th Cir. 2008) ..............................................................................33

*Middlesex Ret. Sys. v. Quest Software Inc.*,

    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ................................................................30

*Mulligan v. Impax Laboratories, Inc.*,

    36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................................................... 19

*Murphy v. Precision Castparts Corp.*,

    2017 WL 3084274 (D. Or. June 27, 2017) ................................................................... 13

*New Mexico State Inv. Council v. Ernst & Young LLP*,

    641 F.3d 1089 (9th Cir. 2011) ..................................................................................... 31

*Odom v. Microsoft Corp.*,

    486 F.3d 541 (9th Cir. 2007) ....................................................................................... 14

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,

    58 F.4th 195 (5th Cir. 2023) ........................................................................................ 12

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,

    575 U.S. 175 (2015) ..................................................................................................... 17

*Osher v. JNI Corp.*,

    183 F. App'x 604 (9th Cir. 2006) ................................................................................ 35

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,

    759 F.3d 1051 (9th Cir. 2014) ..................................................................................... 27

*Prodanova v. H.C. Wainwright & Co., LLC*,

    2018 WL 8017791 (C.D. Cal. Dec. 11, 2018) ............................................................ 21

*Reese v. BP Exploration*,

    643 F.3d 681 (9th Cir. 2011) ....................................................................................... 22

*S.E.C. v. Merch. Cap., LLC*,

    483 F.3d 747 (11th Cir. 2007) ..................................................................................... 23

*Schueneman v. Arena Pharms., Inc.*,

    840 F.3d 698 (9th Cir. 2016) ................................................................................ 11, 25

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Shroyer v. New Cingular Wireless Serv.*, Inc.,

    622 F.3d 1035 (9th Cir. 2010) .......................................................................................... 14

*Sneed v. AcelRx Pharms., Inc.*,

    2023 WL 4412164 (N.D. Cal. July 7, 2023) ...................................................................... 16

*South Ferry LP, No. 2 v. Killinger*,

    542 F.3d 776 (9th Cir. 2008) ................................................................................... 26, 27, 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

    551 U.S. 308 (2007) ..................................................................................................... 10, 25

*TSC Indus., Inc. v. Northway, Inc.*,

    426 U.S. 438 (1976) .......................................................................................................... 15

*U.S. Sec. & Exch. Comm'n v. C3 Int'l, Inc.*,

    2022 WL 16814859 (C.D. Cal. Nov. 7, 2022) ................................................................. 28

*Vess v. Ciba-Geigy Corp. USA*,

    317 F.3d 1097 (9th Cir. 2003) ......................................................................................... 11

*Vignola v. FAT Brands, Inc.*,

    2019 WL 6888051 (C.D. Cal. Dec. 17, 2019) ................................................................. 24

*Warshaw v. Xoma Corp.*,

    74 F.3d 955 (9th Cir. 1996) ............................................................................................. 12

*Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*,

    2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ................................................................. 32

*Yinou Pure Furniture Ltd. v. U.S. Pride Furniture Corp.*,

    2021 WL 6882211 (C.D. Cal. Nov. 17, 2021) ................................................................. 14

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B)..................................................................................................11

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## I.     PRELIMINARY STATEMENT

This In February 2023, after cost overruns nearly doomed their ambitious nuclear power project (the Carbon Free Power Project ("CFPP")), NuScale was given a reprieve: increase its subscription rate from 25% to 80% over the next twelve months or be forced to repay tens of millions of dollars in development costs. Over the next six months, Defendants misled investors by disclosing an overly rosy picture of the Company's ability to meet the subscriber requirements while omitting all negative information concerning NuScale's progress in meeting the requirement and the obstacles the Company faced in recruiting new subscribers. Defendants assured investors that the subscription drive was "going quite well," that "the progress is looking pretty good," and that NuScale would hit the 80% threshold unless things changed. Reasonable investors would infer that NuScale was adding subscriptions. Unbeknownst to investors, NuScale never added a single new subscriber. Further, the Company's internal cost projections had increased even further, dooming any hope of adding additional subscriptions.

While negotiating the inevitable termination of the CFPP, and knowing that the collapse of the CFPP – one of NuScale's two customers – would cause investors to panic, Defendants hastily issued a "massive" "major announcement" to preempt the bad news. On October 6, 2023, NuScale announced plans to build nuclear plants for a new customer, Standard Power, that was four times larger than the CFPP in terms of megawatts generated. Defendants emphasized the new customer was an "immediate situation" because "they have the power" and "they have the demand." Just as Defendants had hoped, NuScale's stock price shot up by over 20%, prompting Defendants to say "I think the investment public sees this is a great win. So we're very happy with the performance we have today."

The truth began to come crashing down on NuScale on the morning of October 19, 2023, when Iceberg Research issued a research report ("Iceberg Report") detailing reasons why both the

1
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

CFPP and Standard Power contracts would collapse. Iceberg revealed that NuScale had not added a single new subscriber since the February reprieve. Further, Iceberg reported that Standard Power announcement was a sham: the small company had neither the resources nor the demand to execute what would be a $37 billion project. Iceberg also reported that the Company was facing a cash crunch. Confidential Witnesses corroborate the findings of the Iceberg Report.

On October 24, 2023, the Company issued a press release denying Iceberg's allegations. But just two weeks later, on November 8, 2023, NuScale announced the termination of the CFPP project. The announcement confirmed Iceberg's reporting that NuScale had failed to engage enough subscribers. On January 5, 2024, The Huffington Post revealed that, as mounting costs and the cancellation of its landmark first power plant have burned through shrinking cash reserves, NuScale was laying off nearly a third of its workforce."

Defendants' Motion to Dismiss ("Motion") does not – and cannot – dispute that (i) Defendants knew that NuScale never added any new subscribers in 2023; and (ii) NuScale never disclosed this fact to investors. Further, the Motion does not dispute that Standard Power had no need – much less an "immediate" need – for the massive 1,848 megawatt project that NuScale announced. Rather than addressing Plaintiff's well-pleaded allegations, the Motion attacks the credibility of Iceberg and the confidential witnesses. These attacks are misplaced, and the Motion should be denied.

## II.    FACTUAL BACKGROUND

### A.    The Parties

Defendant NuScale Power Corporation ("NuScale" or the "Company") is a nuclear power company that develops small modular reactor ("SMR") technology. ¶2. SMRs have lower power capacities and lower costs than conventional nuclear reactors. ¶30. NuScale claims its "modules" can each generate 77 million watts of electric power ("MWe"). *Id*. Its power plant design, the

VOYGR, can accommodate up to 12 NPMs for a total maximum gross output of 924 MWe. *Id*. NuScale started trading publicly on May 3, 2022 following a merger with special purpose acquisition company ("SPAC") Spring Valley Acquisition Corp. ¶31. NuScale's common stock and warrants trade on the New York Stock Exchange under the symbol "SMR." ¶16.

Defendant John L. Hopkins was the Company's Chief Executive Officer at all relevant times. ¶17. Defendant Chris Colbert was the Company's Chief Financial Officer until August 7, 2023. ¶18. Defendant Robert R. Hamady has served as the Company's Chief Financial Officer since August 7, 2023. ¶19. Defendant Clayton Scott served as the Company's Executive Vice President of Business Development until August 7, 2023, when he was promoted to Chief Commercial Officer. ¶20.

Confidential Witness 1 ("CW1") was a Director of Business Development at NuScale from January 2023 to July 2023 who sought out potential new customers for the Company. ¶25. Confidential Witness 2 ("CW2") was a senior financial employee at NuScale from 2022 through October 2023 and oversaw budgeting, forecasting, costs, and cash flow for the Company. ¶26. Confidential Witness 3 ("CW3") was a Contracts Manager at NuScale from December 2022 to August 2023. ¶27. CW3 oversaw the contracts NuScale signed with third party companies and was involved in issuing requests for proposals. *Id*. Confidential Witness 4 ("CW4") was a Senior Project Manager at NuScale from October 2019 to January 2024. ¶28. CW4 worked with both the commercial and engineering sides of project management. *Id*. Confidential Witness 5 ("CW5") was a Director of Sales at NuScale from September 2018 to January 2024. ¶29. CW5 helped try to generate leads and locate potential customers for NuScale. *Id*.

**B.    The Carbon Free Power Project**

NuScale's first customer was the Utah Associated Municipal Power Systems ("UAMPS"), a group primarily composed of municipalities in the western United States. ¶32. The United States

Department of Energy approved a joint grant by NuScale and UAMPS to fund the Carbon Free Power Project ("CFPP") to provide power to UAMPS's members (mainly municipalities in the western United States). ¶32. The agreement contemplated that UAMPS would deploy a power plant with six modules for a total of 462 MWe. *Id.* NuScale told investors that construction would begin in 2025 and that the plant would be operational in 2029. *Id.* NuScale valued the agreement at over $9 billion. *Id.*

Between 2016 and 2020, NuScale projected pricing the power at $55/MWh. In 2021, NuScale raised the target price to $58/MWh. ¶33. In January 2023, however, the price rose to $89/MWh. ¶34. NuScale attributed the increase to inflationary pressures and rising interest rates. *Id.* The 53% increase in the NuScale's target power price since 2021 has been driven by a dramatic 75% jump in the project's estimated construction cost, which has risen from $5.3 billion to $9.3 billion. *Id.*

On February 28, 2023, NuScale and UAMPS amended their Development Cost Reimbursement Agreement ("DCRA"). ¶35. Under the DCRA, the Company would be obligated to refund to UAMPS a percentage of its net development costs if CFPP does not secure a total of 370 MWe of committed subscription obligation by February 1, 2024. *Id.* The total of 370 Mwe represented 80% of the total 462 MWe under the UAMPS agreement, and the committed level of subscriptions as of February 28, 2023 was 120 Mwe, or 25%. *Id.*

### C.    The Standard Power Announcement

On October 6, 2023, NuScale suddenly announced an agreement with blockchain-affiliated Standard Power that would dwarf the UAMPS agreement. ¶44. The Company announced that Standard Power had agreed to develop two power plants in Ohio and Pennsylvania to power nearby data centers. *Id.* With a projected capacity of 1,848 MWe, the deal's projected value for NuScale was $37 billion. *Id.* As part of the agreement, NuScale's commercial partner Entra1 would help

fund, develop, manage, own, and operate the SMRs. NuScale announced that Standard Power planned to open the plants by 2029. *Id*.

### D.    The Truth Emerges

#### 1.    The Iceberg Report.

On October 19, 2023, Iceberg Research published a report titled "NuScale Power ($SMR): A Fake Customer and a Major Contract in Peril Cast Doubt on NuScale's Viability." ¶79. The Iceberg Report explained why NuScale's contracts with both UAMPS and Standard Power were both unlikely to ever result in any revenue for the Company. *Id*.

The Iceberg Report disclosed that – despite Defendants repeatedly providing overly optimistic updates on the Company's progress – not a single additional customer had subscribed to the CFPP since March 2023. ¶81. The Iceberg Report also disclosed that the Standard Power contract was merely a desperate attempt by Defendants to distract from the UAMPS contract falling through. *Id*. Iceberg reported that the Standard Power deal's total projected output is 1,848 MWe, four times the size of NuScale's existing agreement with its other major client UAMPS, and translates to a staggering $37 billion financial commitment. *Id*. But the reported data mining capacity of the company was a mere 50 MWe, far below the contracted SMRs total capacity of 1,848 MWe. *Id*. Standard Power's own website reveals that "Planned development at this site (Ohio) include a 40 megawatt blockchain mining operation and a data center with critical capacity of up to 12 megawatts." *Id*. The Iceberg Report also cast doubt on the credibility of ENTRA1 and Standard Power's leadership. ¶¶83-84.

On this news, the Company's share price fell $0.61 per share, or 12.0%, to close at $4.46 per share on October 19, 2023, on unusually high trading volume. The Company's share price continued to fall another $0.67 per share, or 14.9%, to close at $3.80 per share on October 20, 2023, on unusually high trading volume. ¶85.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### 2.   NuScale Confirms the Termination of the UAMPS Agreement

On November 8, 2023, after the market closed, NuScale issued a press release announcing the termination of the UAMPS project: "Despite significant efforts by both parties to advance the CFPP, it appears unlikely that the project will have enough subscription to continue toward deployment." ¶87. The press release confirmed Iceberg's reporting about the CFPP. On an earnings call the same day and announced that the Company expects to make a $49.8 million reimbursement payment to UAMPS. *Id*. On this news, the Company's share price fell $1.02 per share, or 32.9%, to close at $2.08 per share on November 9, 2023, on unusually high trading volume. ¶88.

### 3.   NuScale Lays Off Nearly One-Third of its Workforce

On January 5, 2024, The Huffington Post reported that "as mounting costs and the cancellation of its landmark first power plant have burned through shrinking cash reserves, the Oregon-based company is laying off nearly a third of its workforce." ¶89, The article quoted a NuScale engineer who had been laid off: "The company had become far less transparent since its stock market debut, the former employee said, noting that the press release announcing the power plant's cancellation claimed that NuScale and its partners 'mutually' decided to call it quits. 'As much as NuScale might publicly say it was a mutual decision,' the employee said, 'I bet they'd say laying us off was a mutual decision to part ways, too.'" *Id*. On this news, the Company's share price fell $0.24 per share, or 8.4%, to close at $2.62 per share on January 5, 2023, on unusually high trading volume ¶90.

### E.      Defendants' Material Misstatements and Omissions

### 1.   The UAMPS Subscription Drive

Throughout the Class Period, Defendants materially misled investors about the Company's ability to fulfill its contract obligations to UAMPS.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

On an investor call on March 15, 2023, an analyst asked "what level of confidence" the Company had that it could "go from, say, 25% subscribed today to 80% by February of 2024." ¶64. Colbert stated that the Company was confident it would meet the 80% subscription requirement because the market is "changing." *Id*. Colbert stated, in relevant part, that "[t]he news is that as you saw with [UAMPS] coming forward with 26 or 27 members voting to move forward with the project earlier this year at the $89 per megawatt hour price, that's very much indicative of a market that's changing and tightening in that area." Id. Colbert stated that "we think that will continue in the Western region, particularly as coal plants continue to retire at a faster pace than expected, as we see people looking to get benefit from the Inflation Reduction Act we're making investments now as opposed to later on." Id.

On May 9, 2023, Hopkins stated that NuScale was "working closely with UAMPS on securing additional subscriptions and believe this is going to be generated through a combination of existing CFPP participating members increasing their subscription levels, UAMPS members who are not currently CFPP participants signing on to the project, and additional Western public power entities, investor-owned utilities and industrials." ¶66. Hopkins continued, stating that "UAMPS members and other public power entities in the Western US are facing the rapid retirement of coal plants in the expense and the challenge of access to natural gas. These issues highlight their need to add capacity in dispatchable load growth to complement renewable resources." *Id*. During the same call, an analyst asked for "a little more color on how the conversations are progressing with some of those entities to hit that committed subscription level in the CFPP?" ¶67. Hopkins replied that "***It's going quite well***. What we're looking at is members that can up their subscription from what they currently have. We're in discussions also with certain industrials that don't necessarily want to own a nuclear asset but they certainly want a 24/7 clean energy that will be awarded from

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

our CFPP project. So we continue to work with the customer. And so far, ***the progress is looking pretty good***." *Id*. (Emphasis added).

On August 9, Hopkins stated again stated that UAMPS is targeting additional subscribers in three ways: "First, existing CFPP participants can increase their subscription levels; second, UAMPS members who are not CFPP participants can sign on to the project; and third, Carbon Free Power Project can bring in additional Western public power utilities, investor-owned utilities, data center operators and industrial customers." ¶70. Hopkins also expressed optimism that these three paths would succeed, stating that "[t]he expense and challenge of accessing natural gas in the region, the rapid retirement of coal plants and the acute need to add dispatchable power generation to complement renewable resources are primary consideration for CFPP participants, other UAMPS members and utilities operating in the Western U.S., creating opportunities across all 3 of these groups." *Id*. Later in his opening remarks, Hopkins stated that "our working assumption is that CFPP will hit [the 80%] subscription goal." ¶71.

During the same call, an analyst asked for "more color" on the progress of reaching the 80% subscription guarantee and for a timeline for "getting updates on that." ¶72. Hopkins replied, reiterating the three paths to increased subscriptions, and stating "there's a lot of discussions we're having right now with Western public utilities that are facing rapid coal retirement or they're looking at the expense of accessing natural gas." *Id*. Hopkins again offered an overly rosy assessment of the Company's subscription success, stating "things could change, but we see that they will continue to be our first customer, where they will get to subscription, we believe the funding will come through, and we're working diligently to make that happen." *Id*. To further reassure investors, Hopkins claimed to be fully abreast of the latest subscription efforts, stating "From a timing perspective, we're watching it very closely. We have weekly conversations with our customer at UAMPS. So we're informing each other." *Id*.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### 2. Standard Power

On October 6, 2023, NuScale issued a press release announcing Standard Power as a new customer. ¶74. The press release stated that "[b]ased on Standard Power's plans for the two facilities, NuScale will end up providing 24 units of 77 MWe modules producing 1,848 MWe of clean energy from both the Ohio and Pennsylvania sites. *Id*. On an investor call later that day, Hopkins referred to the Standard Power press release as a "major announcement" and a "massive move because that customer is oriented to working with data centers and what's going to be a huge potential in AI." ¶75. Scott emphasized that the deal is an "immediate situation": "And the fact that Standard Power, they need the power like last year. These guys are building data centers. They need it now. And they have the demand and matter of fact, they're looking long term at a lot of opportunities. They see the growth, as I said earlier, AI and data centers, it's a tremendous growth pattern for our future. So it's a great opportunity. We're excited. Now the good thing is, is that this is an immediate situation. We're going to start work right away. Actually, Standard Power has already been working substantially on their existing sites that they're working with. So they're invested. So we'll start immediate work with Standard, and this is an exciting opportunity for the company." ¶76.

Later on the call, Hamady said the quiet part out loud, stating that the Standard Power announcement was a "great win" because it caused the price of NuScale's stock to increase by over 20%: "I think we can consider today a great win. And if I look to see how the markets reacted, at some point, we were up 21%, 22% today. I think the investment public sees this is a great win. So we're very happy with the performance we have today." ¶77.

9

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## III.    ARGUMENT

Courts assess Rule 12(b)(6) motions by considering the complaint[1] in its entirety, "accept[ing] all factual allegations . . . as true" and construing them in the light most favorable to plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint should not be dismissed if it contains a "sufficient factual matter [that], accepted as true, 'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must be mindful that "a district court ruling on a motion to dismiss is not sitting as a trier of fact" and "[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

Claims asserted under Section 10(b) of the Securities Exchange Act must plead six elements: a misrepresentation or omission of material fact, scienter, a connection with the purchase of sale of a security, reliance, economic loss, and loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). Defendants challenge only falsity, scienter, and loss causation.

### A.  Plaintiffs Adequately Pleads Misrepresentations and Omissions of Material Facts

To plead falsity, a plaintiff must "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement [or omission] is misleading." 15 U.S.C. § 78u-4(b)(1)(B). The allegations must identify who made the allegedly misleading statements and what statements were misleading, state where and when the statements were made, and explain

---

[1] Defendants request that the Court take judicial notice of certain documents. ECF 44. To the extent the Court takes notice of these documents, it may only take notice of the fact that statements in those documents were made, and any attempt by Defendants to use these exhibits to defeat Plaintiffs' adequately pled claims is improper and highly discouraged by the Ninth Circuit. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (recognizing a "concerning pattern in securities cases" by defendants to improperly exploit judicial notice "to defeat what would otherwise constitute adequately stated claims at the pleading stage").

why the statements were misleading. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). A statement is misleading "if it would give a reasonable 'investor the impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

Even if a statement is technically "not false, it may be misleading if it omits material information." *Khoja*, 899 F.3d at 1008–09; *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014). When defendants "tout positive information to the market," they must "do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016) (quotation marks and citation omitted). "When a corporation chooses to disclose information, it must reveal any information in its possession necessary to render the disclosure not misleading." *In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1418 (N.D. Cal. 1995) ("This rule applies to statements of future projections as well as statements of past performance.").

Courts evaluate whether a statement is misleading from the perspective of a "reasonable investor." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021) In most circumstances, "[w]hether a failure to disclose company problems is an omission causing statements to be misleading is ... a factual determination left to the jury," and thus should not be decided on a motion to dismiss. *In re Newbridge Networks Sec. Litig.*, 962 F. Supp. 166, 180 (D.D.C. 1997).

The Complaint meets these criteria and adequately pleads falsity.

### 1. Defendants Misled Investors About NuScale's Ability to Fulfill the UAMPS Contract

Throughout the Class Period, Defendants misled investors by disclosing an overly rosy picture of the Company's ability to meet the UAMPS subscriber requirements while omitting all negative information concerning NuScale's (non-existent) progress in meeting the requirement and the obstacles the Company faced in recruiting new subscribers.

11

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Hopkins assured investors that the subscription drive was "*going quite well*" and that "*the progress is looking pretty good*." ¶67. A reasonable investor would infer from these comments that the Company was making actual progress from the 25% subscription rate towards the 80% subscription rate necessary to avoid termination of the UAMPS project. Investors would have been surprised to learn that NuScale never added a single new subscriber and that none of the existing subscribers increased their subscriptions. ¶36. "[E]ven 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143–44 (9th Cir. 2017) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).

Defendants also omitted the fact that NuScale inability to reign in its pricing precluded the Company from attracting new subscribers. Former NuScale employees' corroborating statements confirm that (i) potential subscribers were turned off by the $89/MWh price given that cheaper alternatives were available (¶¶37-38); (ii) NuScale's own cost projections exceeded the $89/MWh price that NuScale quoted to investors and potential subscribers (¶¶40-41); and (iii) Defendants were fully aware of the Company's inability the reduce costs and of the consequences to NuScale's business (¶¶40-45). Instead of disclosing that cost concerns were hampering the Company's ability to attract new subscribers, Colbert told investors that 25% of subscribers continuing to move forward with the project after NuScale increased its prices to $89/MWh was "indicative of a market that's changing" in NuScale's favor. ¶64. Once Defendants chose to speak about the relationship between prices and the subscription drive, they had an obligation to tell investors the whole truth so as not to mislead. *See Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 217 (5th Cir. 2023) ("a duty to speak the full truth arises when a defendant undertakes a duty to say anything").

Further, in response to an analyst's question about progress, Hopkins assured him that "***things could change***, ***but*** we see that they will continue to be our first customer, where they will get to subscription, we believe the funding will come through, and we're working diligently to make that happen." ¶72. A reasonable investor would infer from this statement that NuScale was gaining subscribers and was on track to meet the 80% subscription requirement—with a caveat that the pace of new subscriptions could change. Again, investors would have been shocked to learn that NuScale's trajectory was entirely flat and that things would have to drastically change in order for the Company to hit its 80% minimum requirement.

Finally, Defendants misled investors about the market for SMRs amongst UAMPS members. Hopkins assured investors that "public power entities in the Western US" were ideal targets because they "are facing the rapid retirement of coal plants in the expense and the challenge of access to natural gas." ¶¶66, 70. But Defendants failed to disclose that these entities were poor targets for nuclear plants because they were ideal locations for renewable energy plants such as wind and solar – which are far cheaper than nuclear. ¶41.

Defendants make several unavailing arguments as to why none of the alleged misstatements and omissions are actionable.[2] First, Defendants state that the Complaint lacks the particularity

---

[2] Defendants contend, in a footnote, that the Complaint should be dismissed as a "puzzle pleading." Motion at 12-13 & n.7. The Complaint quotes Defendants' public statements and explains why each statement is false or misleading. *See, e.g., Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *7 (D. Or. June 27, 2017), report and recommendation adopted sub nom. Murphy v. Precision Castparts Corp., 2017 WL 3610523 (D. Or. Aug. 22, 2017) (rejecting defendant's puzzle pleading argument and finding complaint alleging misstatements and omissions in a specifically labeled section, organized by fiscal quarter or a particular event, along with the reasons each statement is false or misleading, to be sufficiently particularized). Defendants are well aware of the specific material misstatements and omissions upon which the Complaint is based, as evidenced by the Motion. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) (when Defendants easily parse out false and misleading statements in their motion, the complaint "fulfills the purpose of Rule 8 by putting Defendants on notice of the true substance of the claims against them.").

required by Rule 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). Motion at 12-15. The Complaint identifies the speaker of each challenged statement, quotes the alleged misstatement, alleges when and where the statements were made, and explains how each challenged statement was misleading. ¶¶63-78. Defendants claim that the Complaint fails to identify the precise dates that Defendants learned certain omitted facts is misplaced. Motion at 12-13. As an initial matter, the Motion concedes that NuScale never increased its subscriber level above the 25%--a fact that Defendants knew, and omitted from investors, throughout the Class Period. Motion at 5 ("Unfortunately, by September 30, 2023, subscriptions remained unmoved at 25% of CFPP capacity."). Further, the Motion does not – and cannot – dispute that Defendants were aware of the subscriber rate. *See* ¶72 ("Hopkins claimed to be fully abreast of the latest subscription efforts, stating 'From a timing perspective, we're watching it very closely. We have weekly conversations with our customer at UAMPS. So we're informing each other.'").

The Complaint alleges the timeframes that Defendants learned of the price issues. *See* ¶40 (CW3 states the Company formed a cross-functional team in Spring 2023 to address internal cost projections that exceeded $89/MWh); ¶41 (CW3 left the Company in August 2023 because the pricing team was unable to reduce the costs). "Exact dates, however, are not always necessary to meet the Rule 9(b) pleading standard." *Yinou Pure Furniture Ltd. v. U.S. Pride Furniture Corp.*, 2021 WL 6882211, at \*5 (C.D. Cal. Nov. 17, 2021) (finding "mid-2018" particular enough to satisfy Rule 9(b)) (citing *Shroyer v. New Cingular Wireless Serv.*, Inc., 622 F.3d 1035, 1042 (9th Cir. 2010)). The Motion offers "no reason to believe that defendants will be hampered in their defense" by a lack of particularity. *Odom v. Microsoft Corp.*, 486 F.3d 541, 555 (9th Cir. 2007) (noting that, "Rule 9(b) 'requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations'").

Next, the Motion states – without any accompanying factual or legal argument – that the Complaint fails to plead materiality. Motion at 13. To show materiality, a plaintiff must plead "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). Here, NuScale's ability to meet the 80% subscriber threshold was nearly an existential question for the Company – a failure to meet the threshold would cause the termination of NuScale's only contract and require NuScale to repay UAMPS tens of millions of dollars in reimbursements. Knowing that NuScale had failed to sign up a single new subscriber or convince a current subscriber to increase its subscription would have significantly altered the way investors viewed the value of the Company. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976), ("[t]he determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.").

Next, Defendants assert that none of the alleged misstatements are misleading because they do not "conflict with any omission." Motion at 16. Crucially, Defendants do not even attempt to dispute that (i) Defendants omitted the fact that NuScale failed to add *any* new subscribers or convince any current subscribers to increase their subscriptions; or (ii) given this omission, Defendants' statements misled investors by implying that NuScale was making progress towards the 80% subscription requirement. Further, the Motion states none of the alleged misstatements were misleading because they do not "guarantee that NuScale will meet its 80% subscription goal, claim that no CFPP members have dropped out of the CFPP, or project that CFPP prices are or will be lower than $89/MWh." Motion at 16. As Defendants know, even statements that are not literally false can still be misleading. *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 797 (9th Cir. 2017)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

(reversing dismissal because "though not literally false, the alleged omissions in the Form 8–K filing were misleading"). As explained above, Defendants' overly optimistic statements – taken fully in context – created a misleading picture of the risks NuScale faced in meeting the 80% threshold.

Finally, Defendants attempt to invoke a "truth on the market" defense, claiming that the omitted facts were "well-known to the public at all relevant times." Motion at 16. The "truth on the market" defense is based on the idea that "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000). "[A] 'truth-on-the-market' defense is available in principle . . . but not at the pleading stage." *In re Thoratec Corp. Sec. Litig.*, No. C-04-03168 RMW, 2006 WL 1305226, at *4 (N.D. Cal. May 11, 2006) (quoting *Asher v. Baxter Int'l Inc.,* 377 F.3d 727, 734 (7th Cir.2004). "[T]o avoid liability under this theory, 'any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations.'" *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008) (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)). "As a general rule, the truth-on-the-market defense is intensely fact-specific, so courts rarely dismiss a complaint on this basis." *Id.*

Defendants make no attempt to satisfy their heavy burden to show any such information was conveyed with the necessary degree of intensity and credibility sufficient to counter-balance Defendants' misstatements. *See Sneed v. AcelRx Pharms., Inc.*, 2023 WL 4412164, at *6 (N.D. Cal. July 7, 2023) (refusing to dismiss at pleading stage despite recognizing that "full information . . . was publicly available"). Moreover, the Court should not take judicial notice of the two pre-Class

Period news articles Defendants attach as exhibits – neither of which are mentioned in the Complaint. *See* Motion at 16 & n. 8 (citing Goldberg Exs. 3 and 4).

### 2. Defendants' Statements About UAMPS Are Actionable Even If They Are Opinions

While the majority of the challenged statements are statements of fact, all of the challenged statements would still be actionable if they were treated as statements of opinion. In *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188 (2015), the United States Supreme Court explained that "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience."[3] As the Ninth Circuit explained, "a reasonable investor expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017). Accordingly, "for an opinion to be misleading by omission, (1) the statement must omit material facts about the defendant's inquiry into or knowledge concerning a statement of opinion, and (2) those facts must conflict with what a reasonable investor would take from the statement itself." *Id.* (citation and internal quotation marks omitted) (cleaned up).

As Plaintiffs explained in the previous section, Defendants' statements misled investors because they omitted material facts, and the omission of those facts created a false impression of NuScale's ability to fulfill the UAMPS contract. For these same reasons, to the extent the Court

---

[3] While Omnicare decision was about Securities Act claims under Section 11, the Ninth Circuit has subsequently held that the Omnicare framework is equally applicable to Exchange Act claims under Section 10(b) and Rule 10b-5. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

considers the challenged statements to be opinion, they are still actionable because (i) Defendants omitted material facts concerning the basis of their opinions, and (ii) the omitted facts conflicted with what a reasonable investor would have inferred from the statement itself. Here, there is no dispute that Defendants omitted the following facts: NuScale never added a single new subscriber, and none of the existing subscribers increased their subscriptions (¶81); UAMPS customers were refusing to sign on because the costs were too high (¶¶37-43); and NuScale internally projected costs to be even higher than the $89/MWh Defendants quoted to investors and potential subscribers (¶¶40-41). Accordingly, the only question for the Court is whether these material omissions conflict Defendants' steady beat of optimistic statements.

Defendants were free to believe that NuScale would climb from its current 25% subscriber rate and meet the 80% subscription threshold, but the securities laws prohibit them from omitting material facts conflicting with the opinions they chose to disclose. Over a 6-month period, Defendants told investors that the subscription efforts were "going quite well" (¶67), that "progress is looking pretty good, (*id*.)" that the Company's "working assumption is" that it will hit the 80% subscription requirement (¶71), and that "things" would have to "change" in order for NuScale to miss the 80% requirement (¶72). A reasonable investor would infer from these statements that NuScale was adding subscribers and was on the verge of adding additional subscribers. And "a reasonable investor would place great value in knowledge that" NuScale had failed to attract any new subscribers since the February 2023 DCRA. *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 803 (9th Cir. 2017). The omitted facts thus conflict with the impression created by the disclosed opinions and prevented investors from assessing the likelihood of the termination of the UAMPS deal.

Defendants contend that the omitted facts were merely "some fact cutting the other way." Motion at 19. But NuScale's inability to attract *any* new subscribers over a six month period is a

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

central fact in assessing the likelihood that NuScale would meet the subscriber threshold. In *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770–71 (9th Cir. 2023), the Ninth Circuit rejected the defendants' arguments that the challenged statements were non-actionable opinions. The court held that "w]hen Defendants 'repeatedly reassured investors during the class period that the number ... of prospective sales in the pipeline was unchanged ... and reassured them that the pipeline was full and growing,' they 'affirmatively create[d] an impression of a state of affairs' . . . that did not fairly align with the information in [defendants'] possession at the time." *Id.* at 1144 (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). Similarly, Defendants' rosy assurances did not fairly align with the omitted facts.

Defendants also contend, in a footnote, that the alleged misstatements are inactionable "puffery." Motion at 19 & n. 9. Defendants are wrong. "'In determining whether a statement is puffery, the context matters.'" *In re Bridgepoint Educ., Inc. Sec. Litig.*, 2013 WL 5206216, at *17 (S.D. Cal. Sept. 13, 2013) (quoting *FTC v. Trudeau*, 579 F.3d 754, 766 (7th Cir. 2009)). "What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989); *see also Mulligan v. Impax Laboratories, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) ("the Court may not assess the statements listed in the FAC in a vacuum, 'plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery'"); *Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 872–73 (W.D. Wash. 2022) (denying puffery defense based on defendants' "myopic" characterization of alleged misstatements). "[E]ven 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc., Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).

Other courts have held that statements with descriptors such as "very good," "very pleased," "good progress," and representations that a relationship "was positive" and or program was "very successful," were all, when analyzed in context, actionable.[4] Here, Defendants' repeated statements as to the subscription efforts were crucially important to investors to assess NuScale's current and future financial viability, as evident by analyst follow-up questions during the calls. ¶¶64, 67, 72; *see Glazer Capital Management, L.P.*, 63 F.4th at 770–71 ("This is especially true when "many of the challenged statements were made during earnings conference calls" and "in response to specific questions asked by financial analysts.").

### 3.   Defendants Violated Applicable Accounting Standards

Defendants violated GAAP by failing to record in the Company's Form 10-Q for the second quarter of 2023 an accrual for its probable reimbursement liabilities stemming from its failure to meet performance criteria under the DCRA. ¶¶48-62.

The Company's 2023 Q2 Form 10-Q disclosed the reimbursement liabilities as a loss contingency and estimated that "the maximum expense to the Company would be $11,193 for the DCRA and an additional $4,100 for a separate agreement with CFPP LLC" for "a total of $15,293." ¶57. However, the Company stated that "no accrual has been recorded in our financial statements" because the liability was only "reasonably possible." *Id*. GAAP requires issuers to "record an accrual for a material loss contingency, as a charge against income in its financial statements, if a loss is both probable and reasonably estimable." *See* ASC 450-20-25-2. Plaintiffs adequately allege that NuScale should have recorded an accrual for its reimbursement liabilities because a loss was both probable and reasonably estimable.

---

[4] *See In re Fibrogen, Inc.*, 2022 WL 2793032, at \*8 (N.D. Cal. July 15, 2022); *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at \*12 (N.D. Cal. Jan. 6, 2022); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at \*8 (S.D.N.Y. May 24, 2018); *In re Avon Sec. Litig.,* 2019 WL 6115349, at \*16 (S.D.N.Y. Nov. 18, 2019).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Defendants do not contest that the Company's liabilities were reasonably estimable. Rather, Defendants contend that the difference between "reasonably possible" and "probable" is "nitpicking" and suggest that accounting failures are inactionable because they are "judgment calls." Motion at 22. While following applicable accounting rules often requires judgment, violations of ASC 450 are still actionable. *See, e.g., In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at \*6 (C.D. Cal. June 7, 2018); *In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at \*7 (C.D. Cal. June 6, 2016).

### 4. The PSLRA's Safe Harbor Does Not Save Defendants

Defendants contend that "many" of the alleged misstatements are protected by the PSRLA's safe harbor provision. Motion at 19. To receive the benefit of the safe harbor, a statement must either be "identified as such and accompanied by meaningful cautionary statements" or be made without actual knowledge of its falsity. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010). For several reasons, Defendants are not entitled to safe harbor protection.

First, the PSLRA's safe harbor for forward-looking statements does not apply where, as here, Plaintiffs allege that Defendants omitted present facts. Where plaintiffs "sufficiently alleged that Defendants were aware of and concealed adverse facts that gave investors a misleading impression," the challenged "statements are not protected by the PSLRA's safe harbor." *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at \*18 (N.D. Cal. Feb. 23, 2023).[5]

---

[5] S*ee also Prodanova v. H.C. Wainwright & Co., LLC*, 2018 WL 8017791, at \*12 (C.D. Cal. Dec. 11, 2018) (safe harbor does not apply where complaint is based on the omission of a present fact); *Loftus v. Primero Mining Corp.*, 230 F. Supp. 3d 1209, 1225 (C.D. Cal. 2017) ("[B]ecause Plaintiffs allege that the way in which Primero's representations about future tax projections were misleading was by omitting already-existing historical facts ... these representations are not protected by the safe harbor provisions."); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012), *aff'd sub nom. Fresno Cnty. Employees' Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015) ("[T]o the extent Plaintiffs [ ] challenge Defendants' alleged *omission of present facts* with respect to the challenged statements, the PSLRA's safe harbor does not apply.") (emphasis in original); *In re CV Therapeutics, Inc.*, 2004 WL 1753251, at \*10 (N.D. Cal. Aug. 5,

Second, the statements identified by Defendants' statements are, at most, mixed statements that combine both forward-looking statements and non-forward-looking statements. ¶¶64, 70, 72. "[A] defendant may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor provisions of the PSLRA by combining non-forward-looking statements about past or current facts with forward-looking statements about projected revenues and earnings." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017). "Where, as here, forward-looking statements are accompanied by non-forward-looking statements about current or past facts, that the non-forward-looking statements are, or may be, untrue is clearly an 'important factor' of which investors should be made aware." *Id.* at 1148 ("virtually no cautionary language short of an outright admission that the non-forward-looking statements were materially false or misleading would have been adequate"). Similarly, "even a promise or forward-looking statement can become an inaccurate assertion as to a matter of past or existing fact if repeated filing creates an 'impression of a state of affairs that differs in a material way from one that actually exists.' " *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 759 (S.D. Tex. 2012) (quoting *Reese v. BP Exploration*, 643 F.3d 681, 691 (9th Cir. 2011)).[6]

### 5. The Standard Power Statements Misled Investors

Knowing that the UAMPS deal was about to fall through, Defendants attempted to preempt investor panic by announcing a new partnership with Standard Power. NuScale's press release claimed that the Company "will end up providing 24 units of 77 MWe modules producing 1,848 MWe" of energy—exactly four times more energy than NuScale would have provided under the

---

2004) ("The fact that defendants used [ ] inadequately disclosed historical facts to support unsound projections does not shield their alleged misrepresentations as forward-looking statements.").

[6] Safe harbor is also unavailable to Defendants because Plaintiffs adequately allege that the statements at issue were knowingly misleading.

UAMPS agreement. ¶¶63, 74. On an investor call later that day, Hopkins called it a "major announcement" and a "massive move." ¶75. Similarly, Hamady said it was a "great win." ¶77. Scott emphasized that the deal was "an immediate situation," that Standard Power "need the power like last year . . . [t]hey need it now" and that "they have the demand." ¶76. Scott also claimed NuScale would "start immediate work with Standard." *Id*.[7]

Plaintiffs adequately allege Defendants' press release and statements on the investor call were materially misleading. First, Standard Power did not "need the power like last year" or "now." ¶76. Standard Power's reported data mining capacity as of September 2022 was just 50 MWe, and their own website revealed that the planned Ohio plant consisted of "a 40 megawatt blockchain mining operation and a data center with critical capacity of up to 12 megawatts." ¶82. Second, Defendants omitted the red flags about Standard Power's leadership. CEO Maxim Serezhin has an outstanding $54,000 tax warrant in New York. The SEC obtained a default judgment against former managing director Adam Swickle in 2005 for securities fraud,[8] resulting in over $700,000 in monetary penalties. Defendants' omission of these red flags, while issuing over-the-top praise of the new partnership, misled investors about the prospect any deal coming to fruition. *See S.E.C. v. Merch. Cap., LLC*, 483 F.3d 747, 770 (11th Cir. 2007) ("a reasonable investor *would* have been interested in Wyer's previous personal bankruptcy, and that it was thus materially misleading to

---

[7] Tellingly, there is still no contract with Standard Power, much less "immediate" work. *See* May 9, 2024 Investor Call Transcript, at 9 ("People ask me about where is standard power? They're still there that these are large and complicated financial transactions that just take time to finalize.") (available at https://www.nuscalepower.com/-/media/nuscale/pdf/investors/2024/smr-1q24-transcripts.pdf)

[8] A separate default judgment was entered against Swickle for his involvement in an entirely different securities fraud scheme when he worked at Cobalt Capital. *Cobalt MultiFamily investors I, LLC v. Lisa Arden*, 2010 WL 3791040, at *4 (S.D.N.Y. Sept. 9, 2010), *report and recommendation adopted sub nom. Cobalt Multifamily investors I, LLC v. Arden*, No. 06 CIV.6172 KMW MHD, 2010 WL 3790915 (S.D.N.Y. Sept. 28, 2010).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

omit the information"); *Vignola v. FAT Brands, Inc.*, 2019 WL 6888051, at \*10 (C.D. Cal. Dec. 17, 2019) ("A reasonable person reading the statements regarding the experience and track record of the Company's leadership team and a previous entity's bankruptcy could be misled by the omission of the 2009 bankruptcies and subsequent delisting of FCCG, which resulted from the same leadership team's inability to obtain financing in connection with an acquisition spree in the restaurant industry, sufficient at the pleading stage").

The Motion does not meaningfully address any of these alleged facts.[9] Instead, the Motion baselessly asserts that the alleged facts are not actually facts because they were first brought to light by Iceberg. Motion at 14-15, 16-17. But "it is not *per se* improper for a short-seller report to be incorporated into and form the basis of a securities class action complaint's allegations regarding falsity." *In re Mullen Auto. Sec. Litig.*, 2023 WL 8125447, at \*8 (C.D. Cal. Sept. 28, 2023) (finding plaintiffs adequately pled falsity despite relying on short seller report and holding that "[d]isputes about the reliability of the Hindenburg Report are factual disputes to be resolved at a later stage." Further, the facts that the Iceberg Report brought to light are independently verifiable and have been verified by Plaintiffs' counsel. The allegations concerning Standard Power's power needs come from a news article and Standard Power's own website, and the allegations concerning management's red flags are verified by government websites.[10]

Defendants' reliance on a single inapposite case, *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017), is misplaced. In *Align Tech*, the court held that "Plaintiff's allegation that Defendants failed to conduct any goodwill impairment

---

[9] Ignoring Plaintiffs' actual allegations, the Motion wrongly states that "Defendants' statements were merely that NuScale 'planned' to 'develop two small modular reactor (SMR)-powered facilities' for Standard Power.

[10] *See* https://www.sec.gov/enforcement-litigation/litigation-releases/lr-19411

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

testing at the end of 2011 is not a *fact*, but rather Plaintiff's *conclusion* based on its belief that no set of reasonable assumptions could support Defendants' determination in the fourth quarter of 2011 that the SCCS goodwill was unimpaired." Here, Plaintiffs' allege facts, not conclusions, that plausibly plead falsity.[11]

### B.    Plaintiffs Adequately Allege Scienter

Plaintiffs allege facts raising a strong inference of scienter, which not only includes knowledge, "but also deliberate recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). The "inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 322– 23. A "strong inference" is raised when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference" of nonfraudulent intent. *Id.* at 310. The scienter inference "need not be irrefutable . . . or even the most plausible," and no "smoking-gun" is required. *Id.* at 324–26. Moreover, "a tie goes to the plaintiffs when there are multiple plausible theories at the pleadings stage of litigation." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014).

Here, Defendants fail to offer any competing non-fraudulent inference. Instead of identifying any plausible innocent explanation, Defendants improperly seek to "attack individual

---

[11] Defendants complain that the Complaint fails to "inexorably establish[] as 'fact' that Standard Power and Entra1 were incapable of fulfilling their plans with NuScale. Motion at 15. But Plaintiffs do not need to *prove* falsity at the pleading stage; they only need to plead particularized facts that make falsity *plausible. See, e.g., In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) ("so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds"). Plaintiffs have done that.

allegations in isolation," which "cannot overcome the overwhelming evidence drawn from a holistic view." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012).

### 1. Defendants Knew Or Recklessly Disregarded the Omitted Facts About The UAMPS Partnership

"Particularized allegations that defendants had actual access to the disputed information raise a strong inference of scienter." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017)) (cleaned up); *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) (allegations regarding "management's role in a company" may independently satisfy the PSLRA scienter requirement where they are "particular and suggest that the defendant had actual access to the disputed information."). The Complaint pleads facts demonstrating that Defendants knew the material facts that they omitted from investors and that contradicted their statements to investors.

First, Hopkins and Colbert knew that NuScale had failed to attract any new subscribers. Hopkins told investors that "we're watching it very closely. We have weekly conversations with our customer at UAMPS. So we're informing each other." ¶72. Hopkins also frequently spoke to investors about NuScale's purported progress in recruiting new subscribers and his collaborative work with UAMPS. *See* ¶66 ("Hopkins stated that NuScale was "working closely with UAMPS on securing additional subscriptions"); ¶67 ("we continue to work with the customer"); ¶72 ("there's a lot of discussions we're having right now with Western public utilities"). CW2 corroborated that, in meetings, Hopkins "paid close attention to what happened with the CFPP." ¶39.

Colbert also spoke to investors in detail about the Company's subscription efforts. *See* ¶64. According to CW2, the UAMPS deal was Colbert's "baby." ¶39. Colbert pushed to put the project together and kept close tabs on it throughout his tenure. *Id*. CW2 reported to Hamady and stated that, in meetings, Hopkins "paid close attention to what happened with the CFPP." Colbert also told investors that "we are staying on top of cost estimate changes, communicating these to existing customers and incorporating them to discussions with prospects." ECF 43-5, at 7.

26

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### 2.  Plaintiffs Adequately Allege A Core Operations Theory

Under the core operations doctrine, "it may be inferred that facts critical to the business's 'core operations' or important transactions are known to key company officers." *South Ferry LP*, 542 F.3d at 781. "The core operations doctrine generally applies to transactions worth millions of dollars or when operational issues affect a significant portion of the company's revenue and are of the type for which company officials are responsible." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, *11 (C.D. Cal. Aug. 4, 2014). For example, in *Berson v. Applied Signal Tech., Inc.*, the Ninth Circuit found a strong inference that officers "directly responsible for [the company's] day-to-day operations" would not have known about stop work orders affecting tens of millions of dollars of the company's work. 527 F.3d 982, 987–89 (9th Cir.2008). Similarly, in *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. American West Holding Corp.*, the Ninth Circuit concluded that given the gravity of the ongoing systematic operational problems and FAA's investigation, which could have cost the company $11 million, "[i]t is absurd to suggest that the Board of Directors would not discuss" those issues. *Id.* at 943 n.21.

Here, it is reasonable to infer that Defendants knew the basic operational information concerning the UAMPS contract and subscription drive. UAMPS was NuScale's first and most important of NuScale's two customers. ¶32; *see also* ECF 43-2, at 17 (listing UAMPS and RoPower/SNN as the Company's two customers). The Company's efforts to secure new subscribers were essential to the Company's survival, and they knew that the pricing of the nuclear plants was the deciding factor in recruiting new subscriptions. ¶¶37-42. These facts, in addition to Defendants' own statements professing their involvement and knowledge of the subscription drive and the corroborating statements of the confidential witnesses, plead a strong inference of scienter. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) ("A plaintiff must produce either specific admissions by one or more corporate executives of detailed

involvement in the minutia of a company's operations, such as data monitoring; or witness accounts demonstrating that executives had actual involvement in creating false reports").[12]

### 3. Defendants Knew or Were Willfully Blind About the Standard Power Contract

Corporate executives cannot escape liability for making materially misleading statements by turning a blind eye to plain facts. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) ("an actor is reckless if he 'had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [he] could have done so without extraordinary effort'") (citing *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir. 1984)). Here, Defendants were obligated to perform at least a modicum of diligence concerning Standard Power's power needs, its financial wherewithal, and the backgrounds of its managers. Defendants either knowingly omitted these facts from investors or were willfully blind.

Further, Defendants cannot escape the highly suspicious timing of the Standard Power announcement on October 6. The announcement came less than a week after Defendants determined that termination of the UAMPS project was "probable"—but, crucially, before Defendants disclosed this determination to investors. ¶59. Defendants knew the collapse of the UAMPS deal would cause investor panic, so they rushed and overhyped the Standard Power announcement to preempt the panic. ¶¶3, 45. Hamady's statements on the October 6 call confirm that the intent of the announcement was solely to rally the stock price. Hamady said it was a "great win" because it caused the price of NuScale's stock to increase by over 20%: "I think we can consider today a great win. And if I look to see how the markets reacted, at some point, we were up

---

[12] The Individual Defendants' scienter can be imputed to the Company. *See, e.g., U.S. Sec. & Exch. Comm'n v. C3 Int'l, Inc.*, 2022 WL 16814859, at *5 (C.D. Cal. Nov. 7, 2022) (executive's "scienter can be imputed to [corporate defendant] because a corporation is responsible for a corporate officer's fraud committed within the scope of his employment").

21%, 22% today. I think the investment public sees this is a great win. So we're very happy with the performance we have today." ¶77.

Further, confidential witnesses confirm that Hamady and Scott either knew or recklessly disregarded the fact that neither ENTRA1 or Standard Power had neither the finances nor the demand for a deal of that magnitude. ¶46, 84. The Standard Power contract was arranged through ENTRA1 (¶44), and Hamady worked closely with ENTRA1 founder Wadie Habboush. ¶46. Further, CW1 confirmed that the collaborative efforts with ENTRA1 were handled by Scott: "That was his (Scott's) relationship. He facilitated the whole thing." *Id*.

### 4.   GAAP Violation Supports Strong Inference of Scienter

To plead scienter for accounting violations, a "plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1018 (9th Cir. 2005); s*ee also In re Obalon Therapeutics, Inc*., 2019 WL 4729461, at *9 ("when significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves"). Defendants estimated that, as of June 30, 2023, the maximum expense to the Company under the DCRA was $15.3 million. ¶57. Defendants failure to accrue the $15.3 million was material given that the Company reported under $6 million in revenue that quarter and reported a net loss of nearly $30 million. *See* ECF 43-9 at 7.

### 5.   Motive and Opportunity Support the Inference of Scienter

"[U]nusual' or 'suspicious' stock sales by corporate insiders," which enable Defendants to cash out prior to disclosure of materially adverse facts, may constitute circumstantial evidence of scienter." *Am. West Holding Corp.*, 320 F.3d at 938 (citation omitted). "To evaluate suspiciousness of stock sales, we consider, inter alia, three factors: (1) the amount and percentage of shares sold;

(2) timing of the sales; and (3) consistency with prior trading history." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017) (citation omitted).

Here, Colbert's insider stock sales were highly suspicious. Colbert, who spearheaded the CFPP project, sold off all 238,456 of his NuScale shares during the Class Period before the first corrective disclosure. ¶92. Colbert sold 13,227 shares between May 15, 2023 and May 17, 2023 for $107,605 in proceeds and 149,644 shares between June 20, 2023 and June 26, 2023 for $1,139,229 in proceeds. *Id*. Further, Colbert's wife sold 75,585 shares on October 13, 2023—less than a week before the first corrective disclosure—for $436,216 in proceeds. *Id*. In total, Colbert and his wife sold $1,683,050 worth of NuScale stock during the Class Period while in possession of material, non-public information. *Id*. The Colberts' total proceeds for these insider sales represented more than four times his total salary for 2022, as reported in the Company's proxy statement. Neither of the Colberts had sold NuScale stock prior to the Class Period. *Id*.

There is no question that the amount and percentage of shares sold (100% of his shares for nearly $1.7 million), the timing of the sales (all sales came after his alleged misstatements and before the first corrective disclosure, including sales just six days before the first corrective disclosure), and the consistency of the trades with his prior practice (he had never sold any shares prior to the Class Period) all support an inference of scienter. Defendants' attempts to downplay the suspiciousness of these sales fail. Motion at 28-29.[13]

---

[13] Colbert's suspicious departure is also indicative of scienter. ¶43 (CW5 says Colbert left the Company "abruptly" and that CW5 took Colbert's departure as more indication that the CFPP project was likely not going well because it had been Colbert's "baby" from the beginning); *see also Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017) (resignation of the company's president bolstered the strong inference of scienter alleged); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1187–1188 (C.D. Cal. 2007) ("highly suspicious" resignation leaned "heavily towards a finding of scienter").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### 6. The Inference of Scienter Is At Least As Compelling as Defendants' Suggested Inference

Viewed holistically, as the Court must, the Complaint pleads a strong inference of scienter. Even if each individual scienter allegations are insufficient, the Court must "conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (reversing dismissal and finding a strong inference of scienter). The holistic review must consider even "[v]ague or ambiguous allegations" because "federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Here, Plaintiffs' collective scienter allegations are sufficient. *See, e.g., Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) ("Because Plaintiffs have alleged that Defendants were aware of or had access to information contrary to their public statements, that the misstatements concerned E\*TRADE's core operations, that Defendants violated GAAP provisions, and that Defendants benefited from the from the misrepresentations through stock sale, Plaintiffs have adequately pled scienter.").

Defendants fail to put forward a plausible or compelling non-fraudulent inference. The Motion makes no attempt to explain why Defendants touted the progress of the subscription drive while omitting the fact that NuScale hadn't attracted a single new subscriber. Motion at 24-25. Defendants' "genuine belief" (Motion at 31) that NuScale would miraculously jump from 25% subscription rate to an 80% subscription rate after making zero movement on recruiting new subscribers for months does not excuse Defendants from issuing misleading statements to investors. "It is far from implausible that a corporate executive who had spent months building excitement and momentum around important, new technology products might recklessly misrepresent the inability to deliver on those promises." *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at \*21

31

(C.D. Cal. May 8, 2013); *see also In re DVI, Inc. Sec. Litig.*, No. 2:03-CV-05336, 2010 WL 3522086, at *10 (E.D. Pa. Sept. 3, 2010) ("Even assuming that Defendant, a 'sophisticated businessman,' had a good faith belief in the truth of his statements, his subjective belief will not suffice if 'Defendant was reckless in not knowing information that would prove those statements to have been false or misleading."). Likewise, Defendants do not attempt to explain how they could have been ignorant of the disparity between the massive size of the announced Standard Power Deal (1,848 MWe) and the actual power that Standard Power needed (around 100 MWe). ¶82.

In place of a non-fraudulent explanation, Defendants attack the credibility of the confidential witnesses and the Iceberg Report. Motion at 25-27, 30. Defendants' attempt to persuade the Court to ignore the confidential witnesses fails. *See, e.g., Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *3 (N.D. Cal. Sept. 4, 2012). ("Although the confidential witness allegations do not directly show that the Defendants knew their statements were false, the allegations do provide critical background information . . . that supports the court's finding. The Plaintiffs' failure to recruit a confidential witness with personal knowledge of the Defendants' mental state does not mean the allegations must be disregarded altogether."); *see also* ¶39 (CW2 reported to Hamady and attended meetings with Hopkins).

C.    **The Complaint Adequately Pleads Loss Causation**

To recover for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must establish "'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "The Ninth Circuit has explained that a plaintiff is not required to show that a misrepresentation was the sole reason for the investment's decline in value' in order to establish loss causation." *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009) (internal quotation marks omitted). "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is

inappropriate." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). "This is not a probability requirement . . . it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of loss causation." *Id.* A plaintiff may establish loss causation by showing that a corrective disclosure caused the stock price to decline. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008). A "corrective disclosure" is a disclosure that reveals the fraud, or at least some aspect of the fraud, to the market. *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011).

Plaintiffs plead three corrective disclosures: (i) the Iceberg Report on October 19, 2023 (¶¶79-85); (ii) the Company's announcement of the termination of the UAMPS deal on November 8, 2023 (¶¶87-88); and (iii) the Huffington Post article announcing NuScale's mass layoffs on January 5, 2024 (¶¶89-90). Each of these disclosures revealed new information to the market, were connected to the alleged misstatements, and caused a significant drop in the Company's stock price.

Defendants challenge each corrective disclosure. Motion at 32-35. Each challenge is misplaced.

First, the Motion wrongly states that Iceberg Report "cannot be a corrective disclosure" because they "stand[] to gain if NuScale's stock drops" and because short seller reports that reveal public information cannot serve as corrective disclosures. Motion at 33. The Ninth Circuit recently rejected this argument in *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1186 (9th Cir. 2024). The Ninth Circuit explained that the argument a short seller report "did not reveal the truth to the market because it reflected information that was already public. . . . takes an overly restrictive view of our precedent." *Id.* Rather, courts must examine "whether the pre-existing public information at issue is related to the alleged misrepresentation, and whether it is readily available to the public, easily digestible in its native format, and understandable to a lay person, among other factors." *Id.* ("securities issuers should not escape liability for misrepresentations merely because

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

they can show that corrective information was publicly available on some webpage tucked in a deep corner of the internet"). The Iceberg Report meets this criteria, combining information from all corners of the internet, including: an Australian website, LinkedIn, a Cipher Mining filing, a New York government website, FINRA, an SEC complaint from 2003, minutes of an Idaho Falls Power Board meeting, and a YouTube video of a Washington City Power Board meeting. *See* ECF 43-16.

Second, Defendants assert the press release announcing the termination of the UAMPS deal is unrelated to the alleged misstatements concerning NuScale's progress in achieving the requirements of the UAMPS deal. Motion at 34. Defendants are wrong; the termination revealed that Defendants' overly optimistic statements were misleading. *See, e.g., In re NIO, Inc. Sec. Litig.*, 2023 WL 5048615, at *14 (E.D.N.Y. Aug. 8, 2023) (announcement of termination of construction project served as corrective disclosure for alleged misstatements about progress of project).

Third, Defendants contend the Huffington Post article is not a corrective disclosure because "facts relating to these layoffs are irrelevant to Defendants' alleged misstatements or omissions about the CFPP." Defendants are wrong. In (falsely) denying the Iceberg Report, Defendants "denied that the Company was facing a cash crunch and quoted Hopkins stating that 'we have a solid debt-free balance sheet and a talented and dedicated team.'" ¶86. The Huffington Post article revealed that "as mounting costs and the cancellation of its landmark first power plant have burned through shrinking cash reserves, the Oregon-based company is laying off nearly a third of its workforce." ¶8.

### D.    Plaintiff Adequately Alleges Control Person Liability

Plaintiffs adequately plead control person liability under Section 20(a) by alleging primary violations and the Individual Defendants were in positions of control. ¶¶17-21; *see In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *21 (S.D. Cal. May 23, 2017).

## IV.    CONCLUSION

The Motion should be denied in their entirety. Alternatively, if the Court grants any portion

of the Motion, Plaintiffs respectfully request leave to amend.[14]


Dated: August 1, 2024                    Respectfully submitted,

                                         **THE ROSEN LAW FIRM, P.A.**
                                         By:  _/s/ Phillip Kim_____
                                         Phillip Kim, Esq. (pro hac vice)
                                         Laurence M. Rosen, Esq. (pro hac vice)
                                         Daniel Tyre-Karp (pro hac vice)
                                         275 Madison Avenue, 40th Floor
                                         New York, NY 10016
                                         Telephone: (212) 686-1060
                                         Fax: (212) 202-3827
                                         Email: pkim@rosenlegal.com
                                                 lrosen@rosenlegal.com
                                                 dtyrekarp@rosenlegal.com

                                         *Lead Counsel for Lead Plaintiff and the Class*

                                         **RANSOM, GILBERTSON, MARTIN &
                                         RATLIFF, LLP**
                                         Jeffrey S. Ratliff, OSB 895422
                                         5441 S Macadam Ave, Suite 301
                                         Portland, OR 97239
                                         T: 503-226-3664

                                         *Liaison Counsel for Lead Plaintiff and the Class*

---

[14] *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (holding that leave to amend should be freely granted unless "the pleading could not possibly be cured by the allegation of other facts"); *Osher v. JNI Corp.*, 183 F. App'x 604, 605 (9th Cir. 2006) ("[l]eave to amend is to be granted with extreme liberality in securities fraud cases, because the heightened pleading requirements imposed by the PSLRA are so difficult to meet").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS