RANSOM, GILBERTSON, MARTIN &
RATLIFF, LLP
Jeffrey S. Ratliff
8401 NE Halsey Street Suite 208
Portland, OR 97220
T: 503-226-3664

*Liaison Counsel for Plaintiff*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**

| | |
|---|---|
| SCOTT SIGMAN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NUSCALE POWER CORPORATION, JOHN L. HOPKINS, CHRIS COLBERT, ROBERT R. HAMADY, and CLAYTON SCOTT,<br><br>Defendants. | **Case No: 3:23-cv-01689-IM**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Lawrence Lo and named plaintiffs Adam Kay, Keith Irving, and Philip Holland ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding NuScale Power Corporation. ("NuScale" or the "Company"), analysts' reports and advisories about the Company, interviews with witnesses, and information readily obtainable on the Internet.

Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly-traded NuScale securities between March 15, 2023 and August 2, 2024, inclusive (the "Class Period"). Plaintiffs seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 19(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. NuScale is a nuclear power company that develops small modular reactor ("SMR") technology. It claims that its SMRs will "deliver safe, scalable, cost-effective and reliable carbon-free power." NuScale has not yet commercialized any SMRs.

3. On the morning of October 19, 2023, Iceberg Research issued a research report ("Iceberg Report") that contradicted NuScale's claims that it could fulfill two large contracts: (1) a contract with the Utah Associated Municipal Power Systems ("UAMPS") for its Carbon Free Power Project ("CFPP"), and (2) a contract with Standard Power, a company providing data center services for businesses focusing on blockchain mining and high performance computing applications. The Iceberg Report detailed how the UAMPS contract would likely be terminated due to the Company's inability to meet the 80% subscriber target. Further the Iceberg Report explained that the Standard Power announcement was a sham—the small company could not possibly execute on the $37 billion project. Confidential Witnesses corroborate the findings of the Iceberg Report.

4. On October 19, 2023, the Company's share price fell $0.61 per share, or 12.0%, to close at $4.46 per share, on unusually high trading volume. On October 20, 2023, the Company's share price continued to fall another $0.67 per share, or 14.9%, to close at $3.80 per share, on unusually high trading volume.

5. On October 24, 2023, the Company issued a press release denying Iceberg's allegations.

6. On November 8, 2023, after the market closed, NuScale and UAMPS announced that they had mutually agreed to terminate the CFPP contract because – as Iceberg had detailed – they had failed to engage enough subscribers. The Company also disclosed that it expected to make a $49.8 million reimbursement payment to UAMPS.

7. On this news, the Company's share price fell $1.02 per share, or 32.9%, to close at $2.08 per share on November 9, 2023, on unusually high trading volume.

8. On January 5, 2024, *The Huffington Post* published an article entitled "Mass Layoffs At Pioneering Nuclear Startup**."** Citing an audio recording of a virtual all-hands meeting and "two sources with direct knowledge of NuScale's plans," the article reported that as mounting costs and the cancellation of its landmark first power plant have burned through shrinking cash reserves, the Oregon-based company is laying off nearly a third of its workforce." The article quoted a NuScale engineer who had been laid off: "The company had become far less transparent since its stock market debut, the former employee said, noting that the press release announcing the power plant's cancellation claimed that NuScale and its partners 'mutually' decided to call it quits. 'As much as NuScale might publicly say it was a mutual decision,' the employee said, 'I bet they'd say laying us off was a mutual decision to part ways, too.'"

9. On this news, the Company's share price fell $0.24 per share, or 8.4%, to close at $2.62 per share on January 5, 2023, on unusually high trading volume.

10. In March 2024, NuScale warned investors that a hypothetical SEC inquiry into the Company could harm the Company's performance. On July 29, 2024, a different short seller – Hunterbrook Media – published a letter from the SEC stating that the SEC was conducting an "active and ongoing" investigation of NuScale. This report contradicted NuScale's March 2024 warning about a hypothetical SEC inquiry – the inquiry was an actual risk, not a hypothetical one. NuScale initially denied the report on July 29 before admitting on August 2, 2024 that the Company received an inquiry from the SEC in December 2023. From the time of Hunterbrook's first report on July 29, 2024 to NuScale's eventual corrective disclosure on August 2, 2024, the Company's share price fell $2.26 per share, or 20.8%, on unusually high trading volume.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Additionally, the Company's principal offices are located in this District and Division.

14. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of

interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15. Lead Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased NuScale securities during the Class Period and was economically damaged thereby. Lead Plaintiff's PSLRA certification was previously filed with the Court and is incorporated by reference herein.

16. Named plaintiffs Adam Kay, Keith Irving, and Philip Holland purchased NuScale securities during the Class Period and were economically damaged thereby. Their PSLRA certifications were previously filed with the Court and are incorporated by reference herein.

17. Defendant NuScale is incorporated under the laws of Delaware with principal offices located in Portland, Oregon. NuScale's common stock and warrants trade on the New York Stock Exchange under the symbol "SMR."

18. Defendant John L. Hopkins was the Company's Chief Executive Officer at all relevant times..

19. Defendant Chris Colbert was the Company's Chief Financial Officer until August 7, 2023.

20. Defendant Robert R. Hamady has served as the Company's Chief Financial Officer since August 7, 2023.

21. Defendant Clayton Scott served as the Company's Executive Vice President of Business Development until August 7, 2023, when he was promoted to Chief Commercial Officer.

22. Defendants Hopkins, Colbert, Hamady, and Scott are collectively referred to herein as the "Individual Defendants." Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

23. NuScale is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

24. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to NuScale AG under *respondeat superior* and agency principles.

25. Defendant NuScale and the Individual Defendants are collectively referred to herein as "Defendants."

## RELEVANT NON-PARTIES

26. Fluor Corporation ("Fluor") is the majority stockholder of NuScale and owns a majority of the voting power of the Company's common stock. Fluor collaborates with the Company on its projects.

27. Confidential Witness 1 ("CW1") was a Director of Business Development at NuScale from January 2023 to July 2023 who sought out potential new customers for the Company.

28. Confidential Witness 2 ("CW2") was a senior financial employee at NuScale from 2022 through October 2023. CW2 oversaw budgeting, forecasting, costs, and cash flow at NuScale.

29. Confidential Witness 3 ("CW3") was a Contracts Manager at NuScale from December 2022 to August 2023. CW3 oversaw the contracts NuScale signed with third party companies and was involved in issuing requests for proposals.

30. Confidential Witness 4 ("CW4") was a Senior Project Manager at NuScale from October 2019 to January 2024. CW4 worked with both the commercial and engineering sides of project management.

31. Confidential Witness 5 ("CW5") was a Director of Sales at NuScale from September 2018 to January 2024. CW5 helped try to generate leads and locate potential customers for NuScale.

32. Confidential Witness 6 ("CW6") was a senior engineer for Fluor from January 2016 to June 2024. CW6 worked on licensing for the CFPP.

## BACKGROUND

33. NuScale was founded in 2007 with the mission to "improve the quality of life for

humankind by advancing nuclear power." It aims to change nuclear power by developing SMRs, which have lower power capacities and, by extension, lower costs than conventional nuclear reactors. NuScale developed the NuScale Power Module ("NPM"), its core SMR technology that can generate 77 million watts of electric power ("MWe"). Its power plant design, the VOYGR, can accommodate up to 12 NPMs for a total maximum gross output of 924 MWe.

34. NuScale started trading publicly on May 3, 2022 following a merger with special purpose acquisition company Spring Valley Acquisition Corp.

35. UAMPS was NuScale's first customer. On April 9, 2015, NuScale and UAMPS jointly submitted a grant application to the United States Department of Energy ("DOE") for the CFPP. DOE authorized UAMPS to develop the CFPP at the DOE's Idaho National Laboratory site to provide power to UAMPS's members (mainly municipalities in the western United States). Until NuScale and UAMPS terminated their agreement, they contemplated that UAMPS would deploy a VOYGR power plant with six NPMs, for a total of 462 MWe. NuScale told investors that construction would begin in 2025 and that the plant would be operational in 2029. NuScale's contract with UAMPS, under which it would provide support of license applications, startup and testing, initial training, and initial fuel services, was valued at over $9 billion.

36. Between 2016 and 2020, NuScale projected pricing the power for the CFPP at $55/MWh. In 2021, NuScale raised the target price to $58/MWh.

37. In January 2023, however, the price rose to $89/MWh. NuScale attributed the increase to inflationary pressures and rising interest rates. The 53% increase in the NuScale's target power price since 2021 has been driven by a dramatic 75% jump in the project's estimated construction cost, which has risen from $5.3 billion to $9.3 billion.

**Defendants Misled Investors About Likelihood of Reaching 80% Subscription**

38. On February 28, 2023, NuScale and UAMPS amended their Development Cost Reimbursement Agreement ("DCRA"). The amendment provided that if UAMPS and NuScale failed to meet their subscription target by February 1, 2024, UAMPS could terminate and existing subscribers would be refunded their costs. Under the amendment, the Company may be obligated to refund to UAMPS a percentage of its net development costs if CFPP does not secure a total of 370 MWe of committed subscription obligation. The total of 370 Mwe represented 80% of the total 462 MWe under the UAMPS agreement. The committed level of subscription as of February 28, 2023 was 120 Mwe, or 25%.

39. Throughout the Class Period, Defendants misled investors about the likelihood of meeting the 80% subscription threshold and the Company's progress towards meeting the 80% level. Despite repeated assurances from Defendants that the Company was making good progress, NuScale and UAMPS failed to add *any* new subscriptions during the Class Period.

40. Defendants knew that some members had opted out of the plan when NuScale revised its pricing from $58/MWh to $89/MWh, which was simply too expensive given the cheaper alternatives. And Defendants knew they could not bring the prices down—if anything, they would increase further.

41. CW1 said the Company knew potential subscribers were turned off by the long schedule of construction and implementation and that the price increase caused them to turn to non-nuclear options.

42. CW6 attended weekly CFPP meetings between representatives of NuScale, Fluor, and UAMPS to discuss the status of the project. CW6 stated that NuScale and UAMPS were "joined at the hip" in the process of meeting the minimum subscriber levels and that the lack of progress was regularly discussed at the weekly meetings.

43. According to CW2, the CFPP deal was Colbert's "baby." Colbert pushed to put the project together and kept close tabs on it throughout his tenure. CW2 reported to Hamady and stated that, in meetings, Hopkins "paid close attention to what happened with the CFPP."

44. According to CW3, in Spring 2023 the Company's internal projections saw costs exceeding $89/MWh. In response, NuScale formed a cross-functional team to explore ways to bring costs down to attract new subscribers.

45. CW4 confirmed that the Company's internal cost projections exceeded the $89/MWh target and that the cross-functional team had been tasked with finding ways to reduce costs. CW4 said the team evaluated "a few dozen" different cost reduction approaches, but that none had a significant impact on cost. After evaluating different avenues for saving, it became clear to the Company that cutting construction costs significantly for CFPP was unlikely.

46. CW3 said the team's efforts were ultimately futile – "They were trying to get it down below $89, but there was no way that was going to happen. That's when I was like, these are major red flags. That's why I departed." CW3 stated that, contrary to Defendants' pronouncements otherwise, Western states were poor targets for nuclear power because they are ideal locations for renewable electricity plants such as wind and solar, which are many times cheaper to build than a nuclear plant. CW4 confirmed that the small utilities the Company was targeting as subscribers simply couldn't afford to invest in such a longterm project. "They don't have any money. It's very thinly run margins. They run as non-profits, government-run bodies. They don't have the extra money."

47. CW5 reported to Chuck Goodnight, who was the Company's vice president of sales. CW5 says that, by early 2023, Goodnight "was constantly commenting that the CFPP is going to go away." CW5 regularly met with Goodnight and Scott, to whom CW5 reported. CW5

stated that Scott routinely made negative comments about the UAMPS project starting in the first quarter of 2023, including stating that "there's no way these guys (UAMPS) can manage this." According to CW5, "by the middle of the year – in the inner circle of NuScale and UAMPS – it was known this would go nowhere. UAMPS's appetite for risk was just exceeded, and they would never be able to claw it back."

48. CW5 says Colbert left the Company "abruptly" and that CW5 took Colbert's departure as more indication that the CFPP project was likely not going well because it had been Colbert's "baby" from the beginning.

**With Termination of CFFP Contract Imminent,**
**Defendants Tout Fake Deal with Standard Power**

49. With the viability of NuScale's flagship agreement with UAMPS teetering, the Company suddenly announced an even larger agreement with blockchain-affiliated Standard Power. On October 6, 2023, NuScale announce that the digital infrastructure company had agreed to develop two VOYGR power plants in Ohio and Pennsylvania to power nearby data centers. With a projected capacity of 1,848 MWe, the deal's projected value for NuScale was $37 billion. As part of the agreement, NuScale's commercial partner Entra1 would help fund and would develop, manage, own, and operate the SMRs. NuScale announced that Standard Power planned to open the plants by 2029.

50. The Company later revealed that the announcement of the Standard Power deal came as the Company began negotiating the termination of the CFFP project. Already facing a cash crunch, and fearing an investor mutiny once the termination of the CFFP project became public, Defendants pivoted to the Standard Power deal.

51. CW5 had never even heard of Standard Power prior to the Company's October 6 announcement of the deal and was surprised by the size of the project. According to CW5,

Hamady previously worked with Wadie Habboush, who formed ENTRA1, at the Habboush Group. Further, Scott's "claim to fame" at NuScale, and the reason the company brought him in as EVP of Business Development, was because Scott pitched his ability to bring in a project developer who could finance the construction of the power plants. CW1 said the collaborative efforts with ENTRA1 were handled by Scott: "That was his (Scott's) relationship. He facilitated the whole thing."

52. The Company's Earnings Presentation for the Third Quarter of 2023 contained a slide entitled "Key Financial Themes," which stated in relevant part: "Recently signed agreement with Standard Power and ENTRA1 for 24 modules will continue to drive the company towards cash flow profitability." But NuScale does not appear to have *any* contract with Standard Power, much less a binding agreement. Further, the Company's October 10, 2023 press release denying the Iceberg Report repeatedly refers to Standard Power as a "customer," but Standard Power was not a customer.

53. Following the announcement of the Standard Power deal, CW5 asked Goodnight for a copy of the contract or at least some visibility into the precise terms. CW5 hoped to use the Standard Power contract as a model when working with other potential customers to show them how the project could work for them and provide them with guidance on what a deal would look like. Goodnight told CW5 that "it's being worked on; when its finalized, you'll get it." CW5 stated that, in late 2023, there was no contract or agreement about the Standard Power deal in NuScale's digital document depository where contracts were supposed to be stored.

54. NuScale has since essentially conceded it has no contract with Standard Power. The Company's 2023 Form 10-K, filed with the SEC on March 15, 2024, contains one paragraph concerning "Other Potential Customers." The paragraph states that the Company has "signed

non-binding MOUs with several potential customers around the world" and lists the potential customers with which it has signed an MOU. Standard Power is notably absent from the list. The paragraph continues by stating that "Standard Power announced that it had selected NuScale technology to deploy at two sites" and that "Standard Power has expressed an interest in deploying 12 NuScale units at each of these sites." On a May 9, 2024 investor call, Hopkins confirmed that NuScale still had no contract with Standard Power, stating "People ask me about where is Standard Power? They're still there [and] that these are large and complicated financial transactions that just take time to finalize."

55. As Iceberg later revealed, Standard Power could not possibly execute a $38 billion deal and had no need for a capacity of 1,848 Mwe. Further, Entra1 had neither the means nor the experience to develop such a massive project. But the announcement of the Standard Power deal served its purpose—it temporarily propped up NuScale's stock price.

## SUBSTANTIVE ALLEGATIONS

### Defendants Violated Applicable Accounting Standards

56. GAAP refers to the framework of guidelines for financial accounting used by accountants to prepare financial statements. The SEC has the statutory authority to set accounting standards and has delegated that authority to the Financial Standards Accounting Board ("FASB").

57. The FASB accounting standards codification ("ASC") and the SEC rules and interpretive releases are source of authoritative GAAP for SEC registrants.

58. SEC and New York Stock Exchange rules and regulations require that publicly traded companies such as NuScale include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Section 13 of the Exchange Act; SEC Rule

10-01(d) of Regulation S-X ("Reg. S-X").

59. SEC Rule 4-01(a) of Reg. S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

60. ASC 450 codifies GAAP regarding "loss contingencies." A loss contingency is an existing condition, situation, or set of circumstances involving uncertainty as to a possible loss that will be resolved when one or more future events occurs or fails to occur. *See* ASC 450-20-20. Loss contingencies include (i) actual or possible claims and (ii) pending or threatened litigation. *See* ASC 450-20-05-10.

61. Under GAAP, an issuer must disclose a material loss contingency—such as reimbursement under the DCRA—if a loss is at least reasonably possible. A loss is considered "reasonably possible" when the chance of the future event or events occurring is more than remote but less than likely. A loss is considered "remote" when the chance of the future event or events occurring is slight. Additionally, an issuer must record an accrual for a material loss contingency, as a charge against income in its financial statements, if a loss is both probable and reasonably estimable. *See* ASC 450-20-25-2.

62. An accounting industry rule of thumb holds that: (i) an event that has a less than 10% chance of occurring is considered "remote"; (ii) an event that has between a 10% and 50% chance of occurring is considered "reasonably possible", and (iii) an event that has a greater than 50% chance of occurring is considered "probable".

63. NuScale claimed that its financial statements were prepared in accordance with GAAP. Further, NuScale understood that GAAP required the Company to record an accrual for material loss contingencies that were both probable and reasonably estimable. For example, the

Company's 2022 Form 10-K disclosed certain ongoing litigation against the company as a loss contingency and stated that the Company had not recorded any liability for this contingency because it did not believe it was probable that a loss would be incurred.

64. Defendants violated GAAP by failing to record in the Company's Form 10-Q for the second quarter of 2023 an accrual for its probable reimbursement liabilities stemming from its failure to meet performance criteria under the DCRA.

65. The Company's 2023 Q2 Form 10-Q disclosed the reimbursement liabilities as a loss contingency and estimated its liability. The Company stated that, as of June 30, 2023, "the reimbursement amount would have been $36,970, of which $25,777 consisted of long-lead materials for which we have an agreement in principle that would allow these long-lead materials to become the property of NuScale Corp," meaning "the maximum expense to the Company would be $11,193 for the DCRA and an additional $4,100 for a separate agreement with CFPP LLC" for "a total of $15,293." However, the Company stated that "no accrual has been recorded in our financial statements" because the liability was only "reasonably possible."

66. Defendants knew that subscribers had opted out of the agreement when the price increased to $89/MWh, and they knew the Company had no way to reduce the price back to acceptable levels. Further, Defendants knew they had not recruited any new subscribers in 2023. Accordingly, Defendants were well aware that they would likely fail to meet the 80% subscription target.

67. Further, the Company's 2023 Q3 Form 10-Q disclosed that "as of September 30, 2023 it was probable that we would be required to reimburse CFPP LLC $34,500 for net development costs pursuant to the DCRA." Defendants attempt to attribute the shift – from "reasonably possible" as of June 30, 2023 to "probable" as of September 30, 2023 – to "our

negotiations and ultimate termination of the DCRA and LLM Agreement with CFPP LLC." But the Company's 2023 Q3 Form 10-Q also states that "NuScale and CFPP LLC entered into discussions" ***subsequent*** to September 30, 2023, which means those discussions cannot be the basis for the shift from "reasonably possible" to "probable" as of September 30, 2023.

68. Each reporting period, ASC 450 required the Company to make a reasonable investigation, including evaluating any new relevant facts, to determine whether the likelihood of a future claim is probable.

69. The SEC considers the disclosure of loss contingencies of such importance to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. 210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that "where material contingencies exist, the disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

70. Defendants knew, or recklessly disregarded, that the Company's 2023 Form 10-Q was materially false and misleading in the absence of the accrual required by ASC 450.

**Materially False and Misleading**
**Statements Issued During the Class Period**

71. The Class Period begins on March 15, 2023. On that date, NuScale filed its Form 10-K for the fiscal year ended December 31, 2022, which disclosed that under the amended DCRA "the Company may be obligated to refund to UAMPS a percentage of its net development costs if CFPP does not secure a total of 370 MWe of committed subscription obligation." The total of 370 Mwe represented 80% of the total 462 MWe under the UAMPS agreement. The committed level of subscription as of February 28, 2023 was 120 MWe.

72. The Company also held an earnings call with investors on March 15, 2023.

During the call, an analyst asked "what level of confidence" the Company had that it could "go from, say, 25% subscribed today to 80% by February of 2024." Colbert stated that the Company was confident it would meet the 80% subscription requirement because the market is "changing." Colbert stated, in relevant part, that "[t]he news is that as you saw with [UAMPS] coming forward with 26 or 27 members voting to move forward with the project earlier this year at the $89 per megawatt hour price, that's very much indicative of a market that's changing and tightening in that area." Colbert stated that "we think that will continue in the Western region, particularly as coal plants continue to retire at a faster pace than expected, as we see people looking to get benefit from the Inflation Reduction Act we're making investments now as opposed to later on."

73. The statements identified in ¶72 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants misled investors by failing to disclose that, (i) members opted out of the CFPP deal because the price increased to $89/MWh; (ii) the Company's own price projections exceeded $89/MWh; (iii) the Company could not reduce prices below $89/MWh; (iv) the Company had failed to add any new subscribers or increase any existing subscribers subscription rates in 2023; and (v) due to the increased costs and longterm investment the CFPP required, the Company and UAMPS would be unable to meet the 80% subscriber target. As a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

74. On May 9, 2023, the Company filed a Form 10-Q with the SEC for the quarterly period ended March 31, 2023. On the same day, NuScale held an earnings call with investors, at which Hopkins stated that NuScale was "working closely with UAMPS on securing additional

subscriptions and believe this is going to be generated through a combination of existing CFPP participating members increasing their subscription levels, UAMPS members who are not currently CFPP participants signing on to the project, and additional Western public power entities, investor-owned utilities and industrials." Hopkins continued, stating that "UAMPS members and other public power entities in the Western US are facing the rapid retirement of coal plants in the expense and the challenge of access to natural gas. These issues highlight their need to add capacity in dispatchable load growth to complement renewable resources."

75. During the same call, an analyst asked for "a little more color on how the conversations are progressing with some of those entities to hit that committed subscription level in the CFPP?" Hopkins replied that "***It's going quite well***. What we're looking at is members that can up their subscription from what they currently have. We're in discussions also with certain industrials that don't necessarily want to own a nuclear asset but they certainly want a 24/7 clean energy that will be awarded from our CFPP project. So we continue to work with the customer. ***And so far, the progress is looking pretty good.***" (Emphasis added).

76. The statements identified in ¶¶74-75 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants misled investors by failing to disclose that, (i) members opted out of the CFPP deal because the price increased to \$89/MWh; (ii) the Company's own price projections exceeded \$89/MWh; (iii) the Company could not reduce prices below \$89/MWh; (iv) the Company had failed to add any new subscribers or increase any existing subscribers subscription rates in 2023; and (v) due to the increased costs and longterm investment the CFPP required, the Company and UAMPS would be unable to meet the 80% subscriber target. As a result, Defendants' positive statements about the Company's business,

operations, and prospects were materially misleading and/or lacked a reasonable basis.

77. On August 9, 2023, the Company filed a Form 10-Q for the quarterly period ended June 30, 2023. As discussed, the Form 10-Q was materially false and misleading in the absence of the accrual required by ASC 450.

78. On the same day, NuScale held an earnings call with investors, at which Hopkins stated again stated that UAMPS is targeting additional subscribers in three ways: “First, existing CFPP participants can increase their subscription levels; second, UAMPS members who are not CFPP participants can sign on to the project; and third, Carbon Free Power Project can bring in additional Western public power utilities, investor-owned utilities, data center operators and industrial customers.” Hopkins also expressed optimism that these three paths would succeed, stating that “[t]he expense and challenge of accessing natural gas in the region, the rapid retirement of coal plants and the acute need to add dispatchable power generation to complement renewable resources are primary consideration for CFPP participants, other UAMPS members and utilities operating in the Western U.S., creating opportunities across all 3 of these groups.”

79. Later in his opening remarks, Hopkins stated that “our working assumption is that CFPP will hit [the 80%] subscription goal.”

80. During the same call, an analyst asked for “more color” on the progress of reaching the 80% subscription guarantee and for a timeline for “getting updates on that.” Hopkins replied, reiterating the three paths to increased subscriptions, and stating “there’s a lot of discussions we’re having right now with Western public utilities that are facing rapid coal retirement or they’re looking at the expense of accessing natural gas.” Hopkins again offered an overly rosy assessment of the Company’s subscription success, stating “things could change, but we see that they will continue to be our first customer, where they will get to subscription, we

believe the funding will come through, and we're working diligently to make that happen." To further reassure investors, Hopkins claimed to be fully abreast of the latest subscription efforts, stating "From a timing perspective, we're watching it very closely. We have weekly conversations with our customer at UAMPS. So we're informing each other."

81. The statements identified in ¶¶77-80 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants misled investors by failing to disclose that, (i) members opted out of the CFPP deal because the price increased to $89/MWh; (ii) the Company's own price projections exceeded $89/MWh; (iii) the Company could not reduce prices below $89/MWh; (iv) the Company had failed to add any new subscribers or increase any existing subscribers subscription rates in 2023; and (v) due to the increased costs and longterm investment the CFPP required, the Company and UAMPS would be unable to meet the 80% subscriber target. As a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

82. On October 6, 2023, NuScale filed a press release with the SEC titled "Standard Power Chooses NuScale's Approved SMR Technology and ENTRA1 Energy to Energize Data Centers." The Company filed the press release on a Form 8-K, which Hamady signed. The press release stated that "Standard Power, a provider of infrastructure as a service to advanced data processing companies, announced plans to develop two small modular reactor (SMR)-powered facilities that will together produce nearly 2GW of clean, carbon free energy and has chosen to work with technology provider NuScale Power Corporation the only technology provider and producer of SMRs that has obtained U.S. regulatory approval, and ENTRA1 Energy (ENTRA1) an independent global energy development and production company to support Standard

Power's two projects." The press release further stated that "[b]ased on Standard Power's plans for the two facilities, NuScale will end up providing 24 units of 77 MWe modules producing 1,848 MWe of clean energy from both the Ohio and Pennsylvania sites.

83. Also on October 6, 2023, NuScale held a conference call for its Analyst/Investor Day. During the call, Hopkins referred to the Standard Power press release as a "major announcement" and a "massive move because that customer is oriented to working with data centers and what's going to be a huge potential in AI."

84. Later on the call, Scott continued lavishing praise on the Standard Power announcement, stating: "We've announced this morning that we are going to do 2 plants, 12 modules, 924 megawatts each, one in Ohio, one in Pennsylvania." Scott emphasized that the deal is an "immediate situation": "And the fact that Standard Power, they need the power like last year. These guys are building data centers. They need it now. And they have the demand and matter of fact, they're looking long term at a lot of opportunities. They see the growth, as I said earlier, AI and data centers, it's a tremendous growth pattern for our future. So it's a great opportunity. We're excited. Now the good thing is, is that this is an immediate situation. We're going to start work right away. Actually, Standard Power has already been working substantially on their existing sites that they're working with. So they're invested. So we'll start immediate work with Standard, and this is an exciting opportunity for the company."

85. Later on the call, Hamady said the quiet part out loud, stating that the Standard Power announcement was a "great win" because it caused the price of NuScale's stock to increase by over 20%: "I think we can consider today a great win. And if I look to see how the markets reacted, at some point, we were up 21%, 22% today. I think the investment public sees this is a great win. So we're very happy with the performance we have today."

86. The statements identified in ¶82-85 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants misled investors by failing to disclose that (1) Standard Power did not have the financial ability to support its agreement with NuScale; (ii) Standard Power had no use for the power capacity of such a massive project; (iii) Entra1 had neither the resources nor experience to finance or develop a project of that size, and (iv) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH BEGINS TO EMERGE

87. On October 19, 2023, Iceberg Research published a report titled "NuScale Power ($SMR): A Fake Customer and a Major Contract in Peril Cast Doubt on NuScale's Viability." The Iceberg Report explained why NuScale's contracts with both UAMPS and Standard Power were unlikely to result in any revenue for the Company, albeit for different reasons.

88. As to the UAMPS agreement, the Iceberg Report reported that "we are three months to the deadline and subscriptions have not moved an inch."

89. The Iceberg Report disclosed that – despite Defendants repeatedly providing overly optimistic updates on the Company's progress – not a single additional customer had subscribed to the CFPP since March 2023: "At a September meeting of the Washington City power board, when asked about subscription progress, director Rick Hansen said . . . that "Not anybody that's able to or willing to sign at this point." He added. "We have lots of cheerleaders but not a lot of people that want to jump in the game at this point." Interested parties want additional mechanisms to de-risk it, according to him.

90. The Iceberg Report also disclosed that the Standard Power contract was merely a

desperate attempt by Defendants to distract from the UAMPS contract falling through. Iceberg reported that the Standard Power contract "has zero chance of being executed as Standard Power clearly does not have the means to support contracts of this size." Specifically, "[t]he deal's total projected output is 1,848 MWe, four times the size of NuScale's existing agreement with its other major client UAMPS, and translates to a staggering $37 billion financial commitment." But "the reported data mining capacity of the company was a mere 50 MWe, far below the contracted SMRs total capacity of 1,848 MWe. Adding to the confusion, Standard Power's basic website reveals that 'Planned development at this site (Ohio) include a 40 megawatt blockchain mining operation and a data center with critical capacity of up to 12 megawatts.'"

91. The Iceberg Report also cast doubt on the credibility of Standard Power's leadership. It disclosed that "CEO Maxim Serezhin has an outstanding $54k tax warrant in New York, indicating a failure to fulfill his tax obligations" and "Former [managing director] Adam Swickle has a track record that screams 'investor beware'. He cut his teeth at notorious Wall Street firms like Stratton Oakmont and Meyers Pollock & Robbins — both infamous for pump-and-dump schemes and ultimately shuttered due to regulatory crackdowns." Swickle was subject to SEC scrutiny in 2003 for "setting up a fake foreign exchange trading house and making off with investors' cash," resulting in over $700,000 in monetary penalties. Iceberg concluded that Standard Power does not have the balance sheet to support this contract, both in the present and in the future."

92. The Iceberg Report also disclosed that Defendants' praise of the Company's partnership with Entra1 was also misleading: "Entra1 was incorporated in Delaware in December 2021. But the firm has only one employee referenced on LinkedIn, its online presence is almost non-existent, its Twitter account is essentially a NuScale bulletin board, and its only

announced deal is unsurprisingly, with NuScale." Iceberg concluded that "Considering Fluor's plan to divest its NuScale stake and the apparent lack of substantial activity at Entra1, one could speculate that Standard Power and Entra1 were brought in primarily to pump NuScale's stock, just like many other SPACs."

93. On this news, the Company's share price fell $0.61 per share, or 12.0%, to close at $4.46 per share on October 19, 2023, on unusually high trading volume. The Company's share price continued to fall another $0.67 per share, or 14.9%, to close at $3.80 per share on October 20, 2023, on unusually high trading volume.

94. On October 24, 2023, the Company issued a press release denying the allegations in the Iceberg Report. The press release began by stating "[t]he inaccurate and deceptive 'research' is riddled with speculative statements with no basis in fact." The press release denied Iceberg's reporting about the inability of Standard Power and Entra1 to execute the announced deal. Further, the press release denied that the Company was facing a cash crunch and quoted Hopkins stating that "we have a solid debt-free balance sheet and a talented and dedicated team."

95. On November 8, 2023, after the market closed, NuScale published a press release on Form 8-K filed with the SEC titled "Utah Associated Municipal Power Systems (UAMPS) and NuScale Power Agree to Terminate the Carbon Free Power Project (CFPP)." The press release cited as the reason for the termination that "Despite significant efforts by both parties to advance the CFPP, it appears unlikely that the project will have enough subscription to continue toward deployment." The press release confirmed Iceberg's reporting about the CFPP. The Company hosted an earnings call the same day. On the call, Hamady stated that the Company expects to make a $49.8 million reimbursement payment to UAMPS.

96. On this news, the Company's share price fell $1.02 per share, or 32.9%, to close

at $2.08 per share on November 9, 2023, on unusually high trading volume.

97. On January 5, 2024, *The Huffington Post* published an article entitled "Mass Layoffs At Pioneering Nuclear Startup**."** Citing an audio recording of a virtual all-hands meeting and "two sources with direct knowledge of NuScale's plans," the article reported that as mounting costs and the cancellation of its landmark first power plant have burned through shrinking cash reserves, the Oregon-based company is laying off nearly a third of its workforce." The article quoted a NuScale engineer who had been laid off: "The company had become far less transparent since its stock market debut, the former employee said, noting that the press release announcing the power plant's cancellation claimed that NuScale and its partners 'mutually' decided to call it quits. 'As much as NuScale might publicly say it was a mutual decision,' the employee said, 'I bet they'd say laying us off was a mutual decision to part ways, too.'"

98. On this news, the Company's share price fell $0.24 per share, or 8.4%, to close at $2.62 per share on January 5, 2023, on unusually high trading volume.

99. On March 15, 2024, the Company filed its Form 10-K with the SEC for the year ending December 31, 2023. Hopkins and Hamady signed the 2023 Form 10-K. The 2023 10-K contained a risk warning, which stated in relevant part that "Short selling reports may potentially lead to increased volatility in an issuer's stock price and to regulatory and governmental inquiries" and that "any potential inquiry or formal investigation from a governmental organization or other regulatory body, including an inquiry from the SEC, arising from the presence of such allegations could result in a material diversion of our management's time and may have a material adverse effect on our business and results of operations."

100. The statements identified in ¶99 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and

prospects. Specifically, Defendants misled investors by implying to investors that an SEC inquiry was hypothetical when the Company knew in December 2023 that SEC had opened an investigation into NuScale, that the SEC had requested information from NuScale concerning that investigation, that NuScale had responded to the SEC's request for information, and that the SEC had not closed the investigation.

101. In May 2024, short seller Hunterbrook Media ("Hunterbrook") issued a Freedom of Information Act ("FOIA") request to the SEC concerning "any investigation(s) or inquiries that directly pertain to the conduct, disclosures, and/or transactions of the registrant NuScale Power from January 1, 2023." On June 27, 2024, the SEC denied Hunterbrook's FOIA request.

102. On July 29, 2024, Hunterbrook published the SEC's response to Hunterbrook's appeal of the SEC's denial of the FOIA request. The SEC's denial of Hunterbrook's appeal confirmed that the SEC has an "active and ongoing" investigation of NuScale. Specifically, the denial stated in relevant part that "Enforcement staff confirmed the existence of responsive records concerning NuScale Power" and that "We have confirmed with Division of Enforcement staff that the investigation from which you seek records is still active and ongoing."

103. On this news, the Company's share price fell $1.35 per share, or 12.4%, to close at $9.50 per share on July 29, 2024, on unusually high trading volume.

104. Hunterbrook's July 29 report quoted a spokesperson for NuScale stating, in response to the report, "We are unaware of any SEC investigation into NuScale or any reason for such an investigation."

105. That same day, NuScale issued a press release stating "The Securities and Exchange Commission has not communicated to NuScale that it is the target of a current or prospective investigation, and the Company is unaware of any reason for such an investigation."

106. The statements identified in ¶¶104-105 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants misled investors by implying to investors that an SEC inquiry was hypothetical when the Company knew in December 2023 that SEC had opened an investigation into NuScale, that the SEC had requested information from NuScale concerning that investigation, that NuScale had responded to the SEC's request for information, and that the SEC had not closed the investigation.

107. On August 2, 2024, NuScale filed a Form 8-K with the SEC that finally admitted that the SEC's Denver Regional Office had requested information from the Company in December 2023 and on July 31, 2024. The Form 8-K further stated that "[t]he Company is in the process of responding to those requests and we intend to fully cooperate with the SEC. NuScale cannot predict the timing or outcome of the SEC's investigation at this time."

108. On this news, the Company's share price fell $0.52 per share, or 5.7%, to close at $8.59 per share on August 2, 2024, on unusually high trading volume.

## **ADDITIONAL FACTS SUPPORTIVE OF SCIENTER**

109. In addition to the many scienter facts alleged above, the fraud alleged herein relates to the core business of the Company, so knowledge of the fraud may be imputed to each of the Individual Defendants. Given the Individual Defendants' knowledge or conscious disregard of (i) the Company's failure to add any new subscribers and the (ii) the inability of Standard Power and Entra1 to execute the enormous contract the Company announced, the omissions and positive statements detailed above, made contemporaneously with that knowledge, were false and/or misleading.

110. Colbert, who spearheaded the CFPP project, sold off all 238,456 of his NuScale shares during the Class Period before the first corrective disclosure. Colbert sold 13,227 shares between May 15, 2023 and May 17, 2023 for $107,605 in proceeds. He sold 149,644 shares between June 20, 2023 and June 26, 2023 for $1,139,229 in proceeds. Colbert's wife sold 75,585 shares on October 13, 2023—less than a week before the first corrective disclosure—for $436,216 in proceeds. In total, Colbert and his wife sold $1,683,050 worth of NuScale stock during the Class Period while in possession of material, non-public information. The Colberts' total proceeds for these insider sales represented more than four times his total salary for 2022, as reported in the Company's proxy statement. Neither of the Colberts had sold NuScale stock prior to the Class Period.

111. Hopkins and Hamady were motivated to mislead investors about the UAMPS contract and the Standard Power deal. As detailed in the Company's Proxy Statement, filed with the SEC on April 12, 2024, the NuScale Professional Incentive Plan directly tied the Individual Defendants' bonuses, in part, to "Customer Acquisition" and "Securing New Contracts."

112. According to the Proxy Statement, in February 2024, the Board assessed management's performance against the incentive goals and "determined that performance justified a payout at 94.6 percent of target, which the Company paid in March 2024. Hopkins received $425,700 In 2023, the Board adopted ten NuScale Professional Incentive Plan goals for management related to: Funding, Customer Acquisition, Securing New Contracts, Achievement of Development and Delivery Milestones, Revenue, Spending, Investor Relations, Environmental Targets, and Social Attributes. In February 2024, the Board assessed management's performance against these 2023 incentive goals and determined that performance

justified a payout at 94.6 percent of target, which the Company paid to bonus-eligible employees, including the NEOs, in March 2024.

113. For 2023, under the NuScale Professional Incentive Plan, Hopkins received $425,700, which represented over 70% of his 2023 salary. Hamady received $57,149, which represented nearly 40% of his 2023 salary.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

114. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired NuScale securities publicly traded on the OTC markets during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of NuScale, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

115. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NuScale securities were actively traded on the OTC Market. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

116. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

117. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

118. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of NuScale;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused NuScale to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of NuScale securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

119. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

120. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- NuScale shares met the requirements for listing, and were listed and actively traded on the New York Stock Exchange, an efficient market;
- As a public issuer, NuScale filed periodic public reports;
- NuScale regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- NuScale securities were liquid and traded with moderate to heavy volume during the Class Period; and
- NuScale was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

121. Based on the foregoing, the market for NuScale securities promptly digested current information regarding NuScale from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

122. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
## For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

123. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

124. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

125. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

126. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of NuScale securities during the Class Period.

127. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of NuScale were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of NuScale, their control over, and/or receipt and/or modification of NuScale's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning NuScale, participated in the fraudulent scheme alleged herein.

128. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other NuScale personnel to members of the investing public, including Plaintiffs and the Class.

129. As a result of the foregoing, the market price of NuScale securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of NuScale securities during the Class Period in purchasing NuScale securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

130. Had Plaintiffs and the other members of the Class been aware that the market price of NuScale securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased NuScale securities at the artificially inflated prices that they did, or at all.

131. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

132. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of NuScale securities during the Class Period.

## COUNT II
## Violations of Section 20(a) of the Exchange Act
## Against the Individual Defendants

133. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

134. During the Class Period, the Individual Defendants participated in the operation and management of NuScale, and conducted and participated, directly and indirectly, in the conduct of NuScale's business affairs. Because of their senior positions, they knew the adverse non-public information about NuScale's false financial statements.

135. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to NuScale's financial condition and results of operations, and to correct promptly any public statements issued by NuScale which had become materially false or misleading.

136. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which NuScale disseminated in the marketplace during the Class Period concerning NuScale's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause NuScale to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of NuScale within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of NuScale securities.

137. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by NuScale.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a) declaring this action to be a proper class action, certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiffs' counsel as Class Counsel;

(b) awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 20, 2024

**THE ROSEN LAW FIRM, P.A.**
By: */s/ Phillip Kim*
Phillip Kim
Laurence M. Rosen
Daniel Tyre-Karp
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
lrosen@rosenlegal.com
dtyrekarp@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*

THE SCHALL LAW FIRM
Rina Restaino
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Direct: (213) 509-5739
Fax: (877) 590-0483
rina@schallfirm.com

*Additional Counsel*

RANSOM, GILBERTSON, MARTIN & RATLIFF, LLP
Jeffrey S. Ratliff
8401 NE Halsey Street Suite 208
Portland, OR 97220
T: 503-226-3664

*Liaison Counsel for Lead Plaintiff and the Class*