B. JOHN CASEY, OSB No. 120025
john.casey@stoel.com
ALEX VAN RYSSELBERGHE, OSB No. 174836
alex.vanrysselberghe@stoel.com
KATHARINE S. SHEPHERD, OSB No. 224891
kate.shepherd@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| SCOTT SIGMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NUSCALE POWER CORPORATION, JOHN L. HOPKINS, CHRIS COLBERT, ROBERT R. HAMADY, and CLAYTON SCOTT,<br><br>Defendants. | Lead Case No.: 3:23-cv-01689-IM<br><br>Consolidated Case No.: 3:23-cv-01956-IM<br><br>**REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**ORAL ARGUMENT REQUESTED** |

REPLY IN SUPPORT OF MOTION TO DISMISS
127354318.8 0034163-00092

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

I. INTRODUCTION ................................................................................................................ 1

II. ARGUMENT ...................................................................................................................... 2

    A.    Falsity.......................................................................................................................... 2

        1.    Defendants' guarded statements about the CFPP's "progress" and discussions with prospective customers are not misleading. .................... 3

        2.    Defendants' statements about the market were not false when made and, in any event, triggered no duty to disclose information about NuScale's prices............................................................................... 8

        3.    Plaintiffs' Standard Power allegations are meritless on their face, and Plaintiffs cannot now rewrite their allegations in their Opposition............................................................................................... 10

        4.    Plaintiffs do not refute that Defendants' forward-looking statements were made with cautionary statements and are protected under the Safe Harbor. .............................................................. 12

        5.    Defendants' admitted judgment calls did not violate GAAP................... 14

        6.    Plaintiffs fail to plead that Defendants made any false or misleading statement about the SEC's purported "investigation.".......... 15

    B.    Scienter ................................................................................................................... 18

        1.    Plaintiffs effectively concede the unreliability of their confidential witnesses. .................................................................................. 18

        2.    Plaintiffs' sparse allegations cannot establish scienter, either directly or under a "core operations" theory............................................ 19

        3.    Nothing in the SAC establishes that Defendants had any reason to hold Plaintiffs' and Iceberg's pessimistic predictions about Standard Power as true................................................................................ 20

        4.    Plaintiffs' scienter allegations concerning the SEC "investigation" are conclusory and devoid of particularity............................................ 22

        5.    Plaintiffs cannot establish scienter for alleged GAAP violations because Defendants reasonably believed in the CFPP's chances on June 30, 2023. ...................................................................................... 23

        6.    Neither a single Defendant's stock sales nor routine corporate incentives, disconnected from the alleged fraud, establish motive and opportunity. ...................................................................................... 23

        7.    A holistic review establishes that Defendants genuinely and reasonably believed in NuScale's projects. .......................................... 24

**TABLE OF CONTENTS**
(continued)

**Page**

C.    Loss Causation ................................................................................................ 25

1.    Plaintiffs waive their argument that there was a corrective disclosure regarding an SEC "investigation," dooming Plaintiffs' claim. ................................................................................................ 25

2.    The Short Seller Post is not a corrective disclosure because it disclosed only "opinions" and otherwise simply reposted news already known to the public. .................................................................. 26

3.    The November 8, 2023 Press release is not a corrective disclosure because it did not "correct" any prior statements. ................................... 27

4.    The Huffington Post Article is not a corrective disclosure because it does not correct or contradict any prior statements. ............................ 27

III. CONCLUSION .................................................................................................. 28

# TABLE OF AUTHORITIES

**Cases**

*In re Avon Sec. Litig.*,
No. 19 Civ. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ..................................8

*Berson v. Applied Signal Technology, Inc.*,
527 F.3d 982 (9th Cir. 2008) ...............................................................................................20

*In re BioMarin Pharm. Inc. Sec. Litig.*,
No. 3:20-cv-06719-WHO, 2022 WL 164299 (N.D. Cal. Jan. 6, 2022)...................................8

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)..............................................................................16, 22

*In re Bofi Holding Inc. Sec. Litig.*,
977 F.3d 781, 790 (9th Cir. 2020) ......................................................................................28

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) .................................................................................13

*In re Chicago Bridge & Iron Co. N.V. Securities Litigation*,
No. 17 Civ. 1580 (LGS), 2018 WL 2382600 (S.D.N.Y. May 24, 2018)..................................7

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ...............................................................................................11

*City of Roseville Employees' Ret. Sys. v. Textron, Inc.*,
810 F. Supp. 2d 434 (D.R.I. 2011), *aff'd sub nom. Auto. Indus. Pension Tr.
Fund v. Textron Inc.*, 682 F.3d 34 (1st Cir. 2012) ................................................................9

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ...............................................................................................3

*In re Daou Systems, Inc.*,
411 F.3d 1006 (9th Cir. 2005) .............................................................................................23

*In re DVI, Inc. Sec. Litig.*,
No. 2:03-cv-05336, 2010 WL 3522086 (E.D. Pa. Sept. 3, 2010).........................................25

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024) ................................................................................................26

*Farhar v. Ontrak, Inc.*,
714 F. Supp. 3d 1198 (C.D. Cal. 2024) ...............................................................................12

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ..................................................................................13

*In re Fibrogen, Inc.*,
  No. 21-cv-02623-EMC, 2022 WL 2793032 (N.D. Cal. July 15, 2022) ...................................8

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................................25

*Gammel v. Hewlett-Packard Co.*,
  No. SACV 11-1404..........................................................................................25

*In re Genius Brands Int'l, Inc. Securities Litigation*,
  97 F.4th 1171 (9th Cir. 2024) .........................................................................26, 28

*Glazer Capital Mgmt., L.P. v. Forescout Technologies., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ................................................................................7

*Gompper v. VISX, Inc.*,
  298 F.3d 893 (9th Cir. 2002) ..............................................................................15

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) .........................................................................20, 21

*HRSA-ILA Funds v. Adidas AG*,
  No. 3:23-CV-00629-IM, 2024 WL 3848440 (D. Or. Aug. 16, 2024), *appeal
  docketed*, No. 24-6655 (9th Cir. Oct. 31, 2024) .....................................................3, 11

*Institutional Investors Group v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)................................................................................19

*KCG Americas LLC v. Brazilmed, LLC*,
  No. 15 Civ. 4600(AT), 2016 WL 900396 (S.D.N.Y. Feb. 26, 2016) .........................................9

*Kipling v. Flex Ltd.*,
  No. 18-CV-02706-LHK, 2020 WL 2793463 (N.D. Cal. May 29, 2020) .......................................14

*In re Lions Gate Ent. Corp. Sec. Litig.*,
  165 F. Supp. 3d 1 (S.D.N.Y. 2016)..........................................................................17

*Longo v. OSI Sys., Inc.*,
  No. CV 17-8841 FMO, 2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) ......................................24

*Mandalevy v. Bofi Holding, Inc.*,
  No. 17cv667-GPC-KSC, 2018 WL 6436723 (S.D. Cal. Dec. 7, 2018), *aff'd in
  part, rev'd in part on other grounds, Grigsby v. BofI Holding, Inc.*, 979 F.3d
  1198 (9th Cir. 2020)........................................................................................17

127354318.8 0034163-00092

*McHenry v. Renne*,
   84 F.3d 1172 (9th Cir. 1996) ...............................................................................13

*Melot v. JAKKS Pac., Inc.*,
   No. LA CV13-05487 .............................................................................................14

*Menaldi v. Och-Ziff Capital Management Group LLC*,
   164 F. Supp. 3d 568 (S.D.N.Y. 2016)...................................................................22

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .............................................................................24

*Moshell v. Sasol Ltd.*,
   481 F. Supp. 3d 280 (S.D.N.Y. 2020)......................................................................7

*In re Mullen Auto. Sec. Litig.*,
   No. CV 22-3026-DMG, 2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) .................11

*In re NIO, Inc. Securities Litigation*,
   No. 19-CV-1424 (NGG) (JRC), 2023 WL 5048615 (E.D.N.Y. Aug. 8, 2023).......27

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West
   Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ...............................................................................20

*Odom v. Microsoft Corp.*,
   486 F.3d 541 (9th Cir. 2007) .................................................................................9

*Povey v. Castle and Cooke Mortg.*,
   No. 3:23-cv-01388-IM, 2024 WL 4693896 (D. Or. Nov. 6, 2024) .......................25

*Reese v. BP Expl. (Alaska) Inc.*,
   643 F.3d 681 (9th Cir. 2011) ...............................................................................13

*Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*,
   711 F.3d 754 (7th Cir. 2013) ...............................................................................18

*Richard v. Nw. Pipe Co.*,
   No. C9-5724RBL, 2011 WL 3813073 (W.D. Wash. Aug. 26, 2011) ....................24

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ...............................................................................24

*Sarkisian v. Newmar Indus., Inc.*,
   No. 3:21-cv-1123-IM, 2023 WL 5206953 (D. Or. Aug. 14, 2023) .......................26

*In re Silver Wheaton Corp. Securities Litigation*,
   No. CV15-5146-CAS(JEMx), 2016 WL 3226004 (C.D. Cal. June 6, 2016) ..........15

127354318.8 0034163-00092

*In re Snap Inc. Securities Litigation*,
   No. 2:17-cv-03679-SVW-AGR, 2018 WL 2972528 (C.D. Cal. June 7, 2018).......................15

*Turocy v. El Pollo Loco Holdings, Inc.*,
   No. SA CV 15-1343-DOC, 2016 WL 4056209 (C.D. Cal. July 25, 2016) .............................12

*Tyvoll v. City of Portland*,
   No. 3:20-cv-01878-JR, 2023 WL 5606980 (D. Or. Aug. 30, 2023)......................................13

*Washtenaw County Employees' Retirement System v. Celera Corp.*,
   No. 5:10-cv-02604 EJD, 2012 WL 3835078 (N.D. Cal. Sept. 4, 2012)..................................18

*Wu v. GSX Techedu Inc.*,
   738 F. Supp. 3d 527 (D.N.J. 2024) .......................................................................................19

*Yentz v. Nat'l Credit Adjusters, LLC*,
   No. 3:20-cv-01364-AC, 2021 WL 1277961 (D. Or. Feb. 15, 2021) .......................................26

*Yinou Pure Furniture Ltd. v. U.S. Pride Furniture Corp.*,
   No. CV 21-04367-MWF, 2021 WL 6882211 (C.D. Cal. Nov. 17, 2021)................................9

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ................................................................................................18

**Statutes**

15 U.S.C. § 78u-5(c)(1) .................................................................................................................14

**Rules**

Federal Rule of Civil Procedure 9(b)...................................................................................9, 11, 27

Rule 10b-5.........................................................................................................................11, 14

127354318.8 0034163-00092

## I.  INTRODUCTION

Plaintiffs' Opposition to Defendants' Motion to Dismiss (Opposition or Opp.) reveals the complete dearth of actionable allegations in Plaintiffs' Second Amended Complaint (SAC) and the fundamental weakness of their claims.  Plaintiffs' case is, at bottom, an opportunistic lawsuit filed in the wake of temporary drops in stock price[1] caused by short sellers' hyperbolic blog posts seeking to tank NuScale's stock.  This cannot be the basis of a securities class action under the Private Securities Litigation Reform Act (PSLRA).

Throughout their Opposition, Plaintiffs avoid wrestling with either Defendants' arguments or the actual content—or context—of Defendants' statements.  Plaintiffs instead resort to conclusory assertions of "fraud" and bad intent.  But a plain review of the statements themselves shows no indicia of "fraud."  There are three main categories of statements challenged by Plaintiffs: (i) NuScale's general statements discussing its attempts to increase subscription rates under the CFPP; (ii) statements made months before the subscription deadline that conversations with prospective subscribers were "going quite well" and "progress is looking pretty good"; and (iii) statements describing "plans" to develop facilities for Standard Power at some point in the future.

There simply is nothing false or misleading about these statements.  Indeed, most of the statements challenged by Plaintiffs are not actionable as a matter of law because they are opinion statements, classic puffery or they are forward-looking statements accompanied by cautionary language.  Putting aside the lack of falsity, Plaintiffs offer no facts showing *any* inference, much

---

[1] NuScale's stock price has dramatically rebounded since the events described in Plaintiffs' Complaint.  Indeed, as of the date of filing, NuScale's stock price is trading at $27.97, *six to seven times higher* than it did at the time of the alleged "corrective disclosures" in this case. *See* NuScale Power Corporation share price at https://finance.yahoo.com/quote/SMR/ (last visited January 24, 2025).

1 - REPLY IN SUPPORT OF MOTION TO DISMISS
127354318.8 0034163-00092

less a "strong inference," of scienter, *i.e.*, that Defendants intended to deceive anyone.  Nor do Plaintiffs allege loss causation—that there were any "corrective disclosures" that revealed a "fraud" and caused a loss.

Plaintiffs make several silent—but crucial—concessions in their Opposition.  Plaintiffs try to show scienter in the SAC through confidential witness statements, but Plaintiffs effectively concede in their Opposition the insufficiency of their confidential witnesses, making virtually no effort to defend their reliability.  The confidential witness statements establish nothing.  Plaintiffs also abandon many of their pleaded "omissions" concerning Standard Power (tacitly acknowledging their insufficiency), and instead shift focus to other statements that Plaintiffs did not specify in the SAC as the basis of their claims, but which are not actionable regardless.  And Plaintiffs make no effort whatsoever to defend the sufficiency of the alleged corrective disclosures tied to their "SEC investigation" claims, thus waiving those claims.

Copying and pasting short seller speculation into a complaint does not state a claim of securities fraud.  Plaintiffs do not come close to meeting the heavy pleading burden imposed by the PSLRA.  The Court should dismiss Plaintiffs' case in its entirety with prejudice.

## II.  ARGUMENT

### A.     Falsity

None of Defendants' statements were false or misleading.  Plaintiffs' allegations about the CFPP are essentially that Defendants should have informed investors, in the earliest months of the subscription drive, that the CFPP had little or no chance of success.  To be clear, NuScale had *approximately a year*—from February 2023 to February 2024—to fill 55% more of its subscription capacity, and in the first six months of that term (*i.e.*, through August 2023), NuScale worked hard to do so by meeting with numerous prospective customers and exploring

2 - REPLY IN SUPPORT OF MOTION TO DISMISS
127354318.8 0034163-00092

"dozen[s]" of ways to reduce costs.  SAC ¶ 45; AVR Dec. Ex. 7 at 7, Ex. 10 at 9–10.  And this is precisely what it told the market—it was having "conversations" with prospects and looking for ways to increase subscriptions.

In September 2023, with still almost half a year left, NuScale began reevaluating the project—and in November 2023, with still three months left before the deadline, NuScale made the conservative and reasonable decision to terminate the CFPP and move on to other projects. At all times, NuScale was transparent with investors about its work, the obstacles, and the very real risk that the CFPP could fail.  Defendants never falsely implied that the CFPP had gained subscriptions it did not have, much less that the project would be sure to succeed.

Plaintiffs' other allegations also fail.  Plaintiffs' allegations about Standard Power are essentially that Defendants should have shared, and disclosed, short sellers' negative and biased opinions speculating about Standard Power.  This is simply not a basis for securities fraud. Meanwhile, Plaintiffs' remaining allegations identify nothing untrue or misleading in NuScale's SEC filings and press releases.

Plaintiffs' claims fail to even get out of the gate because they have failed to identify a single false or misleading statement.

> **1.    Defendants' guarded statements about the CFPP's "progress" and discussions with prospective customers are not misleading.**

As this Court (and the Ninth Circuit) has explained, reasonable investors "know how to devalue the optimism of corporate executives" when valuing corporations, *HRSA-ILA Funds v. Adidas AG*, No. 3:23-CV-00629-IM, 2024 WL 3848440, at *12 (D. Or. Aug. 16, 2024) (citation omitted), *appeal docketed*, No. 24-6655 (9th Cir. Oct. 31, 2024), and generally "do not rely on . . . feel good monikers" and broad optimistic opinions, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).  Nonetheless, Plaintiffs double down on their primary claim that

3 - REPLY IN SUPPORT OF MOTION TO DISMISS

Defendants misled investors with precisely such "feel good monikers" and opinions, supposedly causing investors to falsely believe that the CFPP was adding subscriptions and would ultimately meet the subscription deadline by February 2024. Plaintiffs' claim is based on just two opinion statements made by Hopkins, NuScale's CEO, on May 9 and August 9, 2023:

May 9:    In response to an analyst question on an earnings call asking for "more color on how the *conversations are progressing* with some of those entities to hit that committed subscription level in CFPP," Hopkins stated: "It's going quite well. What we're looking at is members that can up their subscription from what they currently have. We're in discussions also with certain industrials that don't necessarily want to own nuclear asset but they certainly want a 24/7 clean energy that will be awarded from our CFPP project. So we continue to work with the customer. And so far, the progress is looking pretty good."

August 9:    "[T]hings could change, but we see that they will continue to be our first customer, where they will get to subscription, we believe the funding will come through, and we're working diligently to make that happen."

Opp. at 7, 10–19 (emphasis added); *see generally* SAC ¶¶ 75, 80.

The case law is clear on these types of statements: they are not actionable. Myriad cases hold that similar broad opinions that a project is "going well" generally do not communicate specific facts about a company. *See* Defendant's Motion to Dismiss Second Amended Class Action Complaint (MTD) at 14–17 (collecting cases). Plaintiffs, tellingly, make no attempt to distinguish these cases. Plaintiffs note only—and unremarkably—that such statements can be misleading if they "address specific aspects of a company's operation that the speaker knows to be performing poorly." Opp. at 11 (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017)). However, despite Plaintiffs' lip service to the idea that "context matters," Opp. at 17, Plaintiffs make no effort to parse Hopkins' statements in context. *Id.* at 11, 12, 19.

While Hopkins' statements themselves are so innocuous on their face that context should not even matter, the context here confirms that the statements are not actionable. On May 9, 2023—with almost a year to go before the February 2024 subscription deadline—Hopkins was

4 - REPLY IN SUPPORT OF MOTION TO DISMISS
127354318.8 0034163-00092

responding to an analyst's question merely about how "*conversations* are progressing" with *prospective* subscribers.  Hopkins opined only that *conversations* with *prospective* subscribers were "going quite well" and that "progress" in those "discussions" was "looking pretty good," and critically, that Hopkins would continue to update investors as NuScale "progressed":

> [Analyst:] ". . . John, you had hit a little bit on it in your prepared remarks, but can we get a little more color on **how the conversations are progressing** with some of those entities to hit that committed subscription level in the CFPP?"
>
> [Hopkins:] "Yes.  Actually, Shar, thanks for the question.  **It's going quite well**. What we're looking at is members that can up their subscription from what they currently have.  **We're in discussions also with certain industrials** that don't necessarily want to own a nuclear asset but they certainly want a 24/7 clean energy that will be awarded from our CFPP project.  So **we continue to work with the customer**.  And so far, the **progress is looking pretty good**."
>
> [Analyst:] "Okay.  And do you expect to, I guess, update the Street on nuclear as they happen?  Or more broadly, just what kind of visibility will we have on the process **as it ramps up**?"
>
> [Hopkins:] ". . . No, **we'll continue to update, obviously, as we continue to progress**."

AVR Dec. Ex. 7 at 7 (emphases added).  Investors would not take from this exchange that the CFPP had gained subscriptions.  Rather, investors would understand exactly what Hopkins said: that preliminary *conversations* with *prospective* subscribers were "going well" and that, when the CFPP gains additional subscribers, NuScale will say so.

On August 9, Hopkins made clear that although there was "progress" on CFPP, "things could change."  He also clarified that his views about "progress" on the CFPP were supported specifically by NuScale's work authorization submitted to the Nuclear Regulatory Commission and more "discussions" with prospective customers:

> [Hopkins:] ". . . [W]e continue to make progress on CFPP.  We, as I commented, they **just submitted a limited work authorization to the NRC review just a little early.  This will authorize the early start constructions**.  As it relates to

5 - REPLY IN SUPPORT OF MOTION TO DISMISS
127354318.8 0034163-00092

> **subscriptions**, **we are working with UAMPS** because they are targeting 80% subscription for CFPP by 2023.
>
> "And as I mentioned before, we believe there's 3 ways you can get it. The existing CFPP participants could increase their subscription levels. We believe they're undersubscribed currently. We can sign UAMPS members that are not participating. And as I mentioned before, there's a lot of **discussions we're having right now with Western public utilities** that are based in rapid coal retirement or they're looking at the expense of accessing natural gas. So **we're working with them. And as it stands right now, things could change, but we see that they will continue to be our first customer where they will get to subscription.** We believe the funding will come through, and we're working diligently to make that happen.

AVR Dec. Ex. 10 at 10 (emphases added).

These are classic examples of inactionable opinion, puffery, and forward-looking statements. *See* MTD at 12–22. Reasonable investors would not interpret these opinions about "discussions" and "conversations" with *prospective* subscribers in May 2023 to mean that NuScale had actually added new subscribers.

And even if that inference were the most plausible inference, it still is a far cry from misleading investors about the likelihood that the CFPP would meet its 80% subscription target by February 2024.[2] That is, after all, the relevant inquiry, as Plaintiffs themselves admit in summarizing the SAC in their Opposition: "Defendants misled investors about the *likelihood of reaching the 80% goal*" in the future." Opp. at 14 (emphasis added); *see also* SAC at 8, ¶¶ 39, 73, 76, 81. As discussed in detail in Defendants' Motion to Dismiss, NuScale said nothing of the sort and was always clear that it may not meet the subscription target. *E.g.*, MTD at 15, 21–22. Plaintiffs omit, for example, that earlier on the August 9 call, Hopkins explicitly warned:

---

[2] Of course, if analysts wanted to understand the actual numbers of new subscribers, if any, they could have asked that question.

6 - REPLY IN SUPPORT OF MOTION TO DISMISS
127354318.8 0034163-00092

> [Hopkins:] "[*I*]*t is possible that conditions arise that the project could terminate and UAMPS could recover a portion of its net development cost and expense associated with long lead materials from NuScale.*"

AVR Dec. Ex. 10 at 7 (emphasis added). Indeed, analysts' questions themselves reflected investors' clear understanding that the Company may not meet the 80% subscription goal. *See, e.g.*, *id.* at 9 (analyst asking how "much cash could be going out the door" if the CFPP "ends up not going forward").

Given the context of Hopkins' opinions, each case cited by Plaintiffs is inapposite. All of Plaintiffs' cases involve statements that—unlike Defendants' statements here—made specific factual assertions that directly conflicted with reality. For instance, in *In re Chicago Bridge & Iron Co. N.V. Securities Litigation*, No. 17 Civ. 1580 (LGS), 2018 WL 2382600 (S.D.N.Y. May 24, 2018), the defendants stated that a nuclear project was making "good progress," which—in context—communicated that it was meeting construction and regulatory approval "milestones" "without delay." *Id.* at *8. These factual assertions were contradicted by the fact that the project was subject to a three-month Stop Work order *halting all such progress*. *Id.* Similarly, in *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 285, 294 (S.D.N.Y. 2020), statements that a project was "progressing on track" and "well-managed" were made as part of specific representations about the cost and schedule of the project, which were directly contradicted by known billion-dollar cost overruns and scheduling delays. *Id.* at 290–92. Obviously, no such facts exist here.

Likewise, in *Glazer Capital Mgmt., L.P. v. Forescout Technologies., Inc.*, 63 F.4th 747 (9th Cir. 2023), the defendants' statements were not "opinions" at all but rather "concrete assurances" about objective facts regarding the company's sales contracts. *Id.* at 770–71. The defendants' objective factual assurances that the company's sales contracts were "unchanged" and "growing" were contradicted by facts that contracts were, in reality, changing and not

7 - REPLY IN SUPPORT OF MOTION TO DISMISS

growing. *Id.* at 767–71. Again, no similar facts exist here.[3] None. The Court should accordingly dismiss Plaintiffs' claims concerning Defendants statements about the CFPP "progress" and "conversations" with prospective subscribers.

### 2. Defendants' statements about the market were not false when made and, in any event, triggered no duty to disclose information about NuScale's prices.

Defendants' generic statements about how a "changing" energy market could be helpful in attracting CFPP subscribers were likewise not misleading. For this claim, Plaintiffs focus on just one statement by Colbert, the Company's former CFO, on March 15, 2023:

> The news is that as you saw with them coming forward with 26 or 27 members voting to move forward with the project earlier this year at the $89 per megawatt hour price, **that's very much indicative of a market that's changing and tightening in that area**. And depending upon those factors going forward, we think that will continue in the Western region, particularly as coal plants continue to retire at a faster pace than expected, as we see people looking to get benefit from the Inflation Reduction Act we're making investments now as opposed to later on.

AVR Dec. Ex. 5 at 9; *see* Opp. at 6, 11. There is nothing fraudulent about this statement. Colbert merely offered an opinion that, because 26 or 27 members in CFPP decided to stay in the project despite a significant price increase, that could be a sign that the market was changing in a way that could be helpful for CFPP.

Plaintiffs nonetheless claim that Colbert deliberately hid that "costs were too high" for customers and that "NuScale internally projected costs to be even higher," precluding any

---

[3] Plaintiffs' other cited cases are likewise distinguishable. *E.g.*, *In re Fibrogen, Inc.*, No. 21-cv-02623-EMC, 2022 WL 2793032, at *8–9 (N.D. Cal. July 15, 2022) (statements were not puffery because they made objectively false specific factual representations about efficacy of new drug); *In re BioMarin Pharm. Inc. Sec. Litig.*, No. 3:20-cv-06719-WHO, 2022 WL 164299, at *12 (N.D. Cal. Jan. 6, 2022) (statements were not opinions or puffery but rather "factual assertions" about, specifically, project timelines and inspections that were objectively false); *In re Avon Sec. Litig.*, No. 19 Civ. 01420 (CM), 2019 WL 6115349, at *16 (S.D.N.Y. Nov. 18, 2019) (statements touting a "strong [sales] team" were, in context, directly contradicted by facts that sales team was minimally trained and created a significant debt crisis for company).

success of the CFPP.  Opp. at 11, 16; *see* SAC ¶ 73.  As an initial matter, Plaintiffs offer not one *fact* showing that "costs were too high" for unspecified customers.  Nor do Plaintiffs allege any facts establishing who those customers were, and how many were there (one? a dozen?), such that this was material.  Plaintiffs' statement that "costs were too high" is nothing more than their opinion, and it is meaningless.

As for their position that Colbert's general opinion of a potentially favorable market was misleading because "NuScale internally projected costs to be even higher" than $89/MWh, Plaintiffs do not state *when* NuScale purportedly reached this conclusion.  To be actionable, statements must be false *when made*.  *See* MTD at 18.  Yet Plaintiffs allege that NuScale's internal price projections of $89/MWh arose, at the very earliest, at some unspecified time "in Spring 2023."  SAC ¶ 44.  But "Spring 2023" began on March 20, 2023, *after* Colbert's statements on March 15.  Colbert's statements were thus not false *when made*.

Plaintiffs argue that "exact dates" are not required under Federal Rule of Civil Procedure 9(b).  Opp. at 13.  But Plaintiffs' only support for this assertion are cases not decided under the PSLRA.  *See Yinou Pure Furniture Ltd. v. U.S. Pride Furniture Corp.*, No. CV 21-04367-MWF (MAAx), 2021 WL 6882211 (C.D. Cal. Nov. 17, 2021) (contract, fraudulent inducement, and conversion case); *KCG Americas LLC v. Brazilmed, LLC*, No. 15 Civ. 4600(AT), 2016 WL 900396 (S.D.N.Y. Feb. 26, 2016) (fraudulent inducement, contract, and fraudulent conveyance case); *Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007) (RICO case).  Plaintiffs, tellingly, identify not one *securities fraud case* holding that temporally ambiguous allegations, like here, meet the PSLRA's heightened standards.  The PSLRA requires far more particularity than Plaintiffs provide.  *See City of Roseville Employees' Ret. Sys. v. Textron, Inc.*, 810 F. Supp. 2d 434, 445 (D.R.I. 2011) ("[V]ague allegations of an 'increase' in cancellations sometime in 'late

9 - REPLY IN SUPPORT OF MOTION TO DISMISS
127354318.8 0034163-00092

summer' or 'fall' is simply not specific enough to plausibly demonstrate that statements made in July, September, and October, were false, as those statements could have predated the later onrush of cancelled orders described by the confidential witnesses."), *aff'd sub nom. Auto. Indus. Pension Tr. Fund v. Textron Inc.*, 682 F.3d 34 (1st Cir. 2012).

Even putting the timing issues aside, if NuScale *had* conclusively determined that prices were going to be greater than $89 per megawatt as of March 15, 2023, that certainly does not render Colbert's general statements about the market false. Plaintiffs make no effort to address the numerous cases holding that broad opinions about the market do not trigger a duty to disclose anything. *See* MTD at 16–18. Here, Colbert's statements were merely that Western utilities used to rely on coal, but are now turning to new (more expensive) renewable options, as "indicated" by most CFPP subscribers remaining subscribed at the $89/MWh price. AVR Dec. Ex. 5 at 9. Colbert also said NuScale would target those Western utilities. These statements are not inconsistent with—or even incomplete without—the "fact" that NuScale's $89/MWh price would hold or potentially increase.[4] Plaintiffs make no meaningful effort to address this problem. The Court should accordingly hold that Defendants' statements are not misleading.

**3.      Plaintiffs' Standard Power allegations are meritless on their face, and Plaintiffs cannot now rewrite their allegations in their Opposition.**

Meanwhile, Plaintiffs' allegations about Standard Power could not be more exemplary of a dubious, opportunistic securities claim. Plaintiffs' allegations merely repeat the Short Seller Post's "speculation" and "opinions" that the Standard Power deal is "fake" and has "zero

---

[4] Additionally, on the May 9 call, analysts asked about NuScale's work to reduce costs from the $89/MWh price. AVR Dec. Ex. 7 at 7–8. Hopkins stated, accurately, that NuScale was "talk[ing] about . . . any ways . . . to drive cost down" with suppliers, but—critically—forces like inflation and interest rates could be obstacles to NuScale's efforts. *Id.* Investors thus understood, contrary to Plaintiffs' allegations, that NuScale's $89/MWh price could increase.

10 - REPLY IN SUPPORT OF MOTION TO DISMISS

chance" of succeeding.  *Compare* SAC at 11, ¶ 90, *with* AVR Dec. Ex. 16 at 1, 11.  Iceberg itself does not hide that these "speculat[ive]" assertions are made with the goal of hurting NuScale's public image as much as possible so Iceberg can maximize profits from short positions on NuScale stock.  AVR Dec. Ex. 16 at 10, 17–18.  When copied and pasted into a securities lawsuit, Plaintiffs end up with a claim that is logically absurd: Because two of Standard Power's executives (including one former executive) have once been *personally* penalized for financial misconduct—and because Standard Power's *current* need for power is allegedly small— Standard Power *ipso facto* lacks the ability to fulfill a *future, five-year project* with NuScale.  *See* SAC ¶ 86.  Parroting a short seller's admitted opinion and speculation about a prospective project is not the stuff of securities fraud.  *See* Opp. at 25; *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) (plaintiff opinions cannot be omissions).[5]

Seemingly appreciating the deficiency of their allegations, Plaintiffs now recast their allegations in their Opposition brief, focusing on Scott's informal statement that NuScale was "excited" about the opportunity with Standard Power because it "need[s] the power like last year" and because of the "omission" of the executives' financial penalties.  Opp. 23–24.  As an initial matter, these are not alleged omissions in the SAC.  *See* SAC ¶ 86; *HRSA-ILA Funds*, 2024 WL 3848440, at *5 (PSLRA and Rule 9(b) requires plaintiffs to describe and specify each

---

[5] Plaintiffs try to refute these points by mischaracterizing Defendants as challenging the "reliability" of the facts in the Short Seller Post, like the defendant in *In re Mullen Auto. Sec. Litig.*, No. CV 22-3026-DMG (AGRx), 2023 WL 8125447, at *7–8 (C.D. Cal. Sept. 28, 2023).  Not so.  Defendants challenge Plaintiffs' reliance on Iceberg's expressly named (and admittedly biased) *opinions* and *conclusions* in the Short Seller Post, which cannot serve as omissions in a Rule 10b-5 claim as a matter of law.  *City of Dearborn Heights*, 856 F.3d at 619.  Defendants also highlight the extremely dubious reasoning used in the Short Seller Post, which is aimed not to pass muster in a court of law but is instead meant to merely disparage a company publicly so short sellers can quickly realize profits.

alleged misstatement with particularity and why it is unlawful).  Plaintiffs cannot save their claim by rewriting new allegations in their brief to replace deficient allegations in their pleading.

Regardless, there is nothing misleading about these statements.  Scott's remark that Defendants were "excited" because Standard Power "need[s] the power like last year," given its ventures into data centers and AI projects, is the very definition of inactionable "puffery."  *See, e.g.*, *Farhar v. Ontrak, Inc.*, 714 F. Supp. 3d 1198, 1209–10 (C.D. Cal. 2024) (similar "excited" statements were puffery); *Turocy v. El Pollo Loco Holdings, Inc.*, No. SA CV 15-1343-DOC (KESx), 2016 WL 4056209, at *9 (C.D. Cal. July 25, 2016) (same).  In context, investors knew that Scott's informal and exuberant statement about Standard Power "need[ing] power like last year" was talking about the potential of NuScale's *future* project with Standard Power.  *See* AVR Dec. Ex. 14 at 24.  Further, Plaintiffs cite no case for the remarkable proposition that a company is required to disclose if executives of a *contract partner* may have been the subject of some kind of civil penalty—a fact that Plaintiffs do not even allege Defendants were *aware of*.  Of course, the fact that some Standard Power *executives* may have been the subject of financial penalties does not render Defendants' statements about *Standard Power, the company*, misleading.

4.   **Plaintiffs do not refute that Defendants' forward-looking statements were made with cautionary statements and are protected under the Safe Harbor.**

The PSLRA Safe Harbor provides an independent basis to reject Plaintiffs' claims. NuScale identifies multiple forward-looking statements in the SAC.  *See* MTD at 20 n.9; *see, e.g.*, SAC ¶ 72 (asserting that the market "will continue [to change and tighten] in the Western region, particularly as coal plants continue to retire"), ¶ 78 ("express[ing] optimism" that NuScale and UAMPS will secure additional subscriptions), ¶ 80 (predicting that UAMPS "will continue to be our first customer" because "the funding will come through").  Plaintiffs do not refute that these statements are forward looking, nor do Plaintiffs meaningfully refute that

12 - REPLY IN SUPPORT OF MOTION TO DISMISS

Defendants' cautionary language, made with each of these forward-looking statements, is sufficient under the PSLRA.  *See* MTD at 20–22.[6]

Plaintiffs argue that Defendants' statements "are, at most, mixed statements that combine both forward-looking statements and non-forward looking statements," supposedly excluding them from protection under the Safe Harbor.  Opp. at 21.  But Plaintiffs make no attempt to explain what "non-forward looking" statements are "mixed" within Defendants' obvious forward-looking statements, let alone show how any non-forward looking statements amount to fraud.  This Court need not, and should not, parse Defendants' statements on Plaintiffs' behalf to distinguish between any present and forward-looking statements.  *Cf. Tyvoll v. City of Portland*, No. 3:20-cv-01878-JR, 2023 WL 5606980, at *3 (D. Or. Aug. 30, 2023) (court not required to "'comb the record'" to "'find some reason'" to deny dispositive motion (citation omitted)); *McHenry v. Renne*, 84 F.3d 1172, 1178 (9th Cir. 1996) (complaint insufficient where it fails to sufficiently set out "who is being sued . . . on what theory").  In any event, it is ultimately the *forward*-looking statements that Plaintiffs take issue with; their own summary of the SAC is that "Defendants misled investors about the *likelihood of reaching the 80% goal*" in the future.  Opp. at 14 (emphasis added); *see also* SAC at 8, ¶¶ 39, 73, 76, 81.[7]

---

[6] Plaintiffs' citation to *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995), is misplaced. *Fecht* was decided under the legal framework that preceded the PSLRA, so its reasoning about the sufficiency of cautionary statements is no longer good law.  In any event, the cautions in *Fecht* were far more subtle than Defendants' direct and explicit warnings here.

[7] Plaintiffs are wrong that, under *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 759 (S.D. Tex. 2012), mere repetition of a forward-looking statement strips it of immunity under the Safe Harbor.  *See Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011) (rejecting similar argument and analyzing forward-looking statement for whether it involved misrepresentation of present fact).  Regardless, Defendants' few statements here do not come close to matching the numerous repeated statements in *In re BP p.l.c. Securities Litigation*. 843 F. Supp. 2d at 759.

13 - REPLY IN SUPPORT OF MOTION TO DISMISS
127354318.8 0034163-00092

Plaintiffs alternatively argue that the Safe Harbor "does not apply where, as here, Plaintiffs allege that Defendants omitted present facts." Opp. at 20–21 (citing *Homyk v. ChemoCentryx, Inc.*, No. 21-cv-03343-JST, 2023 WL 3579440, at \*18 (N.D. Cal. Feb. 23, 2023)). This principle, however, is not established law in the Ninth Circuit. Indeed, numerous Courts have rejected it. *See, e.g.*, *Kipling v. Flex Ltd.*, No. 18-CV-02706-LHK, 2020 WL 2793463, at \*12 (N.D. Cal. May 29, 2020); *Melot v. JAKKS Pac., Inc.*, No. LA CV13-05487 JAK (SSx), 2016 WL 6902093, at \*24 (C.D. Cal. Nov. 18, 2016). Indeed, as one court explained, Plaintiffs' proposition is inconsistent with the plain text of the Safe Harbor provision, 15 U.S.C. § 78u-5(c)(1), which "specifically provides that, as to forward-looking statements, both an 'untrue statement of material fact' and an 'omission of a material fact necessary to make the statement not misleading' are subject to immunity under the PSLRA if accompanied by meaningful cautionary language." *Melot*, 2016 WL 6902093, at \*24 (citation omitted).

### 5.    Defendants' admitted judgment calls did not violate GAAP.

Plaintiffs' claim that Defendants violated GAAP is based entirely on Plaintiffs' assertion, made in hindsight, that Defendants made an erroneous judgment call on June 30, 2023 by predicting that the CFPP's failure was only "reasonably possible" rather than "probable." Once again, this is nitpicking at its worst. Even Plaintiffs agree that "following applicable accounting rules" like the ASC 450 "often requires judgment"—and Plaintiffs do not meaningfully try to refute that Defendants' statement that the CFPP's failure was "reasonably possible" as of June 30 was a judgment call and not objectively true or false. Opp. at 20. Nonetheless, Plaintiffs continue to insist, without explanation, that Defendants' statement violated ASC 450 and is actionable under Rule 10b-5. *Id.*

14 - REPLY IN SUPPORT OF MOTION TO DISMISS
127354318.8 0034163-00092

The PSLRA was designed to bar "opportunistic" and "hindsight" claims like this, where plaintiffs assert future knowledge as fact and merely attack past predictions of company leaders. *See Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002). This claim should be rejected.[8]

**6.    Plaintiffs fail to plead that Defendants made any false or misleading statement about the SEC's purported "investigation."**

Plaintiffs continue to try to sensationalize—like the short-seller Hunterbrook—NuScale's voluntary request from the SEC as a scandalous "active and ongoing" investigation, misleadingly implying misconduct. Unfortunately, the need for clarity continues.

In December 2023, the SEC sent NuScale a *voluntary request for information* about, specifically, "*employment, severance, and confidentiality agreements*." AVR Dec. Ex. 20 at 2. NuScale understood that the SEC sent similar requests to many companies as part of a broader inquiry regarding SEC whistleblower provisions. *Id.* NuScale was not legally required to respond, but it nonetheless assisted the SEC by responding, promptly and fully, in January 2024. *Id.* Thereafter, NuScale believed its participation in the matter was complete. NuScale heard nothing from the SEC suggesting otherwise. *Id.*

In March 2024, known short-seller Hunterbrook sent a Freedom of Information Act (FOIA) request to the SEC and learned about the voluntary request. AVR Dec. Ex. 19 at 1–2. In the face of a FOIA appeal by Hunterbrook, the SEC refused to produce certain documents to Hunterbrook, relying on an "active and ongoing investigation" exemption to FOIA's production requirements. *Id.* at 2–4. Hunterbrook, seeking to profit from a stock drop, then wrote a hit-

---

[8] Neither *In re Snap Inc. Securities Litigation*, No. 2:17-cv-03679-SVW-AGR, 2018 WL 2972528, at *6 (C.D. Cal. June 7, 2018), nor *In re Silver Wheaton Corp. Securities Litigation*, No. CV15-5146-CAS(JEMx), 2016 WL 3226004, at *9 (C.D. Cal. June 6, 2016), help Plaintiffs. In both cases, the defendants violated ASC 450 by making *no* disclosures whatsoever of existing liabilities; here, in contrast, Plaintiffs merely quibble over Defendants' judgment in predicting how likely a liability would be to materialize.

15 - REPLY IN SUPPORT OF MOTION TO DISMISS
127354318.8 0034163-00092

piece on July 29, 2024, accusing NuScale of being under "active and ongoing investigation" by the SEC. *See id.* at 1–4. Hunterbrook did not hide that its goal behind the article was to hurt NuScale's public image as much as possible to devalue NuScale's stock so that Hunterbrook could maximize profit from its short positions. *See id.* at 6 ("By accessing this site, users acknowledge that Hunterbrook Media . . . may hold positions in securities mentioned herein, potentially yielding significant gains from stock price fluctuations post-publication.").

Hunterbrook's blog post was so misleading that NuScale issued a press release on July 29, 2024, clarifying—accurately—that, as of then, the SEC had "not communicated to NuScale that it is the target of a current or prospective investigation, and the Company is unaware of any reason for such an investigation." *See* Press Release, NuScale, *NuScale Power Comments on Short Seller Report* (July 29, 2024).[9] NuScale then contacted the SEC about the Hunterbrook post. *See* AVR Dec. Ex. 20 at 2. On July 31, the SEC sent NuScale a follow-up request about the December 2023 inquiry. *Id.* Out of an abundance of caution and transparency, NuScale subsequently disclosed to the public, on August 2, 2024, that the SEC had sent a voluntary request for information in December 2023 (to which NuScale had fully responded in January 2024), and that the SEC later sent a follow-up inquiry on July 31, 2024 (to which NuScale was now responding). *Id.*

This is hardly the scandalous investigation-and-cover-up story that Plaintiffs imply, and the subject of the SEC's inquiry—employment and related agreements—of course has nothing to do with Plaintiffs' principal allegations. The SAC is conspicuously devoid of any allegations that plausibly establish that the SEC's request was targeted at, in particular, possible wrongdoing

---

[9] *See* https://www.nuscalepower.com/en/news/press-releases/2024/nuscale-power-comments-on-short-seller-report.

at NuScale. *Compare In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 721–22 (S.D.N.Y. 2015) (involving undisclosed *qui tam* complaint and multi-agency civil investigative demand into violations of Anti-Kickback Statute and False Claims Act). Plaintiffs simply try to catch NuScale in a "gotcha" securities law violation based on how FOIA broadly defines "investigation" in public document disclosure exemptions, in addition to NuScale's chosen wording in its SEC filings and press releases.

Plaintiffs ultimately cannot refute (and do not try to refute) that NuScale, in March 2023, never actually denied the existence of an SEC inquiry or investigation into *employment, confidentiality, and severance agreements*. Opp. at 22–23. NuScale had referenced only investigations arising from short seller accusations, which the SEC inquiry undisputedly was not. Plaintiffs also fail to support their assertion that NuScale's accurate statements on July 29 (that, as of then, the SEC had not told NuScale of any "current or prospective investigation") is tantamount to a denial of *any* SEC inquiry—including completed and abated inquiries from the previous year. Finally, Plaintiffs fail to explain how the SEC's voluntary request for information about "employment, severance, and confidentiality agreements"—for which there is no established connection to any alleged wrongdoing—was material. Plaintiffs make no effort to distinguish the multiple similar cases in which other courts have rejected Plaintiffs' very reasoning regarding materiality here. *See Mandalevy v. Bofi Holding, Inc.*, No. 17cv667-GPC-KSC, 2018 WL 6436723, at *7 (S.D. Cal. Dec. 7, 2018), *aff'd in part, rev'd in part on other grounds, Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198 (9th Cir. 2020); *see also In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 13–15 (S.D.N.Y. 2016). The Court should accordingly deny Plaintiffs' claims concerning the sensationalized "SEC investigation."

## B.    Scienter

Not only do Plaintiffs fail to allege a single false statement, they fail to meet the "exacting" scienter requirement—that Defendants *knew* they were making false statements. MTD at 24–25.

### 1.    Plaintiffs effectively concede the unreliability of their confidential witnesses.

Plaintiffs seek to establish scienter with confidential witness allegations, but they make virtually no attempt to defend the reliability and sufficiency of these allegations. *See id.* at 26–30 (detailing numerous reasons by Plaintiffs' confidential witnesses are unreliable and do not establish either falsity or scienter). Plaintiffs criticize Defendants for purportedly attacking the "credibility" of Plaintiffs' witnesses. But evaluating the reliability of confidential witnesses is precisely what this Court is required to do. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009); *City of Livonia Emps.' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013). Plaintiffs offer no reasoned argument defending their witnesses' reliability or distinguishing Defendants' numerous cases rejecting similar testimony.

Plaintiffs passingly cite *Washtenaw County Employees' Retirement System v. Celera Corp.*, No. 5:10-cv-02604 EJD, 2012 WL 3835078, at *3 (N.D. Cal. Sept. 4, 2012), which notes that confidential witnesses can sometimes provide "critical background information." But in relying on this case, Plaintiffs effectively admit that their confidential witnesses lack "personal knowledge of the Defendants' mental state" and "do not directly show that the Defendants knew their statements were false." *Id.*; Opp. at 33 (so quoting *Washtenaw*). Moreover, Plaintiffs do not explain how their confidential witnesses in this case have sufficient knowledge and reliability to provide even such "background information." The Court should accordingly disregard Plaintiffs' confidential witness allegations in evaluating Plaintiffs' claims.

18 - REPLY IN SUPPORT OF MOTION TO DISMISS
127354318.8 0034163-00092

**2.    Plaintiffs' sparse allegations cannot establish scienter, either directly or under a "core operations" theory.**

Plaintiffs do little to defend their scienter allegations concerning the CFPP statements, besides merely repeating their allegations that Hopkins was "watching [the CFPP] very closely" and "paid close attention to what happened with the CFPP," Opp. at 26; SAC ¶¶ 43, 80, and that the CFPP was Colbert's "baby," Opp. at 26; SAC ¶ 43. These allegations meet none of the PSLRA's heightened standards for establishing that either Hopkins or Colbert knew *any particular information* about the CFPP at the time of their respective statements that made the statements false when made. Indeed, as discussed above, Plaintiffs' allegations suggest that Defendants *could not* have known about many developments of the CFPP until *after* their statements.[10] Nor do repeated "analyst questions over a series of calls" contribute to scienter here. *See* Opp. at 26–27. The mere two or three questions quoted in the SAC about "how conversations are progressing" with potential subscribers are hardly the "specific" and "focused" questions that contributed to scienter in *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 269–70 (3d Cir. 2009), and *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 560–61 (D.N.J. 2024).

Plaintiffs try to defend their sparsely pleaded "core operations" theory by emphasizing that the CFPP project was a large customer for NuScale. But that is nowhere near sufficient to establish the "particularized" facts to establish under a "core operations" theory that individual Defendants knew specific pieces of information about the CFPP at specific times. Plaintiffs'

---

[10] Plaintiffs also cannot show that Colbert, to the extent he omitted on March 15 that some "members opted out of the CFPP deal" and NuScale had not yet added new subscribers, intended to mislead. The context of Colbert's statement reveals that both he and the analysts had already read the news about current CFPP subscriptions from other sources. AVR Dec. Ex. 5 at 8–9 (both Colbert and analyst refer to prior news about CFPP subscriptions).

19 - REPLY IN SUPPORT OF MOTION TO DISMISS
127354318.8 0034163-00092

reliance on *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 987–89 (9th Cir. 2008), and *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003), does not help them; both cases concerned whether defendants knew about fundamental problems that entirely halted leading company projects, not (as here) whether Defendants knew about specific pricing and market details about a project. Further, and more fundamentally, Plaintiffs identify no facts showing that Defendants conclusively determined that CFPP was doomed before NuScale actually cancelled the project—in November 2023.

> **3.    Nothing in the SAC establishes that Defendants had any reason to hold Plaintiffs' and Iceberg's pessimistic predictions about Standard Power as true.**

Plaintiffs' vague allegations that Hamady and Scott knew or worked closely with leaders at Standard Power and Entra1 do not establish that Plaintiffs knew that certain Standard Power executives had been penalized for financial misconduct.  But even if Defendants knew this, that still does not establish that Defendants knew that Standard Power lacked "the financial ability to support its agreement with NuScale" and "had no use for power capacity of" the project.  SAC ¶ 86.  The same is true for Plaintiffs' allegations about Entra1.  As noted, it is an absurd leap of logic to draw such conclusions from Plaintiffs' few allegations.

Indeed, Plaintiffs seem to acknowledge that their allegations are fundamentally lacking. Plaintiffs now argue that Defendants perhaps did not know about Standard Power's purported "financial inabilities," but nonetheless failed to do due diligence in vetting the project.  *See* Opp. at 28.  But as Plaintiffs acknowledge, *see id.*, willful ignorance is actionable only if an individual has "reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [he] could have done so without extraordinary effort." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (quoting

20 - REPLY IN SUPPORT OF MOTION TO DISMISS
127354318.8 0034163-00092

*Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir. 1984)). Plaintiffs' few allegations about Standard Power do not establish that Defendants had reasonable grounds to believe that Standard Power and Entra1 could not fulfill the project, or that such information about Standard Power's finances were available "without extraordinary effort." *Id.*[11]

Plaintiffs' remaining scienter arguments about Standard Power are likewise misplaced. Plaintiffs argue that Defendants "cannot escape the highly suspicious timing of the Standard Power announcement on October 6," approximately a week after NuScale's conclusion on September 30 that the CFPP would probably not succeed, and over a month before the CFPP's termination. Opp. at 28–29. But nothing about the timing of the announcement suggests fraud. It is entirely normal, and certainly not fraudulent, for companies to mix all relevant information—good and bad—when disclosing information to the public.

The Court should also reject Plaintiffs' attempt to rewrite their allegations to center around Defendants' statements referring to Standard Power as a "customer" with a "signed agreement." *Id.* at 29. These are not the misstatements alleged in the SAC. *See* SAC ¶ 86. In any event, the statements do not establish that Standard Power was in fact *not* a "customer" or that there was *no* signed agreement of any kind. Plaintiffs establish merely that NuScale has no current "MOU" with Standard Power, that the parties' agreement is still being drafted and finalized, and that certain confidential witnesses have not personally seen the contract. *See* SAC

---

[11] Plaintiffs' reliance on *Howard v. Everex Systems, Inc.*, if anything, highlights the deficiencies in Plaintiffs' allegations. The *Howard* defendant knew of numerous specific "alarm signals" about a company's finances and internal controls, like specific "irregularities" in the company's financial statements and projections, the lack of a system handling obsolete inventory, a "lack of vertical accountability amongst staff," "no internal audits," and the company's own admission that it was "facing a crisis." 228 F.3d at 1064. Plaintiffs allege nothing like that here.

¶¶ 53–54. Plaintiffs fail to plausibly establish that any of Defendants' statements were false, let alone that they evidence an intent to deceive.

> **4.** **Plaintiffs' scienter allegations concerning the SEC "investigation" are conclusory and devoid of particularity.**

Plaintiffs make almost no effort to respond to Defendants' scienter arguments concerning the alleged "SEC investigation." Plaintiffs identify not even one allegation plausibly establishing that *any* Defendant knew about the SEC's December 2023 voluntary inquiry into "employment, severance, and confidentiality agreements." *See* Opp. at 29–30. The SAC says nothing about who at NuScale would have received the inquiry, who managed its response, or why anyone else might have known of it. Plaintiffs merely insist, without explanation or support, that "Defendants knew" about it and "misled investors" and "deliberately lied" about it.

Plaintiffs' speculation—based on a vague and hyperbolic short seller blog post—is not enough to show that the SEC inquiry was so important at NuScale that any Defendant would have known about it, let alone at any particular time. As noted, nothing in either the SAC or the Hunterbrook post suggests that the SEC request raised even a specter of wrongdoing by NuScale, such that the inquiry would be of sufficient importance for Defendants to have known about it— let alone have culpable intent in withholding information about it. As such, Plaintiffs' citations to *Menaldi v. Och-Ziff Capital Management Group LLC*, 164 F. Supp. 3d 568, 585 (S.D.N.Y. 2016), and *In re BioScrip, Inc. Securities Litigation*, 95 F. Supp. 3d 711, 733 (S.D.N.Y. 2015), are misplaced, as those cases involved official investigations (involving subpoenas and civil investigative demands) into clearly unlawful conduct. The Court should reject Plaintiffs' scienter allegations about the SEC inquiry.

### 5. Plaintiffs cannot establish scienter for alleged GAAP violations because Defendants reasonably believed in the CFPP's chances on June 30, 2023.

As Defendants have established, Plaintiffs fail to establish that Defendants actually believed, as of June 30, 2023, that the CFPP's failure was "probable" rather than "reasonably possible." MTD at 32. Rather than address this dispositive issue, Plaintiffs argue merely that "the adjustments" recorded in NuScale's risk disclosures "were material in light of the company's overall financial position," quoting *In re Daou Systems, Inc.*, 411 F.3d 1006, 1018 (9th Cir. 2005). Opp. at 30. But Plaintiffs misrepresent *Daou* in suggesting that it holds that financial materiality is *sufficient* to establish scienter for accounting violations. *Daou* holds no such thing. *See In re Daou Sys., Inc.*, 411 F.3d at 1017–18 (materiality is, at most, necessary but not necessarily sufficient). Moreover, *Daou* involved allegedly fraudulent inflation of revenue, not merely a plaintiff's disagreement about what is undisputedly a judgment call, like here. *Id.* at 1017–20. Because the most compelling inference here (by far) is that Defendants made a good faith judgment call about the CFPP's prospects, Plaintiffs' GAAP allegations must be rejected.

### 6. Neither a single Defendant's stock sales nor routine corporate incentives, disconnected from the alleged fraud, establish motive and opportunity.

Plaintiffs' "motive and opportunity" arguments are limited almost exclusively to Colbert's sales of NuScale stock, the *only* Defendant alleged to have sold stock during the class period. Opp. at 30–31. But Plaintiffs do not address the dispositive fact that Colbert sold his stock *months after* his alleged misstatements on March 15, 2023. *See* SAC ¶ 72 (Colbert's only alleged misstatements occurred in March), ¶ 110 (Colbert sold just 5.6% of shares in May, 62.8% in June, and the final 31.6% in October). Colbert's stock sales months after his alleged misstatements do not establish his state of mind months earlier—especially about a fluid ongoing project like the CFPP. Meanwhile, Plaintiffs do not dispute that corroborative stock sales are

23 - REPLY IN SUPPORT OF MOTION TO DISMISS

typically required to establish scienter.  *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008).  Colbert's sales certainly do not establish the state of mind of any other Defendant.

Plaintiffs' only other argument is that Hopkins and Hamady received bonuses for recruiting new customers and contracts for NuScale.  But Plaintiffs make no effort to address the Ninth Circuit's pronouncement that "routine corporate objectives" are generally insufficient to show scienter.  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012); *see* Opp. at 30–31.  That Hopkins and Hamady received bonuses for business-development—which is extremely common in corporate business—does not show that they recruited customers *through fraudulent means*, let alone *made false or misleading statements* about new customers.  As such, this case is nothing like those cited by Plaintiffs, wherein defendants' financial incentives were "specifically and directly tie[d]" to "the very instrument used to commit fraud."  *See Longo v. OSI Sys., Inc.*, No. CV 17-8841 FMO (SKx), 2021 WL 1232678, at *8 n.8 (C.D. Cal. Mar. 31, 2021) (internal quotation marks and citation omitted) (executive increased salary by 14% through committing fraud in managing business project); *see also Richard v. Nw. Pipe Co.*, No. C9-5724RBL, 2011 WL 3813073, at *4–5 (W.D. Wash. Aug. 26, 2011) (executives increased compensation by fraudulently overstating company income).

**7.      A holistic review establishes that Defendants genuinely and reasonably believed in NuScale's projects.**

Notwithstanding Plaintiffs' perplexing assertion that Defendants "make[] no attempt" to identify a non-fraudulent inference from Defendants' conduct, Opp. at 32, Defendants have detailed their clear, reasonable belief in the CFPP (through August 2023) and their good faith belief in the Standard Power project, *see* MTD at 32–33.  Plaintiffs cannot establish scienter under the PSLRA by simply assuming, in conclusory fashion, the worst intent in Defendants.

24 - REPLY IN SUPPORT OF MOTION TO DISMISS
127354318.8 0034163-00092

Plaintiffs must instead present particularized and plausible facts to back up their allegations. Because Plaintiffs offer no real analysis explaining how their individual scienter allegations—each meritless on its own—presents a compelling theory of scienter altogether, the Court should reject Plaintiffs' claims.[12]

## C.    Loss Causation

### 1.    Plaintiffs waive their argument that there was a corrective disclosure regarding an SEC "investigation," dooming Plaintiffs' claim.

Plaintiffs make no attempt to defend the alleged corrective disclosures regarding the "SEC investigation" allegations.  Plaintiffs now concede that they "plead [only] *three* corrective disclosures: (i) the Iceberg Report . . . ; (ii) the Company's announcement of the termination of the UAMPS deal on November 8, 2023 . . . ; and (iii) the Huffington Post article . . . ."  Opp. at 34 (emphasis added).  Plaintiffs decline to respond to NuScale's express argument that "the Hunterbrook Post, NuScale's 2023 Form 10-K, and NuScale's August 2, 2024 8-K" are not corrective disclosures because they do not in fact "correct" any prior "misstatement."  *See* MTD at 35 (incorporating by reference MTD arguments from MTD Section IV.A.5).  As such, Plaintiffs concede Defendants' argument.  *See Povey v. Castle & Cooke Mortgage*, No. 3:23-cv-01388-IM, 2024 WL 4693896, at *4 (D. Or. Nov. 6, 2024) (plaintiff waived claim by not

---

[12] None of the cases on which Plaintiffs rely in their "holistic" analysis involve facts remotely resembling those here. *See, e.g.*, *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) (involving flatly false public statements, multiple clear GAAP violations, and multiple corroborative multi-million-dollar stock sales by several defendants at highly suspicious times); *Gammel v. Hewlett-Packard Co.*, No. SACV 11-1404 AG (RNBx), 2013 WL 1947525, at *21 (C.D. Cal. May 8, 2013) (involving close temporal proximity between defendants' statements and project's failure, massive asset write-downs, the firing of the company's president and CEO at a highly suspicious time, and testimony by 16 confidential witnesses made with undisputedly sufficient particularity); *In re DVI, Inc. Sec. Litig.*, No. 2:03-cv-05336, 2010 WL 3522086, at *7–10 (E.D. Pa. Sept. 3, 2010) (defendant reckless in not knowing warning signs about company's loss reserves and liquidity where defendant had significant access to company's financial statements and records, which are not alleged here).

responding to argument in motion to dismiss); *Sarkisian v. Newmar Indus., Inc.*, No. 3:21-cv-1123-IM, 2023 WL 5206953, at *3 (D. Or. Aug. 14, 2023) (holding same at summary judgment); *Yentz v. Nat'l Credit Adjusters, LLC*, No. 3:20-cv-01364-AC, 2021 WL 1277961, at *4–5 (D. Or. Feb. 15, 2021) (same) (collecting cases), *report and recommendation adopted*, 2021 WL 1270457 (D. Or. Apr. 6, 2021).

Where Plaintiffs rely on a "corrective disclosure" theory of loss causation, as here, a failure to identify a viable corrective disclosure dooms the claim.  *See Espy v. J2 Glob., Inc.*, 99 F.4th 527, 540 (9th Cir. 2024).  The Court should accordingly dismiss the SEC investigation claims.

      **2.**      **The Short Seller Post is not a corrective disclosure because it disclosed only "opinions" and otherwise simply reposted news already known to the public.**

Meanwhile, the Short Seller Post cannot be a corrective disclosure because the post itself admits it discloses only "opinions" and, otherwise, facts already known to the public.  Plaintiffs nonetheless argue that the Short Seller Post suffices under *In re Genius Brands International, Inc. Securities Litigation*, 97 F.4th 1171, 1186 (9th Cir. 2024), because it combines information taken from "all corners of the internet."  Opp. at 34.  But *Genius Brands* itself illustrates how poorly that argument fits in this case.  In *Genius Brands*, the short seller post sufficed as a corrective disclosure because it located, synthesized, and analyzed over 25 pages of raw information regarding children's television show listings (no fewer than 377 listings) that had "'little to no probative value in its native state.'"  97 F.4th at 1186 (citation omitted); *id.* ("[S]ecurities issuers should not escape liability for misrepresentations merely because they can show that corrective information was publicly available *on some webpage tucked in a deep corner of the internet or buried in some unwieldy spreadsheet*." (emphasis added)).  Here, in contrast, the key "corrective" facts disclosed by the Short Seller Post (i.e., the CFPP's unmoved

26 - REPLY IN SUPPORT OF MOTION TO DISMISS

subscription levels) openly come from *news outlets* that already reported the key information about the CFPP.  *See* AVR Dec. Ex. 16 at 13 (quoting admitted "news outlet" POWER Magazine, *see* Sonal Patel, *Two Big Nuclear Regulatory Milestones for Idaho NuScale SMR Project*, Power (Aug. 3, 2023), https://www.powermag.com/two-big-nuclear-regulatory-milestones-for-idaho-nuscale-smr-project/, for statement that CFPP subscriptions had not moved as of August 2023).  The Short Seller Post cannot be a "corrective disclosure" where it simply reposts last month's news.  If that can be a corrective disclosure, anything can be.

> 3. **The November 8, 2023 Press Release is not a corrective disclosure because it did not "correct" any prior statements.**

The November 8, 2023 Press Release is not a corrective disclosure because it did not "correct" any prior statements about NuScale's subscription levels, price projections, the energy market, or anything else.  Although the Press Release broke the news about the CFPP's termination, that news does not automatically render Defendants' earlier opinions about the CFPP misleading.  Defendants never guaranteed the CFPP would succeed.  Meanwhile, information about CFPP subscriptions and the energy market was already public knowledge thanks to the Short Seller Post and prior news quoted therein.  *See* AVR Dec. Ex. 16.[13]

> 4. **The Huffington Post Article is not a corrective disclosure because it does not correct or contradict any prior statements.**

The Huffington Post Article from January 5, 2024 is not a "corrective" disclosure because it corrects nothing at all.  Plaintiffs try to save it (and thus enlarge the class period) by arguing that it "corrects" NuScale's October 24, 2023 Press Release, which "denied that the Company was facing a cash crunch" and claimed that NuScale had "a solid debt-free balance

---

[13] Plaintiffs' citation to *In re NIO, Inc. Securities Litigation*, No. 19-CV-1424 (NGG) (JRC), 2023 WL 5048615, at *14 (E.D.N.Y. Aug. 8, 2023) is unhelpful because that case concerns class certification, not a motion to dismiss under the PSLRA's and Rule 9(b)'s heightened standards.

27 - REPLY IN SUPPORT OF MOTION TO DISMISS
127354318.8 0034163-00092

sheet and a talented and dedicated team."  Opp. at 35; *see* SAC ¶ 94 (referencing such statements).  But Plaintiffs do not identify these October 24 statements as the basis for their claims.  *See* SAC ¶¶ 71–86 (referring to other statements, but not NuScale's October 24, 2023 statements, as the "Materially False and Misleading Statements Issued During the Class Period").

Regardless, the Huffington Post Article—which briefly mentions layoffs and "shrinking cash reserves" in January 2024—does not reveal that NuScale was facing a "cash crunch" or lacked a "solid debt-free balance sheet and talented and dedicated team" in October 2023.  *See In re Bofi Holding Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) (corrective disclosure must "render some aspect of the defendant's prior statements false or misleading").  Experiencing a "cash crunch" is not mutually exclusive with having a debt-free balance sheet or talented and dedicated employees.  *See In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th at 1184 (tweet on X not a corrective disclosure when its content was not "mutually exclusive" with alleged misstatement).  Further, NuScale's financial position in October 2023, before the CFPP terminated, was quite different than in January 2024, after the CFPP terminated and NuScale incurred significant reimbursement obligations—a possible outcome of which the market had always been aware.  These allegations are simply not the stuff of securities fraud.

### III.  CONCLUSION

For the foregoing reasons, this case should be dismissed with prejudice.

DATED: January 24, 2025          STOEL RIVES LLP

*/s/ B. John Casey*
B. JOHN CASEY, OSB No. 120025
john.casey@stoel.com
ALEX VAN RYSSELBERGHE, OSB No. 174836
alex.vanrysselberghe@stoel.com
KATHARINE S. SHEPHERD, OSB No. 224891
kate.shepherd@stoel.com

*Attorneys for Defendants*

28 - REPLY IN SUPPORT OF MOTION TO DISMISS